UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-141-WO-LPA

MR. DEE'S, INC., OLEAN
WHOLESALE GROCERY COOPERATIVE,
INC., RETAIL MARKETING
SERVICES, INC., on behalf of
themselves and all others
similarly situated,

    Plaintiffs,
    v.

INMAR, INC., CAROLINA
MANUFACTURER'S SERVICES, INC.,
CAROLINA COUPON CLEARING, INC.
and CAROLINA SERVICES,

    Defendants.

SECOND AMENDED COMPLAINT –
CLASS ACTION

JURY TRIAL DEMANDED

**SECOND AMENDED CLASS ACTION COMPLAINT**

1.    This case arises in the coupon processing industry, an industry that experienced extraordinary growth in coupon processing fees charged by Defendants during a time in which coupon processing volume has declined and excess capacity for processing services has increased.  Defendants Inmar, Inc., Carolina Manufacturer's Services, Inc., Carolina Coupon Clearing, Inc., and Carolina Services (collectively "Inmar") and co-conspirator International Outsourcing Services, LLC ("IOS") are coupon processors that have profited handsomely from the increases in processing fees.  These Defendants, including their affiliates and

subsidiaries, unlawfully raised coupon processing fees through a scheme in which they conspired to allocate customers and markets and to fix prices. This Complaint is brought on behalf of a class of overcharged purchasers of coupon services for violations of the Sherman Act.

## The Parties

2.    Plaintiff Mr. Dee's, Inc. ("Mr. Dee's") is a consumer goods manufacturer of food products with its principal place of business in Libertyville, Illinois. Mr. Dee's issues coupons to consumers and purchases coupon processing services. Mr. Dee's purchased coupon processing services directly from IOS from 1997 through 2001. From 2001 through roughly 2005, Mr. Dee's purchased coupon processing services directly from Carolina Manufacturer's Services, Inc., a subsidiary of Inmar. Mr. Dee's has been injured, in the form of overcharges in connection with its purchase of coupon processing services, by the Defendants' unlawful practices alleged in this Complaint.

3.    Plaintiff Olean Wholesale Grocery Co-Op, Inc. ("Olean") is a grocery cooperative with its principal place of business in Olean, New York. For a fee, Olean offers a coupon program to its retail members. Over 100 retailers participate in Olean's coupon program. Under its program, Olean purchases coupon processing services from coupon processors. As part of their services,

processors seek reimbursement from consumer goods manufacturers for coupons redeemed by consumers at Olean's retailers. The processors then send manufacturer reimbursement payments directly to Olean, and Olean – after collecting a small fee – sends payments to its retailers. Olean has purchased coupon processing services directly from IOS since the late 1990s and until mid-2008. Olean has been injured, in the form of overcharges in connection with its purchase of coupon processing services, by the Defendants' unlawful practices alleged in this Amended Complaint.

4. Plaintiff Retail Marketing Services, Inc. ("RMS") is a California organization with its principal place of business in Sacramento, California. Until May 1, 2007, RMS purchased coupon processing services for over 1,000 retailers in California. In the late 1990s, RMS purchased coupon processing services directly from National Coupon Redemption Services, which was acquired by IOS. RMS then purchased coupon processing services directly from IOS until May 1, 2007. RMS has been injured, in the form of overcharges in connection with its purchase of coupon processing services, by the Defendants' unlawful practices alleged in this Complaint.

5. Co-conspirator International Outsourcing Services, LLC was an Indiana limited liability company with principal offices in El Paso, Texas and Bloomington, Indiana. IOS, formerly known as International Data, LLC, acted as a processor/agent for retailers

in the coupon redemption process. IOS declared bankruptcy and sold its coupon processing assets to a third party. Throughout this Complaint, the term "IOS" refers collectively to International Outsourcing Services, LLC and International Data, LLC.

6. Co-conspirator SUPERVALU Inc. ("Supervalu") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. As further alleged below, Supervalu took an active role in IOS's operations by virtue of its 50 percent ownership interest in IOS's voting securities, membership on IOS's Board of Directors, and profit-sharing agreement with IOS.

7. Defendant Inmar, Inc. is a North Carolina corporation with its principal offices in Winston-Salem, North Carolina. Inmar's subsidiary, Carolina Manufacturer's Services, Inc. ("CMS") sells coupon processing services to manufacturers. Inmar's subsidiaries Carolina Coupon Clearing, Inc. ("CCC") and Carolina Services ("CS") sell retail processing services to retailers, retail co-operatives/wholesalers, and state associations. Throughout this Complaint, the term "Inmar" refers collectively to Inmar, Inc., Carolina Manufacturer's Services, Inc., Carolina Coupon Clearing, Inc., and Carolina Services.

### Jurisdiction, Venue, and Interstate Commerce

8. The Court has subject matter jurisdiction pursuant to 28

4

U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation), because the claims in this action arise under section 1 of the Sherman Act (15 U.S.C. § 1) and sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a)).

9.    Venue in this District is proper pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965(a); and 15 U.S.C. §§ 15, 22, and 26, in that Defendants inhabit, transact business, reside, are found, or have an agent in this district, and a significant portion of the affected interstate trade and commerce described below has been carried out in this District.  For example, all Defendants reside in this District and agreements at issue in this matter were negotiated, executed, and implemented in this District.

10.    Defendants' anticompetitive and fraudulent activities were within the flow of and had a proximate, direct, substantial, and reasonably foreseeable effect on interstate commerce.

## Industry Background

*A.  Typical Coupon Redemption Process*

11.  Consumer goods manufacturers ("manufacturers") issue coupons to consumers through a variety of distribution mechanisms, such as free standing inserts in newspapers, weekly circulars at retailers, the internet, the mail, at retail checkouts, on product packages, and at retail shelves.  Coupons typically have a set value for consumers, such as $1.00 off the purchase price of a

product.

12.  Typically, manufacturers issue coupons to consumers, and consumers redeem the coupons at retailers in connection with the purchase of a product.  Retailers give consumers discounts off the purchase price of a product equal to the value of the coupons redeemed and then seek reimbursement from manufacturers for the discounts given to consumers, plus a handling fee for each coupon processed.  To seek reimbursement from manufacturers, many retailers rely on the services of retail coupon processors, also known in the industry as clearinghouses or agents (collectively referred to hereafter as "Retail Processors").  Retail Processors sell their processing services to retailers as well as retail co-operatives/wholesalers and state associations, which purchase coupon services for their members.  Retailers, retail co-operatives/wholesalers and state associations that purchase coupon processing services from Retail Processors are hereafter referred to as "Retail Clients."

13.  Retailers collect coupons redeemed at their stores and send them to Retail Processors.  Retail Processors then sort and count the coupons, and send the coupons and invoices for the coupon values to manufacturers or to manufacturer coupon processors (referred to hereafter as "Manufacturer Processors").  Manufacturer Processors are often retained by manufacturers in the

coupon redemption process to audit the coupons sent by Retail Processors. An audit is intended to ensure that the Retail Processor has submitted an accurate count of coupons, that the coupons were properly redeemed, and that coupons were not otherwise fraudulently submitted. After performing their audit, Manufacturer Processors inform manufacturers of the value of the coupons that should be remitted to Retail Processors. Manufacturers then pay the Retail Processor the coupon value (plus a handling fee) and the Retail Processor sends the payments to their Retail Clients.

*B. Pricing of Retail Processing Services*

14. Retail Processors typically charge Retail Clients a transaction fee for each coupon processed. In addition to a transaction fee, Retail Processors may also charge incremental fees to manufacturers, such as fees for shipping coupons and other miscellaneous fees. These incremental fees are charged to manufacturers and are assessed on each invoice sent to a manufacturer.

15. As discussed in greater detail below, IOS's and Inmar's incremental fees for retail processing services have increased dramatically over time. The growth in these incremental fees have left manufacturers with one of two options: either (a) pay the fees and absorb substantial cost increases (as small manufacturers

typically do) or (b) refuse to pay the fees and "chargeback" the value of the fees to the Retail Processor. A manufacturer that refuses to pay an incremental fee will send a Retail Processor a "chargeback" for the value of the incremental fee that the manufacturer refuses to pay. A Retail Processor will then typically extract the incremental fee from a Retail Client by subtracting the value of the manufacturer's incremental fee chargeback from the amount the Retail Client receives for coupons submitted by the Retail Client to the Retail Processor.

16. IOS's contracts with Retail Clients, for instance, provide that IOS will deduct "any and all Manufacturer chargebacks" or "payment denials" from payments made from IOS to the Retail Client. Moreover, in addition to collecting retail processing fees via the chargeback process, IOS and Inmar typically assess an additional "chargeback fee" on Retail Clients.

17. Retail Clients have two mechanisms to avoid paying these fees. First, large retailers or wholesalers that purchase directly from a manufacturer may simply deduct the value of the incremental fee chargeback from the amount the retailer owes the manufacturer or wholesaler in connection with the purchase of product. (These are referred to as "deducting retailers.") Small retailers and state associations do not purchase product directly from manufacturers and thus do not have the ability to deduct

8

incremental fees from manufacturers. Many wholesalers also do not deduct incremental fees from manufacturers. (These are referred to as "non-deducting retailers.")

18. Second, Retail Clients – particularly non-deducting retailers – rely on a competitive retail processing market to limit Retail Processor incremental fees. Increases in a Retail Processor's fees leads to higher chargebacks to Retail Clients, which decreases the amount Retail Clients receive for coupons submitted to Retail Processors. Absent collusion, if a Retail Processor's chargeback rate increases, Retail Clients may contract with a competing processor with lower fees and a lower chargeback rate.

C. *IOS's Processing Programs for Non-Deducting Retailers*

19. IOS has certain processing programs designed for non-deducting retailers, such as IOS's Rapid Pay program. Under Rapid Pay and other, similar programs (collectively "Rapid Pay"), IOS pays Retail Clients an amount upfront for the value of the coupons that the Retail Clients send to IOS. The amount that IOS pays Retail Clients participating in Rapid Pay is based in large part on the incremental fees IOS charges and the chargeback rates associated with these fees. Upon information and belief, Rapid Pay programs have had higher chargeback rates than other IOS programs, at least in part, because the retail processing fees

charged by IOS for these programs are higher than the fees it charges for other programs. After paying Retail Clients participating in Rapid Pay, IOS sends invoices for the coupon value and the coupons themselves to Manufacturer Processors, which then send payments to IOS.

## The Markets for Coupon Processing Services

20. Coupon processors compete in two separate and distinct markets, both of which have high barriers to entry, including but not limited to high start-up costs, economies of scale, and exclusive contracts.

*A. The Market for Manufacturer Processing Services*

21. Manufacturer Processors compete in the United States market for manufacturer coupon processing services, including submarkets thereof. Manufacturer Processors contract with manufacturers and compete principally on the basis of: (a) the price to a manufacturer for performing processing services; and (b) the ability to lower a manufacturer's coupon-related costs, for example, by seeking to avoid paying Retail Processor incremental fees.

22. The market for manufacturer processing services is highly concentrated and has few competitors. There are significant barriers to entry, including long-term exclusive contracts, large start-up costs, and economies of scale. Inmar and another

10

processor named NCH Marketing Services Inc. ("NCH") each have roughly 50 percent share of this market. NCH focuses its business on serving the processing needs of large manufacturers, while Inmar serves small and large manufacturers.

23. IOS used to compete in this market, with a focus on serving the processing needs of small manufacturers. IOS exited the market in or around 2001 in connection with a collusive agreement it entered into with Inmar (discussed below) and transitioned its over 400 manufacturer accounts to Inmar. Since that time, Inmar has dominated the coupon processing business of small manufacturers. Inmar possesses market power in the United States submarket for small manufacturer processing services.

*B. The Market for Retail Processing Services*

24. Retail Processors compete in the United States market for retail coupon processing services, including submarkets thereof. Retail Processors agree to perform processing services for Retail Clients and compete principally on the basis of the amount and number of fees charged for retail coupon processing services.

25. IOS has historically dominated the market for retail coupon processing services. Through at least 2004, IOS had contracts for retail coupon processing services with at least 75 percent of the Retail Clients in the United States. Upon

information and belief, IOS's share of this market has declined marginally following the public disclosure of a government fraud investigation of IOS that resulted in IOS's indictment on March 6, 2007. Upon information and belief, through at least May 2008, IOS had contracts with at least 60 percent of the Retail Clients in the United States. Further, from at least 2001 until IOS sold its assets, IOS has had exclusive coupon processing contracts with all – or nearly all – non-deducting retailers.

26. The market for retail coupon processing services is highly concentrated and has few competitors. There are significant barriers to entry, including long-term exclusive contracts, large start-up costs, and economies of scale. NCH and Inmar are competitors with IOS in this market. NCH has traditionally performed retail coupon processing services for large, deducting retailers (such as mass merchandisers) and has traditionally not competed for the business of small, non-deducting retailers. Inmar used to provide retail coupon processing services to non-deducting retailers, but – in connection with a conspiracy entered into with IOS (discussed below) – Inmar substantially limited or eliminated its competitive offering to non-deducting retailers.

27. IOS possessed market power in the United States market for retail coupon processing services. IOS and Inmar collectively possessed market power in the United States market for retail

processing services.  IOS possessed market power in the United States submarket for coupon processing services for non-deducting retailers.

*C. Excess Capacity Within the Coupon Processing Industry*

28.  The number of coupons redeemed in the United States has steadily been declining since at least the late 1990s, creating excess capacity in the markets for coupon processing services, including excess coupon processing plant capacity. Notwithstanding this excess capacity, IOS and Inmar increased the amount and type of fees they charged for retail processing services.  This increase in the amount and type of fees was a direct result of the anticompetitive scheme involving the Defendants, discussed below.

**The Origins of the Defendants' Anticompetitive Scheme**

*A. The Creation of IOS*

29.  IOS was formed when two retail coupon processors merged in or around January of 1997: (a) Indiana Data, which Bruce Furr founded in 1961 and (b) North American Data, Inc., which Supervalu and Chris Balsiger founded in 1991.  Shortly after its formation, IOS implemented two key strategic initiatives.

30. First, IOS expanded into the manufacturer coupon processing services market by acquiring several Manufacturer Processors, including Consumer Response Corporation ("CRC"), a

Manufacturer Processor with over 400 small manufacturer clients. Through these acquisitions, IOS started competing aggressively in the manufacturer coupon processing services market by, among other things, taking accounts and market share from Inmar's manufacturer coupon processing subsidiary, CMS.

31.  Second, IOS implemented a "chargeback spread" scheme for which it was indicted in 2007.  This scheme functioned as follows: IOS would pay Retail Clients participating in IOS's Rapid Pay programs for the value of their coupons an amount that reflected high fees and chargeback rates associated with the programs.  IOS would then submit to Manufacturer Processors the coupons received from these Retail Clients with the volume of coupons submitted by larger retailers participating in other IOS programs with lower fees and chargeback rates.  Manufacturers would pay IOS directly for Rapid Pay coupons that were submitted with the larger retailers' coupon volume, and IOS would keep for itself the chargeback rate difference between the Rapid Pay coupons and the larger retailers' coupons.  IOS's chargeback spread scheme created incentives for IOS to increase chargeback rates for retailers participating in IOS's Rapid Pay programs, which IOS accomplished (upon information and belief) by increasing incremental fees for Retail Clients participating in these programs.

*B. The Year 2000:  IOS's Business At A Crossroads*

32.  By 2000, IOS's coupon processing business had reached a critical juncture.  As a Manufacturer Processor, IOS had successfully grown its business with small manufacturers and was actively seeking to land a large manufacturer client, such as Nestle USA or Kellogg Company, to expand into the large manufacturer segment of the market.  IOS's growth came at the expense of CMS, which experienced market share declines.

33.  But as a Retail Processor, IOS's dominance was at risk. IOS's chargeback spread scheme – while profitable to IOS – was proving costly to Retail Clients participating in IOS's Rapid Pay programs.  Rapid Pay Retail Clients were realizing less and less for coupons they submitted to IOS and were actively seeking competitive alternatives to IOS.

34.  IOS had worked diligently to eliminate competitive alternatives to these Retail Clients by acquiring processors that offered coupon processing services to non-deducting retailers.  By 2000, IOS's "only major competitor" for non-deducting retailers interested in Rapid Pay programs was Inmar's Retail Processor subsidiary, which a former IOS executive named Lance Furr identified to IOS's auditor as CMS:

> ID's [International Data's] only major
> competitor is CMS which has two programs:
> Couponics and Millenium and per Lance
> [Furr], is the only other player in this
> [Rapid Pay] market.

15

International Data Audit Work Papers, p. 3.

35. As the only major competitor of IOS for non-deducting retailers, Inmar's Retail Processor subsidiary – CCC (not CMS, as referenced by Mr. Lance Furr) – was benefiting from IOS's fees and chargebacks. Indeed, CCC captured some non-deducting retail accounts that left IOS, including at least one state association with coupon processing volume in excess of two million coupons per year.

36. Other non-deducting Retail Clients that remained with IOS had substantial concerns in mid-2000 about IOS's chargeback rate increases. In response to these concerns, IOS took steps to limit the defection of these clients to CCC: it blamed the chargeback rate increases on CCC, Inmar, and CMS.

37. On July 17, 2000, Chris Balsiger, CEO of IOS, sent Robert Carter, President of CMS, a letter concerning "the large increases that [IOS has] seen in charge back rates to coupon submitters that do not have deduct capability[.]" Mr. Balsiger sent carbon copies of the letter to IOS's Retail Clients.

38. In the letter, Mr. Balsiger blamed Inmar, CMC, and CCC for increasing chargebacks for two reasons: (a) to reduce manufacturers' costs to help stop CMS's "downward spiral" in market share in the manufacturer coupon processing market (caused by IOS) and (b) to steer Retail Clients away from IOS and to CCC in the

retail coupon processing market.

39. Mr. Balsiger concluded the letter with a threat that, if North Carolina-based Inmar continued its chargeback policies, it would find itself in the middle of "the worst hurricane to hit North Carolina in the last 200 years":

> I can tell you unequivocally that your decision to continue such policies at this time is going to put you right in the middle of a storm that was gathering before you implemented these policies, and will certainly continue to increase in ferocity until it is resolved. It figures to be the worst hurricane to hit North Carolina in the last 200 years.

July 17, 2000 Letter from C. Balsiger to R. Carter, p. 3. As Mr. Balsiger later explained under oath, in suggesting a "hurricane," he was "threatening a price war." Trial Tr. 2738:12-16 (Balsiger, C.), *United States v. Thomas Chris Balsiger*, No. 07-cr-57 (E.D. Wis.).

40. Of course, in threatening Inmar for the benefit of IOS's clients, Mr. Balsiger failed to disclose a principal source of the chargeback rate increase: IOS's chargeback spread scheme.

## The Defendants' Anticompetitive Scheme

41. Shortly after his threat to Inmar, Mr. Balsiger entered a series of related agreements with Inmar on behalf of IOS intended to restrain competition and increase prices through: (a) market and customer allocation; (b) price fixing; and (c) transfer of

17

confidential retailer client data to Inmar.

42. The agreements between IOS and Inmar: eliminated IOS as a competitive threat to Inmar in the manufacturer coupon processing market; eliminated Inmar as a competitive threat to IOS in the retail coupon processing market; and assured substantial profit increases for both IOS and Inmar by fixing and raising coupon processing fees. As IOS CEO Balsiger testified, "I proposed a joint venture to Carolina. . . . And that was to head off a price war on coupons . . . ; It created noncompetes by doing deals back and forth on subprocessing and the retail." Trial Tr. 2511:25-2512:13 (Balsiger, C.), *United States v. Thomas Chris Balsiger*, No. 07-cr-57 (E.D. Wis.).

*A. IOS's and Inmar's Market Allocation Agreement*

43. IOS and Inmar conspired to allocate markets and customers, and not to compete in either the manufacturer coupon processing services market or the retail coupon processing services market.

44. Collusion between IOS and Inmar began affecting IOS's operations in the fall of 2000, shortly after IOS's hurricane threat to Inmar. That fall, IOS employees noticed a change in attitude among Mr. Balsiger and the leadership of IOS. IOS's interest in securing manufacturer accounts for coupon processing waned, and rumors began circulating that IOS was going to exit the

market for manufacturer coupon processing services.

45. These rumors proved accurate. Mr. Balsiger of IOS and Mr. Carter of CMS convened a meeting in January 2001 at the Daytona Hilton in Daytona Beach, Florida. Attendees at this meeting included Mr. Balsiger, Bruce Furr, and several other employees from IOS, and Mr. Carter, Dean Smith, and one other employee from CMS. At this meeting, Mr. Balsiger introduced Mr. Carter and CMS as IOS's "good friends" and explained that IOS would be turning over its manufacturer clients to CMS and exiting the manufacturer coupon processing market. In return, CMS would share with IOS its manufacturer coupon processing revenues, and Inmar would enter a broader conspiracy with IOS (discussed below).

46. At this meeting, Mr. Balsiger instructed IOS employees to assist CMS in any way CMS requested in transitioning IOS's manufacturer accounts to CMS. Among other things, IOS employees were to accompany Mr. Carter to the accounts IOS had taken from CMS and assure the accounts that transitioning back to CMS was in the accounts' best interests. Of course, with IOS exiting the manufacturer coupon processing market and NCH focused on large manufacturer accounts, the small manufacturer accounts that IOS transitioned to CMS (in excess of 400) had no practical alternative to CMS. As discussed in detail below, these accounts – as did other manufacturers – would soon feel the effects of being captive

to CMS.

47.  By April 11, 2001, Inmar and IOS formalized the broader conspiracy to which Mr. Balsiger referred at the Daytona Hilton meeting.  This conspiracy was reflected in four written anti-competitive agreements.

48.  First, as part of a Proprietary Data Transfer Agreement, IOS sold Retail Client data to Inmar (discussed below), and Inmar agreed to refrain from competing for the business of any IOS Retail Client:

> [D]uring the term of this Agreement, and for a period of one (1) year after the termination of this Agreement for any reason, none of the Inmar Entities or their Affiliates shall, directly or indirectly, on behalf of themselves or any other Person, provide Coupon Services to any ID Retail Customer, or solicit or call upon any ID Retail Customer for the purpose of providing Coupon Services to any such ID Retail Customer.

Proprietary Data Transfer Agreement, p. 6.

49.  Second, in a Coupon Sub-Processing Agreement, IOS agreed to subprocess coupons for CCC's retail customers for a fee and IOS also agreed that IOS would not provide coupon services to CCC's customers.

50.  Third, in the Joint Marketing Agreement, IOS and Inmar agreed that they would jointly market coupon services to mass merchandise retailers (which include Walmart, Kmart, Target, and

wholesalers that serve any of these three retailers), share in any revenue to these organizations, and not compete for coupon processing business of the organizations.

51. Fourth, as part of an Asset Purchase Agreement, IOS transferred its manufacturing processing customers to Inmar and agreed that it would not "engage in the business of providing Manufacturer Coupon Redemption Services" in the United States.

52. The agreements to allocate customers substantially restricted or eliminated competition in the highly-concentrated coupon processing services markets or submarkets for small retailer and small manufacturer processing services, enabling IOS and Inmar to increase the amount and type of fees imposed on retailers and manufacturers during a time in which the number of coupons processed declined and excess capacity for coupon processing services existed.

53. Before IOS and Inmar entered into their customer allocation agreements, IOS already provided processing services to at least 75 percent of Retail Clients. Thus, securing a commitment from its principal competitor not to compete for IOS's retail accounts was of extraordinary value to IOS and eliminated any incentive for the competitors to compete aggressively in the market for retail coupon processing services. Moreover, Inmar's allocation agreement with IOS extended beyond IOS's existing

Retail Clients; it also affected clients that had moved from IOS to CCC in an effort to escape IOS's high fees and chargeback rates. For instance, shortly after Inmar and IOS agreed not to compete, CCC informed at least one state association that had left IOS to contract with CCC that CCC no longer would process coupons for state associations and relinquished the account to IOS. Thus, Inmar was turning the association back to the one Retail Processor the association was trying to avoid. The association – like other Retail Clients – would feel the effects of being captive to IOS.

*B. IOS's and Inmar's Price Fixing Agreement*

54. Defendants' agreements had the purpose and effect of fixing the prices of retail coupon processing fees. This price-fixing scheme was accomplished, at least in part, by IOS taking over much (if not all) of Inmar's retail coupon processing function. As part of the Defendants' Coupon Sub-Processing Agreement, IOS agreed to sub-process coupons for CCC's retail customers for a fee, including invoicing manufacturers on behalf of CCC. As part of this function, IOS and CCC conspired as to the amounts and types of retail coupon processing fees both IOS and CCC would charge. As discussed in further detail below, the Defendants agreed to structure their coupon processing fees to give Inmar a competitive advantage in the manufacturer coupon processing market.

55.  Defendants conspired to fix coupon processing charges to mass merchandise retailers. The Joint Marketing Agreement provided that IOS and Inmar would jointly design "pricing strategies" for coupon services to mass merchandise retailers and share in any such revenue.

56.  In an effort to keep the Defendants' conspiracy secret, after IOS was indicted in March 2007, Inmar abruptly terminated its secret sub-processing arrangement with IOS because Inmar was "paranoid" that retailers and manufacturers would learn that IOS was directing CCC's operations, as an IOS employee named David Howard explained to the FBI:

> Howard said IOS was sub-processing coupons for CCC . . . until the recent March 2007 indictment.  He said after the indictment Inmar, the parent company for CCC, terminated their contract with IOS.  Howard said Inmar was paranoid, that others, meaning manufacturers and other retail clients would know IOS was sub-processing coupons for CCC clients.

David Howard Interview Summary, p. 19.

*C. IOS's Transfer of Competitively Sensitive Data to Inmar*

57.  Under the Proprietary Data Transfer Agreement, IOS transferred to Inmar two types of competitively sensitive Retail Client data.  First, IOS secretly transferred to Inmar "confidential," "proprietary," and competitively sensitive deduction methodologies of IOS's deducting retailers:

> International Data shall provide CMS
> continual, on-line internet and hard copy
> access (and access to other such supporting
> documentation as is reasonably necessary) to
> International Data's confidential proprietary
> retailer-specific chargeback and deduction
> data concerning International Data's Retail
> Customers, including methodology and
> calculations, as well as related master files
> and customer contract files[.]

Proprietary Data Transfer Agreement, p. 2.

58. Methodologies by which retailers deduct from manufacturers are highly confidential, competitively sensitive, and vary by retailer. For instance, some retailers may deduct for shipping fee chargebacks, but other retailers may not. By accessing each retailer's highly proprietary deduction methodology, Inmar could easily discern the chargebacks for which a retailer does not deduct and maximize these chargebacks to IOS's deducting retailers. IOS never informed its large retailers that it was transferring their competitively sensitive deduction methodologies to Inmar.

59. Second, the Proprietary Data Transfer Agreement specified how data for a "One Count" program would be transferred from IOS to Inmar. In return for conspiring, Inmar agreed to participate in IOS's One Count program. Under this program, Inmar would no longer count or audit many (if any) of IOS's coupons and would simply accept IOS's coupon count. Inmar agreed to this program even though it knew, upon information and belief, that IOS

was improperly invoicing Inmar's manufacturer clients, pursuant to IOS's chargeback spread scheme.  For instance, Inmar continued to participate in the One Count program even after a former IOS employee named Robert MacDonald pleaded guilty in 2004 to participating in "a large and ongoing coupon fraud scheme" while at IOS.  Aug. 26, 2004 U.S. Department of Justice Press Release.

60.  The One Count program benefited IOS because it perpetuated IOS's chargeback spread scheme:  eliminating an independent audit of a dominant Manufacturer Processor – CMS – would help IOS hide from manufacturers the fact that it was co-mingling Rapid Pay program coupons with large retailer coupons in invoices to manufacturers.

61.  The One Count program also benefited Inmar.  Inmar's participation in the One Count program was contingent on IOS's agreement not to offer the program to any other Manufacturer Processor.  Inmar and IOS then fixed the prices of retail processing services to penalize manufacturers that failed to contract with the only Manufacturer Processor that participated in the One Count program:  CMS.

62.  Communications from Dean Smith of CMS demonstrate how the Defendants' fixed prices benefited CMS as a competitor in the market for manufacturer coupon processing services.  In a June 23, 2006 e-mail to a manufacturer named nSpired Natural Foods that was

considering moving from CMS to a competing Manufacturer Processor
named Milano Promotional Services ("MPS"), Mr. Smith of CMS warned
nSpired that it would face higher retail coupon processing costs
in light of the fact that MPS did not participate in a One Count
program:

> It is very important that you take a real
> close look at the comparison between MPS
> total costs vs. CMS total costs based on
> actual 2005 nSpired Foods redemption numbers
> (see attached).  As you can see in the
> comparison (1st tab), CMS saves nSpired in
> total over $6,300 annually vs. MPS typical
> proposal.  The largest driver of the total
> cost savings that CMS is currently providing
> and will continue to provide to nSpired is
> the one count cost avoidance which is over
> $12,100 annually.  This is savings year
> after year for nSpired.  MPS does not have
> one count programs.  Due to this, once
> nSpired moves to MPS, you will incur
> additional retailer surcharges on your
> retailer clearinghouse/retailer invoice
> submissions (i.e.: $4 per though IOS two
> count surcharges, IOS $1.35 per store tag
> minimum insurance charge, etc.).  These are
> charges determined by the retailer and their
> clearinghouse, not by CMS.  Just by being a
> CMS client and a participant on our three
> one count programs, you are saving thousands
> of dollars each year compared to all of our
> competitors.
> . . .
> I have been personally in 5 direct
> competitive situations with MPS in the last
> 12 months.  4 out of 5 CMS clients have
> decided to stay with CMS after they have
> taken a closer look at the total cost
> analysis.  Even the 1 client that did decide
> to move to MPS at the beginning of this year
> is already wanting to do an analysis to
> compare again.

June 23, 2006 e-mail from D. Smith to nSpired.

63.  Of course, Mr. Smith did not communicate to nSpired that Inmar and IOS had fixed the retail coupon processing fees charged to manufacturers.  Rather, he falsely claimed that the higher fees were "retailer surcharges" that were (at least partly) "determined by the retailer."  In reality, retailers did not – and do not – determine retail coupon processing fees; those have been unlawfully fixed by Inmar and IOS to the detriment of both manufacturers and retailers.

*D. Other Agreements Between IOS and Inmar*

64.  Upon information and belief, IOS and Inmar entered anticompetitive agreements in addition to the agreements described above that restricted competition and led to the increase in coupon processing fees.

### Examples of the Effects of the Defendants' Anticompetitive Scheme

65.  IOS's and Inmar's anticompetitive and fraudulent scheme had – and continues to have – detrimental effects on Retail Clients and manufacturers, including the following:

66.  First, IOS and Inmar's retail coupon processing fees – in particular their incremental fees, such as freight fees – increased dramatically as a result of the Defendants' scheme. For example, after the April 2001 agreements were entered, IOS began

"making lots of money" on freight fees, "a lot more" than on processing fees. Trial Tr. 1521:25-1522:1, 2551:8-9 (Furr, S.), *United States v. Thomas Chris Balsiger*, No. 07-cr-57 (E.D. Wis.).

67. Not only did the *amount* of the Defendants' fees increase as a result of the scheme, but the *types* of fees charged by the Defendants also increased. For example, IOS charged new non-scan fees, two count fees, insurance fees, chargeback fees, and other miscellaneous processing fees that it did not charge prior to the Defendants' unlawful scheme. As former IOS employee Kari Costello testified, IOS began charging "any kind of postage, handling, extra fees that we could justify to put on the invoice," creating a "cash cow." *Id.* Trial Tr. 72:13-24 (Costello, K.).

68. Moreover, many of the Defendants' fees are charged on a "per invoice" basis, meaning that the fees increase if the number of Defendants' invoices to manufacturers increase. Prior to entering their scheme, both IOS and Inmar included dozens or hundreds of coupons per invoice. After the Defendants began colluding, however, they significantly reduced the number of coupons included in a single invoice to manufacturers, frequently including only one or two coupons in a single invoice, increasing total fees.

69. As IOS CEO Chris Balsiger testified, the April 2001 agreements "caused these earnings explosions" for IOS despite the

"declining market" because it gave IOS "a lot of market power," allowing IOS to "raise rates tremendously." *Id.* Trial Tr. 2511:14-7, 2510:25, 2548:9-14 (Balsiger, C.). According to Balsiger, "I raised rates on processing, I raised rates on chargeback fees because I had the market." *Id.* 2548:9-14. "Once we did the joint venture the combined market share gave us 87 percent control of the market. . . . I increased my fees once we had that control, and I had a noncompete, I increased my fees dramatically." *Id.* 2551:1-6.

70. Second, the Defendants' scheme has led to increases in fees for manufacturer coupon processing services. By agreeing not to compete in the market for manufacturer coupon processing services and then fixing retail coupon processing fees to limit competitive alternatives in the market – particularly for small manufacturers – the Defendants were able to increase coupon processing fees charged to manufacturers.

71. The Defendants' coupon processing fee increases led to substantial increases in their profits, even during a time in which coupon processing volume was declining and excess capacity in the industry was increasing.

72. Defendants undertook their anticompetitive scheme with the purpose of increasing the amount and type of coupon processing fees that they charged.

## Supervalu's Participation in the Anticompetitive Scheme

73. Supervalu approved, facilitated, and benefited from the Defendants' anticompetitive and fraudulent scheme.

74. When North American Data (which Supervalu and Mr. Balsiger owned) and Indiana Data (owned by former IOS executives Lance Furr and Bruce Furr) merged in 1997 to create IOS, the merged entity quickly implemented strategies to maximize profits, including implementing the chargeback spread scheme.

75. Supervalu's "leverage" and "ideas" were recognized by Indiana Data (and the Furrs) at the time of the merger to be key attributes of North American Data that justified Indiana Data's agreement to merge, as a former IOS employee named Ovidio Enriquez described to the FBI:

> Enriquez said [the] Furrs were more
> sophisticated with their processing, but
> Balsiger had Supervalu, their leverage and
> ideas. Enriquez said Balsiger and Supervalu
> created shipping revenue for the company.

Ovidio Enriquez FBI Interview Summary, p. 2.

76. Upon information and belief, Supervalu's "ideas" as to how to generate profits led to the implementation of IOS's unlawful schemes, including the chargeback spread scheme and IOS's efforts to substantially increase the amount and types of fees it charged for retail coupon processing services.

77. Supervalu's "leverage" and "ideas" also enabled the

30

organization to secure a large stake in IOS and maintain an active role in IOS's operations. For instance, after IOS's formation and through at least 2005, Supervalu held 50 percent of the voting securities of IOS and was, upon information and belief, the largest shareholder of IOS voting securities during this time. Supervalu also placed two executives on IOS's Board of Directors, including one executive who served on the Board's audit committee.

78. Upon information and belief, as a controlling shareholder of IOS and through its representation on IOS's Board, Supervalu knew of, approved, facilitated, and/or acquiesced in IOS's conspiracy with Inmar, including IOS's agreement with Inmar (a) to allocate the manufacturer coupon processing services market to Inmar, (b) not to compete with Inmar in the retail coupon processing services market, and (c) fix retail coupon processing fees with Inmar.

79. IOS's and Inmar's conspiracy generated substantial profits for Supervalu. Supervalu maintained a profit sharing agreement with IOS in which it shared in revenues generated by IOS's coupon processing fees, such as shipping fees. As the conspiracy led to higher coupon processing fees, Supervalu's profits generated from the conspiracy also increased.

80. Supervalu also facilitated the continued operation of the conspiracy. For example, when manufacturers and Retail Clients

voiced concerns about coupon processing fee increases, Supervalu defended the reasonableness of IOS's coupon processing fees and falsely attributed the fee increases to the coupon processor not involved in the conspiracy:  NCH.

81.  Upon information and belief, Supervalu knowingly facilitated and/or acquiesced in the activities of the IOS and Inmar executives that implemented the Defendants' unlawful conspiracy and knowingly agreed to perform services to facilitate the unlawful practices of the Defendants.

## Defendants' Fraudulent Concealment of and Acts in Furtherance of Their Conspiracy

82.  Plaintiffs had no knowledge of the secret, unlawful self-concealing conspiracy alleged in this Complaint, and could not have discovered the combination or conspiracy at an earlier date by the exercise of due diligence because of the affirmative steps taken by Defendants to avoid detection of, and fraudulently conceal, their scheme and conspiracy.

83.  For example, after the FBI executed search warrants at IOS facilities in February 2003, former IOS executive Lance Furr directed IOS employees to take computer files and other information home each night to avoid seizure and possible detection of their fraudulent and anticompetitive actions.  Superseding Indictment ¶ 53(a).  Similarly, after February 2003, IOS executive Chris Balsiger ordered that certain documents be destroyed and attempted

to have others destroy documents. *Id.* at ¶ 53(b).

84. IOS provided false and misleading information to retailers regarding IOS's coupon-processing and invoicing practices. *Id.* at ¶¶ 24, 53(c).

85. The Defendants provided false and misleading information to Retail Clients and manufacturers as to the cause of coupon processing fee increases.

86. To further conceal their scheme, IOS and its officers and agents took steps to keep IOS's employees and others with knowledge of the scheme from cooperating with law enforcement officials and to retaliate against those who provided information to federal authorities, including attempting to condition severance benefits for departing employees on the employee's agreement not to speak to law enforcement officials and taking legal action or threatening legal action and/or financial harm to employees who cooperated with law enforcement efforts.

87. For example, on or about February 15, 2005, IOS reached a separation agreement with the company's controller, Christine Peak, which called for payment of an additional year of salary in exchange for agreeing not to speak with anyone – including law enforcement – about IOS without IOS's written consent. *Id.* at ¶ 53(d).

88. When an IOS executive, Kari Costello, wanted to resign

due to concerns about the company's fraudulent invoicing and accounting practices, IOS drafted a separation agreement that prohibited Kari Costello from speaking to any government agency about IOS without IOS's written consent. *Id.* at ¶ 53(e). In June 2005, IOS executive Bruce Furr and others accused Kari Costello of breaching a separation agreement by talking to law enforcement regarding the criminal investigation of IOS, and threatened litigation if Kari Costello continued to cooperate. *Id.* at ¶ 53(f). On February 17, 2006, Co-conspirator IOS filed a civil lawsuit in Indiana against Kari Costello to retaliate against Kari Costello for cooperating with law enforcement and to learn what information she had divulged to law enforcement. *Id.* at ¶ 53(m).

89. In approximately mid-August 2005, Lance Furr directed IOS to remove documents from his office and to hide them in an employee's personal residence. *Id.* at ¶ 53(h).

90. On or about August 18, 2005, IOS executive Chris Balsiger presented false information regarding IOS's coupon-invoicing practices to one of IOS's attorneys, knowing and intending that the same false information would be presented to law enforcement. *Id.* at ¶ 53(j).

91. Between January and August 2006, IOS executive Chris Balsiger and others prepared and revised a memorandum in which they described, documented, and revised a false "store tag"

34

defense. *Id.* at ¶ 53(*l*). The memorandum, which described IOS's historical invoicing practices, falsely indicated that although coupons from independent stores were included on invoices that listed only a large, funded retailer, all of the coupons had accurate "store tags." The document, entitled "IOS Should Not Be Indicted for Mail/Wire Fraud" was intended to be disclosed and later was disclosed to law enforcement. In March 2006, IOS executives and employees Chris Balsiger, James Currey, Ovidio Enriquez, David Howard, and others attempted to create false invoices that could be used to support the "store tag" defense. *Id.* at ¶ 53(n).

92. IOS executives and employees Chris Balsiger, Ovidio Enriquez, and James Currey persuaded two IOS employees – Noreo Castillo and Carlos Zapata – to provide materially false information regarding IOS's coupon-processing practices to law enforcement in April 2006. *Id.* at ¶ 53(s).

93. IOS Executives James Currey and Chris Balsiger developed computer programs to conceal the accounting of various aspects of the scheme, including programs to shift manufacturer chargebacks from non-paying small retailers to stores that were submitting legitimate coupons to IOS. *Id.* at ¶ 28(d); 53(o).

94. Inmar's abrupt termination of its subprocessing agreements with IOS in or around March 2007 had the purpose and

effect of concealing Inmar's role in the conspiracy.

95.  Plaintiffs relied on and were misled by Defendants, who held positions of trust.  Accordingly, the statute of limitations has been tolled and suspended with respect to any and all claims arising from the conspiracy.

## Class Action Allegations

96.  Plaintiffs bring this action, pursuant to Fed. R. Civ. P. 23, on behalf of the following class:

> All entities in the United States that have been overcharged by IOS or Inmar for coupon processing services from January 1, 1997 through the present (and continuing until the effects of IOS's and Inmar's fraudulent and anticompetitive scheme ceases).

97.  Excluded from this class are the Court and its officers, employees, and relatives; Defendants, their parents, subsidiaries, affiliates, shareholders, and co-conspirators.

98.  Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to be in the thousands.  Furthermore, the class is readily identifiable from information and records in the possession of the Defendants.

99.  Questions of law and fact common to members of the class predominate over questions, if any, that may affect only individual class members because Defendants have acted on grounds generally

applicable to the class. Such generally applicable conduct is inherent in Defendants' wrongful conduct. Among those common questions of law or fact are:

> a. Whether the Defendants combined, agreed, and/or conspired to allocate markets and/or customers and/or to fix, raise, maintain, or stabilize prices for coupon processing services;
>
> b. The existence and duration of the illegal contract, combination, and/or conspiracy alleged herein;
>
> c. Whether Defendants conspired to conceal their unlawful activities;
>
> d. Whether the contract, combination, and/or conspiracy caused the prices for coupon processing services to be higher than they would have been in the absence of Defendants' conduct;
>
> e. Whether Defendants' conduct violates the Clayton and Sherman Acts;
>
> f. Whether Plaintiffs and other class members have sustained or continue to sustain damages as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages;
>
> g. Whether Plaintiffs and the other class members are entitled to an award of compensatory, treble, and/or punitive damages, and, if so, in what amount; and
>
> h. Whether Plaintiffs and the other class members are entitled to, injunctive, or other equitable relief.

100. Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs and all members of the class were damaged by the same wrongful conduct by the Defendants, *i.e.,* they have paid artificially inflated prices for coupon processing

services as a result of Defendants' wrongful conduct.

101. Plaintiffs will fairly and adequately protect the interests of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent Plaintiffs and other members of the class.

102. The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants.

103. Defendants have acted or refused to act on grounds generally applicable to the class, thereby rendering injunctive or declaratory relief with respect to the class as a whole appropriate.

104. This class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly-situated entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would

produce. The damages sustained by individual class members, although substantial, do not rise to the level where they would have a significant interest in controlling the prosecution of separate actions against these well-financed corporate defendants.

105. The instant case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### Count I:  Violation of Sherman Act § 1

106. Plaintiffs repeat and reallege the allegations in Paragraphs 1 – 105 above as if fully set forth herein.

107. This Count is brought on behalf of direct purchasers of coupon processing services.

108. Defendants have engaged in a contract, combination and/or conspiracy in restraint of trade and commerce, the purpose and effect of which was – and is – to allocate markets and customers, and unreasonably fix, raise, maintain, or stabilize prices, in the United States markets for (a) manufacturer coupon processing services, including submarkets thereof (such as the submarket for small manufacturer coupon processing services) and (b) retail coupon processing services, including submarkets thereof (such as the submarket for coupon processing services for

non-deducting retailers). The combination or conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants.

109. The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination and/or conspiracy were authorized, ordered, or done by their officers, agents, employees, affiliates, owners, or representatives while actively engaged in the management of Defendants' affairs.

110. Defendants' actions lack any legitimate business justification, and any purported business justifications are pretextual.

111. Defendants' conduct substantially and adversely affects interstate commerce in the relevant markets. Defendants' practices constitute an unreasonable restraint on competition, the net effects of which are anticompetitive.

112. From 1997 until at least mid-2008, Co-conspirator IOS possessed monopoly power in the market for retail coupon processing services, including submarkets thereof.

113. From 2001 through the present, Defendant Inmar possessed market power in the submarket for small manufacturer processing services.

114. Defendants, by and through their anticompetitive actions as outlined herein, have violated Section 1 of the Sherman Act, 15

U.S.C. § 1. Without limitation, Defendants' contract, combination and/or conspiracy constitutes both a *per se* violation of the Sherman Act and a violation of the Sherman Act under the "rule of reason."

115. As a direct and proximate result of Defendants' violations of the Sherman Act, Plaintiffs and class members have been harmed in an amount to be established at trial.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs, on their own behalf and on behalf of the class, demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment:

a. Certifying that this action may be maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives and their counsel as lead class counsel;

b. Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to members of the class;

c. Awarding Plaintiffs and the class their full monetary damages to be proven at trial;

d. Awarding Plaintiffs and the class treble their monetary

damages, pursuant to 15 U.S.C. § 15;

e.    Awarding Plaintiffs and the class pre-and post-judgment interest on their damages;

f.    Awarding Plaintiffs and the class the costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. § 15;

g.    Enjoining Defendants from continuing or resuming their unlawful and anticompetitive practices; and

h.    Awarding Plaintiffs and the class such other and further relief as the Court deems just and proper.

Dated this 9th day of April, 2019

<div style="margin-left:40%">

/s/ Daniel Kotchen
Daniel A. Kotchen
D.C. Bar No. 473496
Daniel L. Low
D.C. Bar No. 480910
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW
Suite 101
Washington, DC 20009
(202) 471-1995 (Tel.)
(202) 80-1128 (Fax)
dkotchen@kotchen.com
dlow@kotchen.com


/s/ Kearns Davis
Kearns Davis
N.C. State Bar No. 22014
kdavis@brookspierce.com
Matthew B. Tynan
N.C. State Bar No. 47181
mtynan@brookspierce.com

</div>

OF COUNSEL:
**BROOKS PIERCE MCLENDON**
 **HUMPHREY & LEONARD LLP**
230 North Elm Street
2000 Renaissance Plaza
Greensboro, NC 27401
Telephone: (336) 373-8850
Fax:  (336) 378-1001

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of April, 2019, the foregoing the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which sends notification of such filing to all counsel of record so registered for this case.

This the 9th day of April, 2019.

/s/ Daniel Kotchen
Daniel A. Kotchen