# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MR. DEE'S INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:19CV141 |
| | ) | |
| INMAR, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Plaintiffs' Motion to Extend Scheduling Order Deadlines (Docket Entry 139). (See Docket Entry dated Apr. 8, 2020 (referring instant Motion to undersigned United States Magistrate Judge).) For the reasons that follow, the Court will grant in part the instant Motion.

## INTRODUCTION

"This case arises in the coupon processing industry . . . . Defendants . . . [and] International Outsourcing Services, LLC ('IOS') are coupon processors . . . [who allegedly] conspired to allocate customers and markets and to fix prices. This [case] is brought on behalf of a class of [allegedly] overcharged purchasers of coupon services for violations of the Sherman Act." (Docket Entry 145 at 1-2; see also Docket Entry 141 at 3 ("Defendant Carolina Manufacturer's Services, Inc. ('CMS') processes coupons on behalf of the issuing manufacturers. Defendant Carolina Coupon Clearing, Inc. ('CCC') processes coupons on behalf of retailers who receive the coupons from customers. Purported Defendant 'Carolina

Services' is not a separate entity, but a d/b/a of CCC. Defendant Inmar, Inc. is the parent of CMS and CCC.").) This Court assumed jurisdiction over this case via transfer from the United States District Court for the Eastern District of Wisconsin on January 31, 2019. (See Docket Entry 113.) Two months later, the parties jointly moved to lift a pre-transfer stay, which had stalled the litigation for over a decade due to parallel criminal proceedings (see Docket Entry 120), and the Court (per United States District Judge William L. Osteen, Jr.) promptly lifted the stay on April 5, 2019 (see Docket Entry 122).

Ten days later, Plaintiffs served Defendants with document requests under Federal Rule of Civil Procedure 34 (see Docket Entry 139-2),[1] which included the following:

Request No. 6
From January 1, 2000 through December 31, 2009, documents sufficient to show, by fee type and amount, the fees you

---

[1] Generally, "[a] party may not seek discovery from any source before the parties have conferred as required by [Federal] Rule [of Civil Procedure] 26(f)," Fed. R. Civ. P. 26(d)(1), which (in this case) did not occur until June 3, 2019 (see Docket Entry 128 at 1; see also Docket Entry 126 at 1 (setting initial pretrial conference for June 24, 2019)); however, where – as here (see Docket Entries 4, 39 (documenting service of process upon and waiver of service of process by Defendants in 2008)) – "[m]ore than 21 days [had passed] after the summons and complaint [we]re served on [Defendants], a request under [Federal] Rule [of Civil Procedure] 34 [could] be delivered . . . to th[em] by any other party," Fed. R. Civ. P. 26(d)(2)(A). "[Those] request[s were] considered to have been served at the first [Federal] Rule [of Civil] Procedure 26(f) conference." Fed. R. Civ. P. 26(d)(2)(B). Defendants, in turn, had to "respond in writing [by July 3, 2019, i.e.,] . . . within 30 days after the parties' first [Federal] Rule [of Civil Procedure] 26(f) conference." Fed. R. Civ. P. 34(b)(2)(A).

2

or IOS charged to retailers and/or manufacturers for coupon processing services.

. . . .

Request No. 11
Documents sufficient to show the prices charged to each customer by you or IOS during the relevant time period, including, but not limited to, the price of coupon processing fees, shipping fees, freight fees, non-scan fees, two count fees, insurance fees, chargeback fees, miscellaneous fees, and any other fees, and when such fees or prices were instituted.

Request No. 12
All documents that constitute or refer to each price circular, price list, price change notification, or price announcement with respect to your coupon processing services that was prepared, authorized, or issued by you, IOS, Supervalu, or by any competitor, and each transmittal document that accompanied each such circular list, notification, or announcement, and any documents related to or constituting complaints received from customers about such price changes, price announcements, or prices charged.

Request No. 13
From January 1, 2000 through December 31, 2009, and for each fiscal year, documents sufficient to show your revenues and operating profit.

Request No. 14
Each of your interim and annual financial statements, including but not limited to balance sheets, profit or loss statements, and income statements, during the relevant time period.

Request No. 15
Documents sufficient to show your profit margins for coupon processing services during the relevant time period.

(Id. at 12-13 (bold font omitted) (underscoring in original).)[2]

---

[2] Where a Docket Entry contains documents with different page numbers on a single page, pin citations refer to the page number(s)
(continued...)

Defendants timely responded in relevant part:

Request No. 6
From January 1, 2000 through December 31, 2009, documents sufficient to show, by fee type and amount, the fees you or IOS charged to retailers and/or manufacturers for coupon processing services.

RESPONSE: Defendants will produce customer contracts indicating fee types and amounts charged by it to retailers and/or manufacturers during the pertinent time period.

. . . .

Request No. 11
Documents sufficient to show the prices charged to each customer by you or IOS during the relevant time period, including, but not limited to, the price of coupon processing fees, shipping fees, freight fees, non-scan fees, two count fees, insurance fees, chargeback fees, miscellaneous fees, and any other fees, and when such fees or prices were instituted.

RESPONSE: See Response to Request No. 7, *supra*.

Request No. 12
All documents that constitute or refer to each price circular, price list, price change notification, or price announcement with respect to your coupon processing services that was prepared, authorized, or issued by you, IOS, Supervalu, or by any competitor, and each transmittal document that accompanied each such circular list, notification, or announcement, and any documents related to or constituting complaints received from customers about such price changes, price announcements, or prices charged.

RESPONSE: Defendants object to the production of information sought by this request on the grounds that prices charged to customers were embodied in the terms of customers [sic] contracts which Defendants will produce (see Response to Request No. 6, *supra*).

---

2(...continued)
in the footer appended to the filing upon docketing via the CM/ECF system (not original pagination on documents within the filing).

Request No. 13
From January 1, 2000 through December 31, 2009, and for each fiscal year, documents sufficient to show your revenues and operating profit.

RESPONSE: Defendants will produce annual audited consolidated financial statements for [Defendant] Inmar, Inc. for the requested period.

Request No. 14
Each of your interim and annual financial statements, including but not limited to balance sheets, profit or loss statements, and income statements, during the relevant time period.

RESPONSE: Defendants object on the grounds that the phrase "interim . . . financial statements" is vague and ambiguous in this context making a reasonable response unduly burdensome and expensive and, depending upon the interpretation placed upon the words in that phrase, are overbroad making production of such documents unduly burdensome and expensive. As stated in Response to Request No. 13, *supra*, Defendants will produce annual audited consolidated financial statements for [Defendant] Inmar, Inc. for the requested period.

Request No. 15
Documents sufficient to show your profit margins for coupon processing services during the relevant time period.

RESPONSE: Defendants object on the grounds that the phrase "show your profit margins for coupon processing services" is vague and ambiguous in this context making a reasonable response unduly burdensome and expensive and, depending upon the interpretation placed upon the words in that phrase, are overbroad making production of such documents unduly burdensome and expensive. As stated in Response to Request No. 13, *supra*, Defendants will produce annual financial statements for the requested period.

(Docket Entry 139-3 at 6-8 (bold font omitted) (ellipsis, italics, and underscoring in original); see also id. at 6 (stating in response to Request No. 7 (subsequently cross-referenced in

5

response to Request No. 11): "Defendants will produce customer contracts with retailers and/or manufacturers during the pertinent time period."), 12 (certifying service of foregoing responses to discovery requests on June 10, 2019).)[3]

On July 19, 2019, Plaintiffs' counsel asked Defendants' counsel "to meet and confer . . . regarding [Defendants'] discovery responses." (Docket Entry 139-6 at 4.) That meeting/conference took place in early August 2019, after which (on August 6, 2019) Plaintiffs' counsel informed Defendants' counsel that "there [we]re several categories of information that would be helpful for future discussions regarding discovery. [Plaintiffs] look[ed] forward to hearing back from [Defendants] regarding . . . the <u>database restoration process</u> [counsel] discussed. In addition, [Plaintiffs] look[ed] forward to receiving . . . a description of the financial information [Defendants] ha[ve] from the relevant time period." (Id. at 2-3 (emphasis added).)

On August 20, 2019, Plaintiffs' counsel sent Defendants' counsel a follow-up request for clarification as to "when [Plaintiffs could] expect to receive th[at] additional information

---

3 Around that same time, the Court adopted the parties' proposed scheduling order (see Text Order dated June 14, 2019 (adopting Amended Joint Rule 26(f) Report (Docket Entry 128))), which, inter alia, (A) required Plaintiffs "to move for class certification and serve expert report and disclosures in support of class certification" by "March 2, 2020" (Docket Entry 128 at 1-2), and (B) established "March 1, 2021" and "August 2, 2021" as the dates for the "[c]lose of fact discovery" and the "[c]lose of expert discovery," respectively (id. at 2).

6

. . . ." (Id. at 2.)  Counsel for Defendants responded, a week later, that "[t]he data restoration of the CCC data (particularly the older data) has run into some hardware issues which [Defendants we]re seeking to solve."  (Id. (emphasis added).)

On September 11, 2019, Plaintiffs' counsel inquired "when [Defendants] expect[ed] to complete [their] production . . . ." (Docket Entry 139-4 at 4.)  Two days later, Defendants' counsel answered that:

> [Defendants we]re continuing to work on the production and [we]re not sure when [it would] be done. [Defendants] r[a]n into a snag in trying to restore CCC transactional data. . . . [T]he database [wa]s no longer supported and present[ed] some significant hardware challenges given its age.  [Defendants we]re trying to work through a former vendor and ha[d] involved the head of [Defendant] Inmar's IT for the purpose.

(Id. (emphasis added).)

The record further indicates that counsel for the parties took part in a telephone call about discovery on September 19, 2019 (see Docket Entry 139-5 at 6), but reveals no additional pertinent communications until December 12, 2019, when Plaintiffs' counsel e-mailed Defendants' counsel as follows:  "During our September 19 call, [Defendant] Inmar stated it was still in the process of restoring transactional data.  Please let us know if this process has been completed and if and when we should expect to receive any additional transactional and financial data."  (Id. (emphasis added).)  That same day, counsel for Defendants replied:  "We have (and have had for some time) all of the pertinent CMS data.  We

7

continue to work on the <u>restoration of the CCC data</u>. As part of that process, we traveled to Philadelphia last month. We have not yet been able to restore all of the data." (<u>Id.</u> (emphasis added).)

On December 14, 2019, counsel for Plaintiffs once more proposed (to counsel for Defendants) a "meet and confer," for the purpose of "discuss[ing Defendants] outstanding productions -- what's still outstanding and when [Plaintiffs] can expect it." (<u>Id.</u>; <u>see also</u> <u>id.</u> ("In addition, we'd like to discuss the schedule.").) A telephone conference then took place on December 23, 2019, following which Plaintiffs' counsel immediately recounted in an e-mail to Defendants' counsel that:

> During the call, [Defendants' counsel] stated that [they] did not believe the CMS and CCC transactional data was responsive to one of Plaintiffs' [document requests]. [Plaintiffs' counsel] were surprised to hear this, as [they] believed [] Defendants were in the process of producing the data, as discussed during the parties' September 19 call. This data is responsive to several [document requests], including [numbers] 6, 11, [and] 12 . . . . Accordingly, please promptly produce this data.

(<u>Id.</u> at 3.)

Three days later, Defendants' counsel reported back that:

> [They] reviewed the [document requests] identified and [did] not believe that th[os]e requests, let alone [Defendants'] responses, could ever be construed to seek the complete granular multi-year transaction data of CMS and CCC that [counsel for the parties] ha[d] been discussing (or an agreement to produce it). The [cited document requests] sought fee and pricing information and [Defendants] agreed to produce the contracts (and ha[d] done so). All that said, however, if [Plaintiffs] ma[d]e a written request for the data, [Defendants would] be happy to provide it.

8

(Id. at 2.) On January 3, 2020, while "disagree[ing] that the transactional data [wa]s not responsive [to prior requests]," Plaintiffs served Defendants with a "request[ for] th[e] data." (Id.; see also Docket Entry 141-2 at 11 (requesting "[a]ll coupon processing transactional data, including but not limited to the CMS and CCC transactional data referenced by Defendants' counsel in his December 26, 2019 email to Plaintiffs' counsel").)[4]

A week later, Defendants responded, in pertinent part, that:

> [They] will produce information reflecting transactions for the period 2000-09 to the extent that such information is extant and reasonably available. By way of further explanation, such data for [CMS] is available and will be provided contemporaneously with this response. Data for [CCC] is in the process of restoration and checking and will be provided to the extent it is capable of being restored when available.

(Docket Entry 141-3 at 4.)

On January 23, 2020, Plaintiffs' counsel acknowledged to Defendants' counsel that (as promised) Defendants had "produc[ed] the CMS data" (Docket Entry 142-2 at 4), but asked "[w]hen [Defendants] expect[ed] to produce the CCC data" (id.). Five days later, Defendants' counsel e-mailed back: "[Defendants] are <u>still working on restoration of the CCC data</u>, but are making progress.

---

4 That same day, Plaintiffs filed the instant Motion, asking the Court "to extend the class certification and expert report and disclosure deadlines by six (6) months in light of Defendants' failure to produce highly relevant transactional, revenue, and margin data central to Plaintiffs' class certification expert report and their ability to move for class certification." (Docket Entry 139 at 1.) Defendants timely responded (see Docket Entry 141) and Plaintiffs timely replied (see Docket Entry 142).

Part of the issue is that different types of customer data was [sic] maintained on separate systems. [Their] IT teams are working to create historical files for both." (Id. (emphasis added).)

On January 31, 2020, Plaintiffs' counsel (once more) asked Defendants' counsel "to meet and confer regarding . . . the production of the CCC data." (Id. at 3.) That meeting/conference apparently occurred in early/mid February 2020. (See id. at 2-3.) Ultimately, "[t]he [CCC] transactional data, after restoration by a third party, was produced on February 20, 2020, and additional later-restored CCC data was produced [on] April 9, 2020." (Docket Entry 146 at 1 (emphasis added).)

## DISCUSSION

Ten months ago, the Court adopted the parties' proposed scheduling order deadline of March 2, 2020, for Plaintiffs "to move for class certification and serve expert report and disclosures in support of class certification" (Docket Entry 128 at 1-2). (See Text Order dated June 14, 2019 (adopting Amended Joint Rule 26(f) Report (Docket Entry 128)).) The instant Motion (filed on January 3, 2020) seeks an "exten[sion of] the class certification and expert report and disclosure deadlines by six (6) months in light of Defendants' failure to produce highly relevant transactional, revenue, and margin data central to Plaintiffs' class certification expert report and their ability to move for class certification." (Docket Entry 139 at 1.) Defendants have opposed the instant

10

Motion on the grounds that: (1) "Plaintiffs did not act with the diligence that is the hallmark of the 'good cause' needed to justify a modification of the scheduling order" (Docket Entry 141 at 2); and (2) "Plaintiffs fail[ed] to explain why their expert [could not] complete his analysis prior to the existing March 2, 2020 deadline, let alone why he need[ed] until September [2020]" (id.; see also id. ("As an attempt to compromise, Defendants have consented to a two-month extension of the deadlines at issue — so long as the subsequent case deadlines are moved correspondingly. This is more than sufficient.")). The Court concludes that, under the circumstances presented, good cause exists for an extension of the deadline(s) at issue, but not of the length requested.

As Defendants' above-quoted (first) argument indicates, once adopted by the Court, "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The applicable commentary further explains that, in this context, "good cause" means the deadline(s) in question "cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16, advisory comm. notes, 1983 amend., discussion, subdiv. (b).; see also id. (indicating that litigants may satisfy "good cause" standard without meeting more stringent "'manifest injustice' or 'substantial hardship' test[s]"). In this case, the record (as detailed in the Introduction) establishes that technical difficulties Defendants experienced in retrieving CCC transactional

11

data (not lack of diligence by Plaintiffs) prevented Plaintiffs from complying with the deadline of March 2, 2020, for serving their expert report(s)/disclosures supporting class certification and for filing their motion for class certification.

Defendants would have the Court find otherwise, based on the assertion that Plaintiffs "failed to timely request the purportedly crucial data . . . ." (Docket Entry 141 at 6.) In considering that matter, the Court accepts that Requests 6 and 11 through 15 (quoted in the Introduction) – which the instant Motion identifies as encompassing transactional data (see Docket Entry 139 at 4) – did not "describe with reasonable particularity [such data as an] item or category of items to be inspected," Fed. R. Civ. P. 34(b)(1)(A). (See Docket Entry 141 at 7-8 (pointing out that Requests 6 and 11, which address "fees" and "prices," "do not ask for 'all documents stating a fee' . . . or any other category broad enough to encompass data about individual transactions," that Request 12 "seeks communications about pricing, not data about the prices charged on particular transactions," that "[d]ata showing the daily transactions between Defendants and their customers does not show either operating profits or margins and, thus, is not responsive to either [R]equest [13 or 15]," and that, because "Request 14 seeks 'interim and annual financial statements, . . . [d]aily transaction data does not fall within [it]").) The Court further agrees with Defendants that their "June 10, 2019 responses

left no doubt as to what they committed to produce [for Requests 6 and 11 through 15]" (id. at 7). (See Docket Entry 139-3 at 6-8 (declaring that, for Requests 6, 11, and 12, "Defendants will produce customer contracts" and, for Requests 13-15, "Defendants will produce annual audited consolidated financial statements").)[5]

If the record revealed nothing more about Plaintiffs' efforts to obtain the CMS and CCC transactional data and/or Defendants' representations about what they would produce, Defendants' lack of diligence argument likely would defeat the instant Motion. However, the record (again, as outlined in the Introduction) reveals much more on both those fronts and, in fact, shows (in the words of Plaintiffs' Reply) that "Defendants' arguments that Plaintiffs have not been diligent in seeking this data are misplaced and ignore the parties' lengthy history of meet and confer efforts during which Defendants repeatedly indicated the data was forthcoming." (Docket Entry 142 at 1.) To begin, Plaintiffs (A) timely contested Defendants' highly restrictive view

---

5 As documented in the Introduction, (A) Defendants' response to Request 11 comes via cross-reference to their response to Request 7, which includes the (above-quoted) language used in their response to Request 6 (see Docket Entry 139-3 at 6-7), (B) Defendants' response to Request 12 contains language materially indistinguishable from the (above-quoted) language used in their response to Request 6 (see id. at 7 (objecting to production other than of "customers [sic] contracts which Defendants will produce")), and (C) Defendants' response to Request 15 omits the words "audited consolidated" from the (above-quoted) phrasing "annual audited consolidated financial statements" used in their responses to Requests 13 and 14 (see id. at 8).

13

of what documents they would produce (as expressed on June 10, 2019), by requesting to meet and confer in July 2019 (see Docket Entry 139-6 at 4), and (B) promptly followed-up on that (first) meet and confer (which the parties held in early August 2019) with communications memorializing counsels' discussions and seeking more information about "the database restoration process" (id. at 3).

A short time later (still in August 2019), Defendants' counsel made clear that Defendants had agreed to undertake "data restoration of the CCC data," but that they "ha[d] run into some hardware issues which [they we]re seeking to solve." (Id. at 2.) Within two weeks, Plaintiffs' counsel pressed Defendants' counsel about "when [Defendants] expected to complete [their] production" (Docket Entry 139-4 at 4), whereupon Defendants' counsel again represented that Defendants' production efforts included "trying to restore CCC transactional data" (id.). Counsel for the parties thereafter participated in a telephone conference on September 19, 2019, during which Defendants confirmed the ongoing nature of "the process of restoring transactional data." (Docket Entry 139-5 at 6; see also id. (setting out return communication from Defendants' counsel not contesting foregoing description of said conference, but instead updating Plaintiffs' counsel that Defendants had gathered "all of the pertinent CMS data" and would "continue to work on the restoration of the CCC data").) Moreover, the record indicates that, only in late December 2019, in the course of yet

14

another meet-and-confer at which Plaintiffs' counsel sought a firm date by which Defendants would complete their production of documents, did Defendants' counsel suggest that Defendants possessed a basis to withhold production of the CMS and CCC transactional data. (See id. at 3.)

Given this course of events and exchanges from July through September 2019, as well as in December 2019 (none of which Defendants' Response to the instant Motion even acknowledges (see Docket Entry 141 at 1-11)), the Court cannot countenance Defendants' contention that "Plaintiffs had no reasonable basis to believe that transaction-level data had been requested or would be produced" (id. at 8).[6] Moreover, Defendants have not meaningfully

---

6 To hold otherwise would run counter to the Court's obligation to "require[] cooperation and collaboration during the discovery process in an effort to attain the goals of Federal Rules of Civil Procedure 1 and 26(b)(1)," Li v. Walsh, No. 9:16CV81871, 2018 WL 5853038, at *1 (S.D. Fla. Nov. 9, 2018) (unpublished). See Fed. R. Civ. P. 1 ("[The Federal Rules of Civil Procedure] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."); M.D.N.C. LR 26.1(b)(1) ("The Court expects counsel . . . to cooperate . . . with each other in all phases of the discovery process."); see also Stultz v. Virginia, No. 7:13CV589, 2019 WL 4741315, at *1 (W.D. Va. Aug. 15, 2019) (unpublished) ("[T]o avoid litigation 'degenerating into wasteful clashes,' [Federal] Rule [of Civil Procedure] 1 place[s] on lawyers the obligation to control the expense and time demands of litigation, which would otherwise be stymied by 'antagonistic tactics, wasteful procedural maneuvers, and teetering brinksmanship.' . . . [It] charge[s] counsel to 'affirmatively search out cooperative solutions, chart a cost-effective course of litigation, and assume shared responsibility with opposing counsel to achieve just results.'" (internal brackets omitted) (quoting Chief Justice John Roberts, "2015 Year-End Report on the Federal
(continued...)

countered Plaintiffs' proffer that they reasonably required the CMS and CCC transactional data to prepare their expert report(s)/ disclosures supporting class certification and/or their class certification motion. (See id. at 1-11; see also Docket Entry 139 at 13 ("[T]he transactional . . . data is important to Plaintiffs' class certification showing. For instance, Plaintiffs' expert will analyze this data to demonstrate that Plaintiffs and members of the class can prove overcharge damages using common evidence.").) With that need effectively undisputed and with the established record fact that – despite Defendants starting work to restore the CCC transactional data in August 2019, and continuing such work through January 2020 – technical impediments (rather than lack of diligence by Plaintiffs) ultimately resulted in Defendants failing to produce any CCC transactional data until February 20, 2020, and failing to complete that production until April 9, 2020, the Court must reject Defendants' (second) argument that "Plaintiffs fail[ed] to explain why their expert [could not] complete his analysis prior to the existing March 2, 2020 deadline" (Docket Entry 141 at 2).

Based on the foregoing analysis, the Court finds good cause under Federal Rule of Civil Procedure 16(b)(4) to extend the time for Plaintiffs to serve their expert report(s)/disclosures

---

6(...continued)
Judiciary," available at https://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf), adopted as modified, 2019 WL 4740241 (W.D. Va. Sept. 27, 2019) (unpublished).

supporting class certification and to file their class certification motion. That finding of good cause, however, does not resolve the question of the proper length of the extension.

As to that matter, the Court agrees with Defendants that "a six-month delay is extreme" (id. at 9), including because it would represent "fully two-thirds of the full pre-certification discovery period" (id.). Viewed from a related perspective: (A) in June 2019, the Court adopted the parties' agreement that they would take the ensuing (not quite) nine months to conduct discovery before beginning to exchange expert reports/disclosures and to make court filings regarding class certification (on March 2, 2020); and (B) if Plaintiffs' expert(s) needed all of the desired data in-hand for a full six months to prepare such report(s) (by March 2, 2020), Plaintiffs would have needed to secure such data by September 2, 2019. The record, however, bears no indicia that Plaintiffs ever pursued discovery (and, more specifically, the CMS and CCC transactional data) with an eye toward any such (self-imposed) pre-deadline deadline. To the contrary, as discussed above, Plaintiffs' initial document requests did not clearly solicit transactional data from Defendants and, although Plaintiffs subsequently exhibited reasonable diligence in pursuing such data during the period from August 6, 2019, through September 19, 2019, and again starting on December 12, 2019, they took no steps to obtain it from September 19, 2019, through December 12, 2019.

17

Those considerations belie the notion that Plaintiffs reasonably required (or even subjectively believed they needed) six months after the production of the CMS and CCC transactional data for their expert(s) to prepare class certification-related report(s).

Put another way, Plaintiffs cannot plausibly maintain an entitlement to production of all transactional data six months ahead of their class certification-related deadline(s), when they did nothing to obtain such discovery for almost three months of the six months immediately preceding their class certification-related deadline(s). Under these circumstances, the Court concludes that 81 days, i.e., the span of time between Plaintiffs' class certification-related deadline(s) (March 2, 2020) and the date Plaintiffs' counsel re-engaged with Defendants' counsel about production of transactional data (December 12, 2019), represents a reasonable figure on which to base the extension. Furthermore, because Defendants did not complete production of the transactional data until April 9, 2020, and in light of the logistical challenges that the current public health situation presents (and, for several weeks, has presented) to litigation activity, the Court will add those 81 days from April 9, 2020 (rather than March 2, 2020). Finally, although the Court will extend Defendants' class certification-related deadlines to a date 60 days thereafter (consistent with the existing scheduling order (see Docket Entry 128 at 2)), to minimize the degree to which the (unavoidable)

18

extension of class certification-related expert report preparation and briefing intrudes into the remaining fact discovery period (which ends March 1, 2021 (see id.)), the Court will reduce the time-span for Plaintiffs to prepare their class certification-related rebuttal expert report(s) and reply (see id.).[7]

CONCLUSION

The record reveals good cause under Federal Rule of Civil Procedure 16(b)(4) for the Court to extend Plaintiffs' deadline to serve expert report(s)/disclosures supporting class certification and to move for class certification, but not for six months.

**IT IS THEREFORE ORDERED** that the instant Motion (Docket Entry 139) is **GRANTED IN PART,** in that Plaintiffs shall serve their expert report(s)/disclosures in support of class certification and shall file any motion for class certification by June 29, 2020.

**IT IS FURTHER ORDERED** that Defendants shall serve their expert report(s)/disclosures in opposition to class certification and shall file any response to Plaintiffs' motion for class certification by August 28, 2020.

**IT IS FURTHER ORDERED** that Plaintiffs shall serve any rebuttal expert report(s)/disclosures in support of class certification and

---

7 Because the Court will not alter the fact discovery deadline (or any subsequent scheduling order deadlines), Defendants' concerns about delaying the disposition of this case (see Docket Entry 141 at 10-11) do not establish "sufficient prejudice to warrant denying [the instant M]otion" (id. at 11).

19

shall file any reply to Defendants' response to Plaintiffs' motion for class certification by September 28, 2020.

                                          /s/ L. Patrick Auld
                                            **L. Patrick Auld**
                              **United States Magistrate Judge**

April 13, 2020