**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| MR. DEE'S INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:19CV141 |
| | ) | |
| INMAR, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case comes before the Court on items (B) and (C) of "Plaintiffs' Emergency Motion (A) to Postpone [Certain] Briefing Deadlines, (B) to Compel, and (C) for a Status Conference" (Docket Entry 166 at 1 (emphasis and all-caps font omitted) (the "Emergency Motion")). (See Docket Entry dated Oct. 26, 2020 (referring Emergency Motion to undersigned Magistrate Judge); see also Text Order dated Oct. 10, 2020 (finding as moot in part and denying in part item (A) of Emergency Motion).) For the reasons that follow, the Court will grant item (B) of the Emergency Motion and will deny without prejudice item (C) of the Emergency Motion.

<u>INTRODUCTION</u>

"This case arises in the coupon processing industry . . . . Defendants . . . [and] International Outsourcing Services, LLC ('IOS') are coupon processors . . . [who allegedly] conspired to allocate customers and markets and to fix prices. This [case] is brought on behalf of a class of [allegedly] overcharged purchasers of coupon services for violations of the Sherman Act." (Docket

Entry 145 at 1-2; see also Docket Entry 141 at 3 ("Defendant Carolina Manufacturer's Services, Inc. ('CMS') processes coupons on behalf of the issuing manufacturers. Defendant Carolina Coupon Clearing, Inc. ('CCC') processes coupons on behalf of retailers who receive the coupons from customers. Purported Defendant 'Carolina Services' is not a separate entity, but a d/b/a of CCC. Defendant Inmar, Inc. is the parent of CMS and CCC.").)[1] Shortly after the case's transfer from another district (see Docket Entry 113), this Court (per United States District Judge William L. Osteen, Jr.) lifted a decade-long stay (see Docket Entry 122), whereupon Plaintiffs served Defendants with document requests (see Docket Entry 139-2) and Defendants responded (see Docket Entry 139-3).

From July 19, 2019, through September 19, 2019, the parties (through counsel) communicated about Defendants' responses to Plaintiffs' document requests. (See, e.g., Docket Entry 139-4; Docket Entry 139-6.) On December 12, 2019, Plaintiffs' counsel e-mailed Defendants' counsel as follows: "During our September 19 call, [Defendant] Inmar stated it was still in the process of restoring transactional data. Please let us know if this process has been completed and if and when we should expect to receive any additional transactional and financial data." (Docket Entry 139-5

---

1 Where a Docket Entry contains documents with different page numbers on a single page, pin citations refer to the page number(s) in the footer appended to the filing upon docketing via the CM/ECF system (not original pagination on documents within the filing).

at 6 (emphasis added).)  That same day, counsel for Defendants replied:  "We have (and have had for some time) all of the pertinent CMS data.  We continue to work on the restoration of the CCC data. . . .  We have not yet been able to restore all of the data." (Id. (emphasis added).)

On December 14, 2019, Plaintiffs's counsel proposed another "meet and confer," for the purpose of "discuss[ing Defendants'] outstanding productions . . . ."  (Id.)  A telephone conference then took place on December 23, 2019, after which Plaintiffs' counsel immediately e-mailed Defendants' counsel to recount that:

> During the call, [Defendants' counsel] stated that [they] did not believe the CMS and CCC transactional data was responsive to one of Plaintiffs' [document requests]. [Plaintiffs' counsel] were surprised to hear this, as [they] believed [] Defendants were in the process of producing the data, as discussed during the parties' September 19 call.  This data is responsive to several [document requests] . . . .  Accordingly, please promptly produce this data.

(Id. at 3 (emphasis added).)

On December 26, 2019, Defendants' counsel reported back that:

> [They] reviewed the [document requests] identified and [did] not believe that th[os]e requests, let alone [Defendants'] responses, could ever be construed to seek the complete granular multi-year transaction data of CMS and CCC that [counsel for the parties] ha[d] been discussing (or an agreement to produce it).  The [cited document requests] sought fee and pricing information and [Defendants] agreed to produce the contracts (and ha[d] done so).  All that said, however, if [Plaintiffs] ma[d]e a written request for the data, [Defendants would] be happy to provide it.

3

(Id. at 2 (emphasis added).) On January 3, 2020, while "disagree[ing] that the transactional data [wa]s not responsive [to prior requests]," Plaintiffs served Defendants with a "request[ for] th[e] data." (Id. (emphasis added).)

Specifically, Plaintiffs requested "[a]ll coupon processing transactional data, including but not limited to the CMS and CCC transactional data referenced by Defendants' counsel in his December 26, 2019 email to Plaintiffs' counsel." (Docket Entry 141-2 at 11 (the "ACPTD Request") (emphasis added).) A week later, Defendants responded, in pertinent part, that:

> Defendants object to the [ACPTD] Request[] to the extent that [it is] inconsistent with or outside the scope of permissible discovery under the Federal Rules of Civil Procedure.
>
> . . . .
>
> Defendants object to the [ACPTD] Request[] to the extent [it] do[es] not include a temporal limitation and therefore . . . the production of such information would be unreasonably burdensome and expensive in light of the immateriality of such information, the needs of the case, the amount in controversy, the limitations on Defendants' resources, and the importance of the issues at stake in the litigation.
>
> . . . .
>
> Subject to and without waiving these objections, Defendants respond as follows to [the ACPTD Request]:
>
> . . . .
>
> . . . Defendants also object that the term "all coupon processing transactional data" is vague and ambiguous in this context making a reasonable response unduly burdensome and expensive and, depending upon the interpretation placed upon the words in that phrase, is

4

overbroad making production of such documents <u>unduly burdensome and expensive</u>. Defendants <u>will produce information reflecting transactions for the period 2000-09 to the extent that such information is extant and reasonably available</u>. By way of further explanation, <u>such data for [CMS] is available and will be provided contemporaneously</u> with this response. <u>Data for [CCC] is in the process of restoration and checking and will be provided to the extent it is capable of being restored when available</u>.

(Docket Entry 141-3 at 2-4 (internal paragraph numbers omitted) (emphasis added).)

From January 2020 through April 9, 2020, Defendants produced documents in response to the ACPTD Request. (<u>See, e.g.</u>, Docket Entry 142-2 at 2-4; Docket Entry 146 at 1.) In the midst of that production, Plaintiffs moved for an "exten[sion of] the class certification and expert report and disclosure deadlines by six (6) months in light of Defendants' failure to [timely] produce highly relevant <u>transactional</u>, revenue, and margin <u>data</u> central to Plaintiffs' class certification expert report and their ability to move for class certification." (Docket Entry 139 at 1 (emphasis added).) Defendants opposed that motion and faulted Plaintiffs for "fail[ing] to timely request the purportedly crucial <u>data</u> . . . ." (Docket Entry 141 at 6 (emphasis added).)

In resolving that dispute, the undersigned Magistrate Judge "accept[ed] that [Plaintiffs' document requests before the ACPTD Request] . . . did <u>not</u> 'describe with reasonable particularity [coupon processing transactional data as a] category of items to be inspected,' Fed. R. Civ. P. 34(b)(1)(A)." (Docket Entry 147 at 12

(citing Docket Entry 141 at 7-8 (noting that some prior requests mention "fees" and "prices," but not "categor[ies] broad enough to encompass data about individual transactions," that another prior request "seeks communications about pricing, not data about the prices charged on particular transactions," as well as that "[d]ata showing the daily transactions between Defendants and their customers does not show either operating profits or margins and, thus, is not responsive to [other prior requests]," and that, because the only other potentially applicable prior request "seeks 'interim and annual financial statements, . . . [d]aily transaction data does not fall within [it]")).)  The undersigned Magistrate Judge, however, also agreed with Plaintiffs that "'Defendants' arguments that Plaintiffs ha[d] not been diligent in seeking [coupon processing transaction data] . . . ignore[d] the parties' lengthy history of meet and confer efforts during which Defendants repeatedly indicated [such] data was forthcoming.'"  (Docket Entry 147 at 13 (quoting Docket Entry 142 at 1).)

"Given th[e] course of events and exchanges from July through September 2019, as well as in December 2019 . . ., the Court [would ]not countenance Defendants' contention that 'Plaintiffs had no reasonable basis to believe that transaction-level data had been requested or would be produced.'"  (Docket Entry 147 at 15 (internal citation omitted) (citing Docket Entry 141 at 8)

6

(emphasis added).)[2] Plaintiffs thereafter filed their Motion for Class Certification (Docket Entry 150) and (on August 31, 2020) Defendants responded in opposition (Docket Entry 158). That same day, Defendants also moved to exclude the report and testimony of Plaintiffs' expert witness, Dr. Kathleen Grace. (Docket Entry 160 ("Grace Exclusion Motion").) By prior order, Plaintiffs had received an extension until October 3, 2020, to file any reply as to the Motion for Class Certification. (See Docket Entry 155.) They also obtained an extension until October 10, 2020, to respond to the Grace Exclusion Motion. (See Docket Entry 165.)

On September 28, 2020, Plaintiffs filed the Emergency Motion, requesting as to item (A) extensions of the deadlines to reply as to the Motion for Class Certification and to respond to the Grace Exclusion Motion (see Docket Entry 166 at 1-2), requesting as to item (B) compelled production of "Defendants' complete transaction data, including withheld data concerning coupon processors' ancillary fees" (id. at 2), and requesting as to item (C) "a telephonic status conference with the Court to discuss how to expeditiously address discovery issues going forward" (id.). In advance of any judicial action on the Emergency Motion, Plaintiffs

_____

2 After further analysis, the Court found "good cause under Federal Rule of Civil Procedure 16(b)(4) to extend the time for Plaintiffs to serve their expert report(s)/disclosures supporting class certification and to file their class certification motion." (Docket Entry 147 at 16-17; see also id. at 18 ("conclud[ing] that 81 days . . . represent[ed] a reasonable figure on which to base the extension" and "add[ing] those 81 days from April 9, 2020").)

timely filed their Reply as to the Motion for Class Certification. (Docket Entry 172.) Upon referral of the Emergency Motion, the undersigned Magistrate Judge deemed "moot[] any issue as to an extension of th[at reply] deadline" and denied the other extension request because, "based on the content of [the timely filed] Reply and [its] attachments . . ., it appear[ed] that Plaintiffs possess[ed] a basis to respond to [the Grace Exclusion] Motion, without need of an extension of that filing deadline." (Text Order dated Oct. 7, 2020; see also Docket Entry dated Oct. 6, 2020 (referring Emergency Motion to undersigned Magistrate Judge).)[3]

That Text Order also deferred any ruling as to item (B) and item (C) of the Emergency Motion, pending an opportunity for Defendants to respond. (See Text Order dated Oct. 7, 2020.) Defendants now have responded (Docket Entry 178), and Plaintiffs have replied (Docket Entry 179). Plaintiffs also have filed a Supplement to the Emergency Motion. (Docket Entry 186.)

<u>DISCUSSION</u>

As to item (B), the Emergency Motion "seek[s] to compel [production of] Defendants' complete <u>transaction data</u>, including withheld data concerning coupon processors' <u>ancillary fees</u>." (Docket Entry 166 at 2 (emphasis added); see also id. ("[T]he

_____

3 The Text Order states that, "[i]f the Court ultimately orders additional production [for item (B) of the Emergency Motion], that order could allow Plaintiffs to make a supplemental filing as to [the] Motion [for Class Certification] and/or [the Grace Exclusion] Motion." (Text Order dated Oct. 7, 2020.)

withheld data is relevant to the issues of class-wide impact and damages, two issues that are contested in the context of Plaintiffs' Motion for Class Certification and [the Grace Exclusion Motion].").) Plaintiffs' Memorandum supporting the Emergency Motion points to the deposition of Defendants' corporate designee, Dawn Grubbs, to establish that Defendants withheld coupon processing transactional data, including particularly as to ancillary fees. (See Docket Entry 167 at 12-14 (discussing and quoting Docket Entry 167-14); see also Docket Entry 167-14 at 6 (documenting Grubbs's acknowledgment that she appeared "as a corporate representative for [Defendant] Inmar and its subsidiaries" as well as that her "testimony will be testimony on behalf of [Defendant Inmar]").) Grubbs's deposition testimony, in fact, does confirm that Defendants possess coupon processing transaction data regarding ancillary fees that they did not produce to Plaintiffs; specifically, Grubbs testified as follows:

> Q.  . . . With respect to data -- transaction data at CMS, would CMS be aware of fees charged to its manufacturer clients by retail processors such as IOS, NCH or CCC?
>
> A.  Yes, they would.
>
> . . . .
>
> Q.  . . . [I]f NCH submits an invoice to [] CMS for a CMS manufacturer client and that invoice contains shipping and handling fees, . . . would CMS's transactional data reflect [] the shipping and handling fees NCH was charging and identify NCH as the organization charging?

9

A.   Yes, <u>that data</u> was maintained in the CMS system.

. . . .

Q.   . . . [CMS] ha[s] data that identifies which organization charged the fees, but [CMS] didn't produce that in discovery?

A.   To my knowledge, it was never requested.

Q.   Is that -- is the data maintained?

A.   <u>It is maintained</u>.

Q.   . . . CMS would have the <u>data that identified the shipping and handling fees</u> of IOS, NCH and CCC and other retail processors?

A.   They would.   <u>CMS would have that information</u> on backup tapes.

Q.   . . . [A]nd those backup tapes are still available, correct?

A.   Yes, going back to the time frame that we previously discussed.

. . . .

Q.   What was not reflected [in the data CMS produced] is what the actual charges were by the retail processors that are being reimbursed, correct?

A.   That is correct.

Q.   But that data exists.   It just wasn't produced to [P]laintiffs in this case?

A.   <u>That data does exist</u>.   And to my knowledge, as I said before, it was never requested.   Never seen anything with a request for that.

. . . .

Q.   And so <u>CMS has data on each of the fees that the retail processors charge</u> that identifies which retail processors charge which fee, correct?

10

A.   They do.

Q.   And that goes back to [] 2001 or . . . back to 1999?

A.   I am not certain that it goes back to 1999. . . .
The other data that you're questioning may only go back
as far as the oldest backup tape, which is 2001.

. . . .

Q.   Would [that data] identify each individual fee by
fee type?

A.   There [] are a few exceptions to that.  But in
general, yes, it would identify each individual fee.

(Docket Entry 167-14 at 40-47 (emphasis added).)

Defendants' response to the Emergency Motion does not deny
that they withheld the data identified by Grubbs in the preceding
block quotation; instead, they contend that she "was exactly right
that Plaintiffs never requested data showing each and every
ancillary charge that each and every non-party retailer processor
billed to one of CMS's manufacturer clients."  (Docket Entry 178 at
10.)  That contention cannot stand, given that the ACPTD Request
solicited "[a]ll coupon processing transactional data, including
but not limited to the CMS and CCC transactional data referenced by
Defendants' counsel in his December 26, 2019 email to Plaintiffs'
counsel" (Docket Entry 141-2 at 11 (emphasis added)).  At her
deposition, Grubbs (on behalf of Defendants) clearly agreed that
the data she described as possessed (but not produced) by
Defendants constituted "transaction data at CMS" (Docket Entry 167-
14 at 40) and "CMS's transactional data" (id. at 41).

11

"[T]ransaction data at CMS" (id. at 40) and/or "CMS's transactional data" (id. at 41) undeniably falls within the broad term "[a]ll coupon processing transactional data" (Docket Entry 141-2 at 11).[4]

Defendants nonetheless would have the Court rule that they "did not withhold, intentionally or otherwise, any data responsive to [the ACPTD R]equest" (Docket Entry 178 at 12), because, after stating objections, "Defendants produced what they said they would"

_____

4 The ACPTD Request's express denotation that the term "[a]ll coupon processing transactional data" (Docket Entry 141-2 at 11) "includ[es] but [is] not limited to the CMS and CCC transactional data referenced by Defendants' counsel in his December 26, 2019 email to Plaintiffs' counsel" (id. (emphasis added)) reinforces the conclusion above and defeats Defendants' effort to limit the scope of the ACPTD Request by positing that, "[w]hen the [ACPTD R]equest was served, it was intended to capture the prices and fees that CCC or CMS charged" (Docket Entry 178 at 12 (citing Docket Entry 139-5 at 2) (emphasis added)). In that regard, by explicitly including "CMS and CCC transactional data referenced by Defendants' counsel in his December 26, 2019 email to Plaintiffs' counsel" (Docket Entry 141-2 at 11), the ACPTD Request demanded "the complete granular multi-year transaction data of CMS and CCC" (Docket Entry 139-5 at 2), which (in their e-mail of December 26, 2019) Defendants' counsel had described as broader than just "fee and pricing information" (id. (emphasis added)). Moreover, if Plaintiffs had "intended" (Docket Entry 178 at 12) for the ACPTD Request only "to capture the prices and fees that CCC or CMS charged" (id.), Plaintiffs presumably would have worded the ACPTD Request as "all coupon processing transactional data capturing the prices and fees that CCC or CMS charged." The plain language of the ACPTD Request, however, eschews that narrower linguistic option which Defendants effectively want the Court to substitute for the actual (broader) wording of the ACPTD Request. (See Docket Entry 141-2 at 11.) Simply put, Defendants' rhetoric charging that (A) Plaintiffs have "attempt[ed] to reimagine the[ ACPTD R]equest nine months after it was served" (Docket Entry 178 at 12), (B) that "the [ACPTD] Request is being reinterpreted [by Plaintiffs]" (id.), and (C) that Plaintiffs have "take[n] whatever interpretation of th[e ACPTD R]equest is most expedient in the moment" (id.) more aptly describes Defendants' approach here.

12

(id. at 11), i.e., "data compris[ing] all of the 'information reflecting transactions' that Defendants committed to produce [in their response to the ACPTD Request]" (id. at 12 (quoting Docket Entry 141-3 at 4); see also id. at 13 ("Plaintiffs served an overly broad, vague [ACPTD R]equest. Defendants objected and interpreted the [ACPTD R]equest with reasonable limitations consistent with the context in which it was served, then followed up by producing what they promised.")). The Court declines to rule in Defendants' favor on that basis for two reasons.

First, as shown in the preceding discussion, Defendants did withhold "data responsive to [the ACPTD R]equest" (id. at 12). Second, apart from their objection that the omission of a "temporal limitation" from the ACPTD Request made responding to it "unreasonably burdensome and expensive" (Docket Entry 141-3 at 3), Defendants did not adequately state objections or otherwise respond to the ACPTD Request in compliance with Federal Rule of Civil Procedure 34 ("Rule 34"), which (as to such matters) mandates:

> (B) *Responding to Each Item*. For each [request], the response must either state that inspection . . . will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons. The responding party may state that it will produce copies of documents . . . instead of permitting inspection. The production must then be completed no later than the time for inspection specified in the request or another reasonable time specified in the response.
>
> (C) *Objections*. An objection must state whether any responsive materials are being withheld on the basis of

13

<u>that objection</u>.  An objection to part of a request must specify the part and permit inspection of the rest.

Fed. R. Civ. P. 34(b)(2) (emphasis added); <u>see also</u> Fed. R. Civ. P. 34 advisory committee notes, 2015 amend. ("Rule 34(b)(2)(B) is amended to require that objections to Rule 34 requests be stated with specificity. . . .  The specificity of the objection ties to the new provision in Rule 34(b)(2)(C) directing that an objection must state whether any responsive materials are being withheld on the basis of that objection.").

As quoted in the Introduction, in responding to the ACPTD Request, Defendants lodged these four objections that potentially bear upon their opposition to item (B) of the Emergency Motion:

1) "inconsistent with or outside the <u>scope of permissible discovery</u> under the Federal Rules of Civil Procedure" (Docket Entry 141-3 at 2 (emphasis added));

2) "do[es] not include a <u>temporal limitation</u> and therefore . . . production of such information would be <u>unreasonably burdensome and expensive</u> in light of the immateriality of such information, the needs of the case, the amount in controversy, the limitations on Defendants' resources, and the importance of the issues at stake in the litigation" (<u>id.</u> at 3 (emphasis added));

3) "the term 'all coupon processing transactional data' is <u>vague and ambiguous</u> in this context making a reasonable response <u>unduly burdensome and expensive</u>" (<u>id.</u> at 4 (emphasis added)); and

14

4) "depending upon the interpretation placed upon the words in th[e] phrase ['all coupon processing transactional data,' that term] is <u>overbroad</u> making production of such documents <u>unduly burdensome and expensive</u>" (<u>id.</u> (emphasis added)).[5]

The first of those four objections does not "state with specificity . . . the reasons," Fed. R. Civ. P. 34(b)(2)(B), the ACPTD Request supposedly seeks information "inconsistent with or outside the scope of permissible discovery under the Federal Rules of Civil Procedure" (Docket Entry 141-3 at 2). (<u>See</u> <u>id.</u> (offering no reasons to support such objection).) The second of the four foregoing objections lists <u>only</u> lack of "a temporal limitation" as a "specific[] . . . reason[]," Fed. R. Civ. P. 34(b)(2)(B), why "production of [] information [responsive to the ACPTD Request] would be unreasonably burdensome and expensive" (Docket Entry 141-3 at 3). Finally, the third and fourth (above-quoted) objections, i.e., that "making a reasonable response" (<u>id.</u> at 4) and/or "making production of [] documents [responsive]" (<u>id.</u>) to the ACPTD Request would qualify as "unduly burdensome and expensive" (<u>id.</u>), both rest on interconnected "reasons," Fed. R. Civ. P. 34(b)(2)(B): "the

_____

5 Defendants also generally objected "to the [ACPTD] Request[] to the extent [it] purport[s] to require production of information that is subject to the attorney-client privilege and/or work product doctrine, or any other applicable claim of privilege or related protective doctrine" (Docket Entry 141-3 at 3) and "to the extent [it] request[s] the production of information which is not . . . or is no longer within Defendants' possession, custody, or control" (<u>id.</u>). Those objections do not inform their opposition to item (B) of the Emergency Motion. (<u>See</u> Docket Entry 178 at 10-20.)

term 'all coupon processing transactional data' is <u>vague and ambiguous</u> in this context . . . and, depending upon the interpretation placed upon the words in that phrase, is <u>overbroad</u>" (Docket Entry 141-3 at 4 (emphasis added)). Those twin objections, however, do not provide adequate "specificity," Fed. R. Civ. P. 34(b)(2)(B), for their underlying "reasons," <u>id.</u> In particular, Defendants offered no explanation about how or why "the term 'all coupon processing transactional data'" (Docket Entry 141-3 at 4) suffers from "vague[ness] and ambiguous[ness] in this context" (<u>id.</u>) or what "interpretation placed upon the words in that phrase" (<u>id.</u>) would render it "overbroad" (<u>id.</u>). (See <u>id.</u>)

Defendants thus properly made only one objection, i.e., that the ACPTD Request "do[es] not include a <u>temporal limitation</u> and therefore . . . production of such information would be <u>unreasonably burdensome and expensive</u>" (<u>id.</u> at 3 (emphasis added)). As to the other three objections – "inconsistent with or outside the scope of permissible discovery" (<u>id.</u> at 2), "vague and ambiguous in this context making a reasonable response unduly burdensome and expensive" (<u>id.</u> at 4), and "overbroad making production of such documents unduly burdensome and expensive" (<u>id.</u>) – Defendants "fail[ed] to present valid objections to the[ ACPTD R]equest[ and thereby] 'waived any legitimate objection [they] may have had,'" <u>Kinetic Concepts, Inc. v. ConvaTec Inc.</u>, 268 F.R.D. 226, 247 (M.D.N.C. 2010) (quoting <u>Mancia v. Mayflower Textile</u>

16

Servs. Co., 253 F.R.D. 354, 364 (D. Md. 2008)); see also American Humanist Ass'n v. Perry, No. 5:15CT3053, 2017 WL 11534764, at *3 (E.D.N.C. Mar. 17, 2017) (unpublished) (granting motion to compel where objections "assert[ed] that the [document] requests [we]re overly broad, vague, and/or burdensome with little further explanation or justification," as such "objections are insufficient" and "subject to waiver"); Tucker v. Momentive Performance Materials USA, Inc., No. 2:13CV4480, 2016 WL 8252929, at *3 n.2 (S.D.W. Va. Nov. 23, 2016) (unpublished) ("[The p]laintiff must state specific reasons for the objections to the . . . request for documents. [The p]laintiff's objections . . . are insufficient. [The p]laintiff has failed to provide specific reasons for his objection in his response to the [document] request." (internal citation omitted)).[6]

---

[6] Alternatively (and to the extent, irrespective of any waiver, the Court, "on its own," Fed. R. Civ. P. 26(b)(2)(C), must assess the propriety of the ACPTD Request), the record does not support a finding that (apart from its lack of a time-limit) the ACPTD Request extends beyond the authorized scope of discovery and/or imposes an undue burden/expense as a result of vagueness/ambiguity or overbreadth. As an initial matter, generally, "[a] party claiming that a discovery request is unduly burdensome must present an affidavit or other evidence that specifically describes the process of obtaining the responsive documents or information and the time and expense involved in responding to the request." Futreal v. Ringle, No. 7:18CV29, 2019 WL 137587, at *10 (E.D.N.C. Jan. 7, 2019) (unpublished) (emphasis added). "[Defendants] ha[ve] not presented these types of materials," id.; to the contrary, the declaration on which they rely to show the burden of further responding to the ACPTD Request (see Docket Entry 178 at 20 (citing Docket Entry 178-1 at 8-9)) states only that "[r]etrieving [unproduced] data back to 2000 would require between 40 and 60 (continued...)

Furthermore, "Defendants' response[ to the ACPTD Request is] deficient in that they fail[ed] to identify whether responsive documents [we]re being withheld on the basis of the objections."

---

6(...continued)
hours of <u>time</u> from one of [their] engineers" (Docket Entry 178-1 at 9 (emphasis added)). Defendants' decision to address only "the <u>time</u> . . . involved in responding," without "specifically describ[ing] the <u>process of obtaining</u> the responsive documents . . . <u>and expense</u> involved," <u>Futreal</u>, 2019 WL 137587, at *10 (emphasis added), precludes a finding that compelled production of data withheld by Defendants would exceed the bounds of discovery "proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), because – absent evidence "specifically describ[ing] the process of obtaining the responsive documents . . . and expense involved," <u>Futreal</u>, 2019 WL 137587, at *10 – the Court cannot conclude that "the burden or expense of the proposed discovery outweighs its likely benefit," Fed. R. Civ. P. 26(b)(1), particularly given Plaintiffs' plausible rebuttal to Defendants' attack on the withheld data's significance (<u>compare</u> Docket Entry 179 at 9-12, <u>with</u> Docket Entry 178 at 14-18) and existing uncertainty as to whether "Defendants already restored their transactional data" (Docket Entry 167 at 23). Additionally, Grubbs's testimony refutes the notion that "the term 'all coupon processing transactional data' is vague and ambiguous in this context" (Docket Entry 141-3 at 4), as she readily agreed that the unproduced data constituted "transaction data at CMS" (Docket Entry 167-14 at 40) and "CMS's transactional data" (<u>id.</u> at 41), which (in turn) a reasonable person familiar with "this context" (Docket Entry 141-3 at 4) would understand as captured by the term "[a]ll coupon processing transactional data" (Docket Entry 141-2 at 11). Lastly, the Court agrees with Plaintiffs that the breadth of the ACPTD Request stems directly from the fact that "Defendants previously argued that Plaintiffs' discovery requests were too narrow to encompass transaction data, such that production of data wasn't required." (Docket Entry 179 at 5 (citing and parenthetically quoting Docket Entry 141 at 7 (arguing Plaintiffs could have used broader language in prior requests, such as "'all documents stating a fee' [or] 'each and every document reflecting a fee'" (comma omitted)))).) The Court declines to "place[ Plaintiffs] in a 'damned if you do, damned if you don't' position," <u>Greenwood v. Koven</u>, 880 F. Supp. 186, 197 (S.D.N.Y. 1995), for accepting Defendants' representation that, if Plaintiffs served a broadly-worded request, Defendants would produce "the complete granular multi-year transaction data of CMS and CCC" (Docket Entry 139-5 at 2).

Stephenson v. McCoy, No. 6:17CV1805, 2018 WL 671500, at *2 (D.S.C. Feb. 1, 2018) (unpublished) (citing Fed. R. Civ. P. 34(b)(2)(C) and granting motion to compel).  Instead, "[s]ubject to and without waiving the[ir] objections, Defendants respond[ed]" (Docket Entry 141-3 at 4) that they "will produce <u>information reflecting transactions for the period 2000-09 to the extent that such information is extant and reasonably available</u>" (<u>id.</u> (emphasis added)) and "further expla[ined that] such data for [CMS] is available and will be provided contemporaneously with this response" (<u>id.</u>), as well as that "[d]ata for [CCC] is in the process of restoration and checking and will be provided to the extent it is capable of being restored when available" (<u>id.</u>). Except as concerns the date restriction (to "the period from 2000-09" (<u>id.</u>)), "an individual reviewing [that] response[] would not know . . . whether [Defendants] had withheld any otherwise responsive documents and whether documents were withheld on one (or more) of the four [objections] . . . identified in the [response] . . . ." <u>Futreal</u>, 2019 WL 137587, at *5.[7]

_____

7 By including a date restriction in the description of what they would produce, Defendants' response to the ACPTD Request gave (at least implied) notice that they had withheld documents from outside that period based on their undue burden/expense objection arising from the ACPTD Request's failure to "include a temporal limitation" (Docket Entry 141-3 at 3). <u>See</u> Fed. R. Civ. P. 34 advisory committee notes, 2015 amend. (approving of response to request "stat[ing] that the responding party will limit the search to documents . . . within a given period of time," coupled with a "statement [identifying] what has been . . . 'withheld' [as]
(continued...)

19

In the well-chosen words of a neighboring court:

> The [] Rules are designed to remove this kind of guessing game from the discovery process. Parties should not need to bring the court into the middle of the discovery process . . . to find out if otherwise responsive documents have been withheld because of a[n objection]. Instead, attorneys should unambiguously state when they have withheld documents responsive to discovery requests . . . . [Defendants'] response[ to the ACPTD Request] failed to meet this standard and did not comply with the [] Rules.

Id. at *6; see also Lee v. Max Int'l, LLC, 638 F.3d 1318, 1322 (10th Cir. 2011) ("Discovery is not supposed to be a shell game, where the hidden ball is moved round and round and only revealed after so many false guesses are made and so much money is squandered.").

Given all these considerations, the Court will order Defendants to produce, for the period from 2000-09,[8] "[a]ll coupon processing transactional data" (Docket Entry 141-2 at 11) and will permit Plaintiffs to use such data to make supplemental filings

---

7(...continued)
anything beyond the scope of the search specified"). Conversely, because Defendants' response to the ACPTD Request elsewhere employs vague language to report what they would produce, i.e., "information reflecting transactions . . . to the extent that such information is extant and reasonably available" (Docket Entry 141-3 at 4), Defendants inadequately "specified what [they] believed, in good faith, was the appropriate scope of discovery," Futreal, 2019 WL 137587, at *5, and obfuscated whether they "rel[ied] on [objections] to withhold otherwise responsive documents," id.

8    Plaintiffs have not contested the propriety of a restriction of the ACPTD Request to that period. (See Docket Entry 166 at 2; Docket Entry 167 at 21-25; Docket Entry 179 at 3-13.)

20

supporting their Motion for Class Certification and opposing the
Grace Exclusion Motion.[9]

As a final matter, item (C) of the Emergency Motion "seek[s]
a telephonic conference with the Court to discuss how to
expeditiously address discovery issues going forward, including the
need to search over 1,000 boxes of hard copy documents, seven years
of annual network server backups, and images of two key executives'
computers . . . ." (Docket Entry 166 at 2-3; see also Docket Entry
186 at 2-3 (providing clarifying information about imaging of
computers).) According to Plaintiffs, "deficiencies uncovered in
Defendants' productions have caused Plaintiffs to become gravely
concerned about whether Defendants adequately searched these
repositories for responsive material, particularly given the
limited quantity and low quality of Defendants' document production
thus far." (Docket Entry 167 at 25.) Plaintiffs therefore want
the Court to use the requested conference to "require[ Defendants]
to disclose what they did to search for and produce documents

---

9 Upon granting a motion to compel, a "court must, after
giving an opportunity to be heard, require the party . . . whose
conduct necessitated the motion . . . to pay the movant's
reasonable expenses incurred in making the motion, including
attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). Only three
exceptions apply to the foregoing mandate: "(i) the movant filed
the motion before attempting in good faith to obtain the disclosure
or discovery without court action; (ii) the opposing party's
nondisclosure, response, or objection was substantially justified;
or (iii) other circumstances make an award of expenses unjust."
Id. Accordingly, the Court also will order the parties to meet and
confer about expense-shifting and thereafter to file a joint notice
setting out their position(s) on that issue.

responsive to Plaintiffs' discovery requests."  (Id. at 26; see also id. ("Defendants' counsel wouldn't disclose this information when asked by Plaintiffs' counsel, and [Grubbs] was instructed not to answer questions regarding these issues on the basis of the attorney-client privilege and work product doctrine.").)

The Rules "impose[] an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37."  Fed. R. Civ. P. 26 advisory committee's notes, 1983 amend., subdiv. (g).  "[T]he spirit of the [R]ules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues . . . ."  Fed. R. Civ. P. 26 advisory committee's notes, 1983 amend.  Consistent with that vision, the Rules impose a certification requirement as to all discovery papers, which "obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection."  Fed. R. Civ. P. 26 advisory committee's notes, 1983 amend., subdiv. (g).  By signing that certification, an attorney "certifies that [he or she] has made a reasonable effort to assure that the client has provided all the information and documents available to [the client] that are responsive to the discovery demand."  Id.; see also Fed. R. Civ. P. 37 advisory committee's notes, 1993 amend., subdiv. (a) ("[Discovery requests] should not be read or interpreted in an artificially restrictive or

22

hypertechnical manner to avoid disclosure of information fairly covered by the discovery request . . . .").

Each time Defendants' counsel served discovery responses, said counsel certified compliance with the foregoing standards. <u>See</u> <u>Buchanan v. Consolidated Stores Corp.</u>, 206 F.R.D. 123, 125 (D. Md. 2002) ("Production and certification by counsel already certifies that [the d]efendant is, in good faith, producing all responsive documents . . . ."). In the face of such certifications by an officer of the Court, Plaintiffs' generalized criticism of the "limited quantity and low quality of Defendants' document production" (Docket Entry 167 at 25) or Plaintiffs' bald assertion that "the computers of two executives centrally involved in assessing and negotiating Defendants' agreements with IOS . . . have not been searched for responsive documents" (Docket Entry 179 at 13) does not warrant judicial intervention, <u>see generally</u> <u>Kinetic Concepts</u>, 268 F.R.D. at 252 ("[E]ven an informed suspicion that additional non-privileged documents exist . . . cannot support an order compelling production of documents."). Nor does the Court infer a breach of Defendants' (and their counsel's) discovery obligations from the mere fact that – consistent with Federal Rule of Civil Procedure 26(e)(1)(A) – Defendants supplemented their prior production in advance of Grubbs's deposition (<u>see</u> Docket Entry 167 at 11 (grousing that, "[o]n August 26, [2020,] Defendants produced 1,328 new documents")), as one would expect additional

23

responsive documents to come to light at that juncture, given that preparation for corporate depositions "requires a good faith effort to find out the relevant facts — to collect information, review documents, and interview employees with personal knowledge," <u>Dorsey v. TGT Consulting, LLC</u>, 888 F. Supp. 2d 670, 685 (D. Md. 2012) (internal quotation marks omitted).

As concrete "deficiencies uncovered in Defendants' productions" (Docket Entry 167 at 25), Plaintiffs' Memorandum supporting the Emergency Motion identifies only the fact that, "[d]uring [a] deposition of a third-party witness . . ., Defendants introduced documents that had never been produced in discovery but that were responsive to Plaintiffs' requests" (<u>id.</u> at 10 (citing Docket Entry 167-5 and referencing Docket Entry 167-6)). The record reflects that, after that deposition (on July 22, 2020), Plaintiffs' counsel e-mailed Defendants' counsel to inquire about <u>three</u> documents, asking, inter alia, "[w]hy weren't these [three] documents produced in discovery?" (Docket Entry 167-5 at 2; <u>see also</u> <u>id.</u> ("Why did you choose to omit the 3rd page of the Milano letter from the deposition, which shows that Mike Milano signed the document?").) The next day, Defendants' counsel responded:

> The first document was not produced because it was not responsive to any of your requests. (It is a comparison of CMS and CRC.)

> The second document was not produced because it also does not mention IOS. To the extent that "Promotion Analysis" is part of IOS, it might be responsive and I am happy to produce it with a bates number if you like.

24

> The third document – the Milano letter – was produced by
> you all.  It was produced to us in an extremely small and
> barely legible way and when it was blown up and copied
> for the deposition, the bates number was excluded.  I did
> not choose to omit the third page; it was never produced
> to us.

(Docket Entry 167-8 at 3-4; see also id. at 3 (documenting subsequent reply from Plaintiffs' counsel that "[b]oth CRC and Promotion Analysis were part of IOS and the two unproduced documents [Defendants] used in [the] deposition were clearly responsive to Plaintiffs' document requests").)

In opposing "a status conference aimed at obtaining . . . 'discovery on discovery'" (Docket Entry 178 at 20), Defendants have argued that Plaintiffs' false accusation that Defendants improperly withheld the Milano letter, when it "in fact came from [Plaintiffs'] own production" (id. at 21 n. 20), reveals the poor "quality of their critique" (id.), and that, "even assuming the [other two] documents should have been produced, the late production of two documents does not provide a basis for Plaintiffs to take discovery on Defendants' process of responding to Plaintiffs' numerous, broad requests" (id. at 22 n. 20 (emphasis added)).  Plaintiffs' mistaken decision to seize upon the Milano letter as a justification to attack the adequacy of Defendants' document production does undercut the force of Plaintiffs' protestations; however, Defendants' dismissal of their failure to produce the other two documents as a mere "late production" (id.) also strikes a false note.  In that regard, Defendants did not

25

simply belatedly uncover those two documents and produce them to Plaintiffs pursuant to the duty of supplementation; rather, as the block quotation above indicates, Defendants intentionally withheld those documents after deeming them non-responsive because they do not mention IOS, notwithstanding the fact that they reference two other entities ("CRC and Promotion Analysis" (Docket Entry 167-8 at 3; see also Docket Entry 167-6 at 2, 4)), which Plaintiffs describe as "part of IOS" (Docket Entry 167-8 at 3).

Viewed from that perspective, Defendants' withholding of those two documents may represent a symptom of a larger problem, i.e., lack of "reasonable effort [by Defendants' counsel] to assure that [Defendants] provided all the information and documents available to [them] that are responsive to [Plaintiffs'] discovery demand[s]," Fed. R. Civ. P. 26 advisory committee's notes, 1983 amend., subdiv. (g), and/or "read[ing] or interpret[ing discovery requests] in an artificially restrictive or hypertechnical manner to avoid disclosure of information fairly covered by the discovery request[s]," Fed. R. Civ. P. 37 advisory committee's notes, 1993 amend., subdiv. (a). For example, if Defendants limited their document searches such that they only retrieved documents containing the word "IOS," without considering whether they also should have searched for documents that discuss "part of IOS" (Docket Entry 167-8 at 3), they (and their counsel) may not have complied with their discovery obligations.

At present, the Court considers a telephone conference an ill-suited and/or premature mechanism for assessing that potential problem.  Instead, the Court will direct:

1) Plaintiffs to identify for Defendants five document requests as to which Plaintiffs hold a good-faith concern that Defendants have not conducted a proper search and/or have not produced responsive documents Plaintiffs expected to receive;

2) Defendants to serve Plaintiffs with "an affidavit describing the efforts made to locate documents responsive to [those] requests," Buchanan, 206 F.R.D. at 125;

3) Plaintiffs to notify Defendants of any objections to the adequacy of those efforts and of any additional efforts Plaintiffs propose, after which the parties shall meet and confer; and

4) the parties to file a joint notice setting out their positions on any disputes that remain following that process.

In closing, the Court once more reminds the parties of Chief Justice John Roberts's admonitions regarding the proper conduct of litigation, as recently excerpted by a neighboring court:

> [T]o avoid litigation "degenerating into wasteful clashes," [Federal] Rule [of Civil Procedure] 1 place[s] on lawyers the obligation to control the expense and time demands of litigation, which would otherwise be stymied by "antagonistic tactics, wasteful procedural maneuvers, and teetering brinksmanship." . . . [It] charge[s] counsel to "affirmatively search out cooperative solutions, chart a cost-effective course of litigation, and assume shared responsibility with opposing counsel to achieve just results."

<u>Stultz v. Virginia</u>, No. 7:13CV589, 2019 WL 4741315, at *1 (W.D. Va. Aug. 15, 2019) (unpublished) (internal brackets omitted) (quoting Chief Justice John Roberts, "2015 Year-End Report on the Federal Judiciary," https://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf), <u>adopted as modified</u>, 2019 WL 4740241 (W.D. Va. Sept. 27, 2019) (unpublished).

CONCLUSION

Defendants did not properly respond to the ACPTD Request and additional reasonable questions exist about the adequacy of Defendants' compliance with their discovery obligations.

**IT IS THEREFORE ORDERED** that the Emergency Motion (Docket Entry 166) is **GRANTED** as to item (B) therein, in that, on or before November 18, 2020, Defendants shall produce to Plaintiffs, for the period from 2000-09, "[a]ll coupon processing transactional data" (Docket Entry 141-2 at 11);

**IT IS FURTHER ORDERED** that, on or before November 25, 2020, the parties shall meet and confer about expense-shifting as to item (B) of the Emergency Motion.

**IT IS FURTHER ORDERED** that, on or before December 2, 2020, the parties shall file a joint notice setting out their position(s) on expense-shifting as to item (B) of the Emergency Motion, including whether and in what amount the Court should order expense-shifting.

**IT IS FURTHER ORDERED** that, on or before December 9, 2020, Plaintiffs may file a supplement of no more than 10 pages in

support of their Motion for Class Certification (Docket Entry 150), limited to discussion of the coupon processing transactional data produced by Defendants in compliance with this Order.

**IT IS FURTHER ORDERED** that, on or before December 9, 2020, Plaintiffs may file a supplement of no more than 10 pages in opposition to the Grace Exclusion Motion (Docket Entry 160), limited to discussion of the coupon processing transactional data produced by Defendants in compliance with this Order.

**IT IS FURTHER ORDERED** that the Emergency Motion (Docket Entry 166) is **DENIED WITHOUT PREJUDICE** as to item (C) therein, in that the Court declines to set a telephone conference at this time.

**IT IS FURTHER ORDERED** that, on or before November 9, 2020, Plaintiffs shall identify for Defendants five document requests as to which Plaintiffs hold a good-faith concern that Defendants have not conducted a proper search and/or have not produced responsive documents Plaintiffs expected to receive.

**IT IS FURTHER ORDERED** that, on or before November 16, 2020, Defendants shall serve Plaintiffs with "an affidavit describing the efforts made to locate documents responsive to [those] requests," Buchanan, 206 F.R.D. at 125.

**IT IS FURTHER ORDERED** that, on or before November 23, 2020, Plaintiffs shall notify Defendants of any objections to the adequacy of those efforts and of any proposals for additional efforts.

**IT IS FURTHER ORDERED** that, on or before November 30, 2020, the parties shall meet and confer about any such objections and/or proposals.

**IT IS FURTHER ORDERED** that, on or before December 7, 2020, the parties shall file a joint notice setting out their position(s) on any remaining disputes about any such objections and/or proposals.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 4, 2020

30