## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MR. DEE'S INC., et al.      )
                                   )
              Plaintiffs,   )
                                   )
            v.              )       1:19cv141
                                   )
INMAR, INC., et al.        )
                                   )
              Defendants.   )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Plaintiffs' Motion to Compel and Request for In Camera Review" (Docket Entry 219) (the "Motion"). For the reasons that follow, the Court will grant in part and deny in part the Motion.[1]

### BACKGROUND

"This case arises in the coupon processing industry . . . ." (Docket Entry 145 (the "Operative Complaint"), ¶ 1.) By way of summary,

> manufacturers issue coupons. Customers redeem the coupons through retailers when purchasing products. The retailers then seek reimbursement for the coupons' value from the issuing manufacturers. Both retailers and manufacturers routinely retain the services of third-party coupon processors to handle the logistics of

---

[1] The undersigned United States Magistrate Judge enters an order rather than a recommendation because "motions to compel discovery" under the Federal Rules of Civil Procedure constitute "[n]ondispositive matters [that] may be referred to a magistrate judge [for rulings] without the parties' consent," <u>Mvuri v. American Airlines, Inc.</u>, 776 F. App'x 810, 810-11 (4th Cir. 2019) (citing Fed. R. Civ. P. 72(a)), <u>cert. denied</u>, ___ U.S. ___, 140 S. Ct. 1227 (2020).

> the transactions between retailers and manufacturers, including counting coupons, invoicing manufacture[r]s, and issuing payments to retailers.

(Docket Entry 141 at 2.) Asserting violations of the Sherman Act, Mr. Dee's Inc., Retail Marketing Services, Inc., and Connecticut Food Association (the "Plaintiffs") brought this action "on behalf of a class of [allegedly] overcharged purchasers of coupon services" (Docket Entry 145, ¶ 1). In particular, Plaintiffs have alleged that Inmar, Inc. ("Inmar"), Carolina Manufacturer's Services ("CMS"),[2] Carolina Services,[3] and Carolina Coupon Clearing, Inc. ("CCC")[4] (the "Defendants"), as well as two non-party co-conspirators — International Outsourcing Services, LLC ("IOS") and SUPERVALU Inc. — "unlawfully raised coupon processing fees through a scheme in which they conspired to allocate customers and markets and to fix prices" (id.). (See id., ¶¶ 2-7.)

According to the Operative Complaint:

In the retail coupon processing industry, coupon processors charge transaction fees (to "Retail Clients") and incremental fees (to manufacturers). (Id., ¶ 14.) Some manufacturers refuse to pay incremental fees by instead sending a "chargeback" to a retail

---

2    CMS, a subsidiary of Inmar, "sells coupon processing services to manufacturers." (Id., ¶ 7.)

3    "Purported Defendant 'Carolina Services' is not a separate entity, but a d/b/a of CCC." (Docket Entry 141 at 3.)

4    CCC, likewise a subsidiary of Inmar, "sell[s] retail processing services to retailers, retail co-operatives/wholesalers, and state associations." (Docket Entry 145, ¶ 7.)

processor, which "will then typically extract the incremental fee from a Retail Client by subtracting the value of the manufacturer's incremental fee chargeback from the amount the Retail Client receives for coupons submitted by the Retail Client to the Retail Processor." (Id., ¶ 15.)  In turn, Retail Clients may "deduct the value of the incremental fee chargeback from the amount the retailer owes the manufacturer or wholesaler in connection with the purchase of product" or, absent that option,[5] "rely on a competitive retail processing market to limit Retail Processor incremental fees." (Id., ¶ 18.)

Two entities, Inmar and NCH Marketing Services Inc. ("NCH"), effectively dominate the market for manufacturer coupon processing services. (Id., ¶ 22.)  At one time, IOS competed with CMS, an Inmar subsidiary, in that market (id., ¶ 30) and "implemented a 'chargeback spread' scheme" by which IOS increased fees paid by Retail Clients (id., ¶ 31).  Another Inmar subsidiary, CCC, "[wa]s the only major competitor of IOS" among non-deducting Retail Clients.  (Id., ¶ 35.)  "On July 17, 2000, Chris Balsiger [('Balsiger')], CEO of IOS, sent Robert Carter [('Carter')], President of CMS, a letter concerning 'the large increases that [IOS had] seen in charge back rates to coupon submitters that do

_____

5    "Small retailers and state associations do not purchase product directly from manufacturers and thus do not have the ability to deduct incremental fees from manufacturers.  Many wholesalers also do not deduct incremental fees from manufacturers. (These are referred to as 'non-deducting retailers.')" (Id., ¶ 17.)

not have deduct capability[.]'" (Id., ¶ 37.) The letter blamed Inmar and its subsidiaries for the increase in chargebacks and threatened those entities with litigation. (Id., ¶¶ 38–39.)

Following that threat, "Balsiger entered a series of related agreements with Inmar on behalf of IOS intended to restrain competition and increase prices through: (a) market and customer allocation; (b) price fixing; and (c) transfer of confidential retailer client data to Inmar." (Id., ¶ 41.) Such agreements "eliminated IOS as a competitive threat to Inmar in the manufacturer coupon processing market; eliminated Inmar as a competitive threat to IOS in the retail coupon processing market; and assured substantial profit increases for both IOS and Inmar by fixing and raising coupon processing fees." (Id., ¶ 42.)

In 2001, IOS exited the manufacturer coupon processing market and turned over its clients to CMS, in exchange for CMS sharing its revenues with IOS and engaging in a broader conspiracy (involving Inmar and IOS). (Id., ¶¶ 45, 47.) That alleged conspiracy involved (i) IOS selling Retail Client data to Inmar and Inmar refraining from competition with IOS (to include participating in a program under which Inmar accepted, without auditing, IOS's coupon count (id., ¶ 59)) (id., ¶ 48), (ii) IOS subprocessing coupons for CCC's retail customers and not providing coupon services to CCC's customers (id., ¶ 49), (iii) IOS and Inmar jointly marketing services to mass merchandise retailers, sharing revenue, and not competing for the business of such retailers (id.,

4

¶ 50), and (iv) IOS transferring its manufacturer customers to Inmar and refraining from providing services to such customers (id., ¶ 51). Those "agreements had the purpose and effect of fixing the prices of retail coupon processing fees." (Id., ¶ 54.) Via the anti-competitive scheme, IOS and Inmar generated substantial profits by increasing incremental fees (to include freight fees), charging additional types of fees, and invoicing fewer coupons at a time (to further increase fees). (Id., ¶¶ 65-72.)

Based on the foregoing allegations, the Operative Complaint lodges a single claim against Defendants for violation of Section 1 of the Sherman Act. (Id., ¶¶ 106-15.) In connection with their class certification motion (Docket Entry 150), Plaintiffs "narrow[ed] their claims to only shipping fees, and narrow[ed] the [putative] class to specific entities that paid observably higher shipping fees." (Docket Entry 193 at 4.)

The instant dispute arose when Plaintiffs, during discovery, requested from Defendants certain documents as to which Defendants have invoked attorney-client privilege. (See generally Docket Entries 219, 220.) The parties attempted to resolve their disagreement by means of a telephonic "meet and confer" conference on April 30, 2021, after which "Defendants agreed to review the [privilege] log, to supplement the privilege descriptions as necessary, and to produce non-privileged documents." (Docket Entry 219 at 2.) After Defendants revised the privilege log and produced

5

additional documents, the parties conducted another telephonic conference. (Id. at 2–3.) Subsequent discussions in May 2021 further reduced the number of documents at issue but failed to fully resolve the dispute. (Id. at 3.)

Via the Motion, Plaintiffs have requested that the Court "[c]onduct an *in camera* review of Document Nos. 17, 77, 78, 117, 311, 502, and 508" (id.), "[o]rder Defendants to produce those documents which the Court determines are not protected by any privilege" (id.), and "[g]rant such other and further relief as the Court deems just and proper" (id.). Defendants responded in opposition (Docket Entry 225; see also Docket Entry 226 (Declaration of David J. Mazza, the "Declaration")), and Plaintiffs replied (Docket Entry 230).

## DISCUSSION

### I. Relevant Standards

"The purpose of discovery is to provide a mechanism for making relevant information available to the litigants." Fed. R. Civ. P. 26 advisory committee's notes, 1983 Amendment. Under Federal Rule of Civil Procedure Rule 26,

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

6

Information within this scope of discovery need not be
admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1) (emphasis added).

"[W]hen the [attorney-client] privilege applies, it affords
confidential communications between lawyer and client complete
protection from disclosure." Hawkins v. Stables, 148 F.3d 379, 383
(4th Cir. 1998). "However, because th[e] privilege 'impedes the
full and free discovery of the truth,' it must be 'narrowly
construed and recognized only to the very limited extent that
excluding relevant evidence has a public good transcending the
normally predominant principle of utilizing all rational means for
ascertaining truth.'" United States v. Under Seal (In re Grand
Jury Subpoena), 341 F.3d 331, 335 (4th Cir. 2003) (quoting Hawkins,
148 F.3d at 383). "In an action asserting a federally based cause
of action, the attorney-client privilege is a matter of federal
common law." Byrnes v. Jetnet Corp., 111 F.R.D. 68, 71 (M.D.N.C.
1986) (citing Fed. R. Evid. 501). "[T]he attorney-client privilege
attaches to corporations as well as to individuals. . . . The
administration of the attorney-client privilege in the case of
corporations, however, presents special problems." Commodity
Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985)
(noting that "a corporation must act through agents" and "cannot
speak directly to its lawyers").

"The burden is on the proponent of the attorney-client
privilege to demonstrate its applicability." United States v.

Jones, 696 F.2d 1069, 1072 (4th Cir. 1982). "In claiming the attorney-client privilege, a party must satisfy procedural and substantive criteria. Procedurally, the party must 'expressly make the claim' and 'describe the nature of the documents . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.'" NLRB v. Interbake Foods, LLC, 637 F.3d 492, 501 (4th Cir. 2011) (quoting Fed. R. Civ. P. 26(b)(5)(A)).

A litigant can satisfy that procedural requirement "through a properly prepared privilege log that identifies each document withheld, and contains information regarding the nature of the privilege/protection claimed, the name of the person making/receiving the communication, the date and place of the communication, and the document's general subject matter." Sky Angel U.S., LLC v. Discovery Commc'ns, LLC, 28 F. Supp. 3d 465, 483 (D. Md. 2014). An adequate privilege log sets forth facts rather than "mere conclusory or ipse dixit assertions." Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Tr. No. 1B, 230 F.R.D. 398, 406 n.14 (D. Md. 2005) (internal quotations marks omitted). "Once a prima facie showing of a privilege has been made, an opposing party can justify in camera inspection of the documents by advancing a factual basis sufficient to support a reasonable, good faith belief that in camera inspection may reveal evidence that information in the materials is not privileged." Interbake Foods,

8

LLC, 637 F.3d at 502 (internal quotation marks omitted).
Conversely, speculative or unfounded doubts about the reliability
of a privilege log do not justify in camera review. Anderson v.
Murphy-Brown, LLC (In re NC Swine Farm Nuisance Litig.), No.
5:15-CV-13, 2017 WL 2313470, at *5 (E.D.N.C. May 26, 2017)
(unpublished).

　　　As far as substantive requirements, under the "classic test,"
which the United States Court of Appeals for the Fourth Circuit has
adopted,

> [attorney-client] privilege applies only if (1) the
> asserted holder of the privilege is or sought to become
> a client; (2) the person to whom the communication was
> made (a) is a member of the bar of a court, or his
> subordinate and (b) in connection with this communication
> is acting as a lawyer; (3) the communication relates to
> a fact of which the attorney was informed (a) by his
> client (b) without the presence of strangers (c) for the
> purpose of securing primarily either (i) an opinion on
> law or (ii) legal services or (iii) assistance in some
> legal proceeding, and not (d) for the purpose of
> committing a crime or tort; and (4) the privilege has
> been (a) claimed and (b) not waived by the client.

In re Grand Jury Subpoena, 341 F.3d at 335.

　　　Regarding the third prong of the classic test, "the client's
confidential communication must be for the *primary* purpose of
soliciting legal, rather than business, advice." North Carolina
Elec. Membership Corp. v. Carolina Power & Light Co., 110 F.R.D.
511, 514 (M.D.N.C. 1986); accord McAirlaids, Inc. v. Kimberly-Clark
Corp., No. 7:13-CV-193, 2014 WL 12782814, at *4 (W.D. Va. Sept. 26,
2014) (unpublished) ("Communications involving an attorney but
relating to business advice are not covered by the attorney-client

9

privilege."). The privilege often will not protect "[c]orporate documents prepared for simultaneous review by legal and nonlegal personnel . . . because [such documents] are not shown to be communications made for the primary purpose of seeking legal advice." North Carolina Elec. Membership Corp., 110 F.R.D. at 514. Moreover, although a "lawyer's involvement in a communication weighs heavily in favor of its being deemed privileged . . . a non-privileged communication containing business advice or information, or containing something other than legal advice, does not suddenly become cloaked with the privilege simply because the sender chose to copy an in-house lawyer on it." Washtenaw Cnty. Emps. Ret. Sys. v. Walgreen Co., No. 15 C 3187, 2020 WL 3977944, at *4–5 (N.D. Ill. July 14, 2020) (unpublished); accord McAirlaids, Inc., 2014 WL 12782814, at *4.

With respect to the fourth prong of the classic test, "[a]ny disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege." Jones, 696 F.2d at 1072. However, "[c]orporations may communicate privileged information at various levels without waiving the attorney-client privilege." Santrade, Ltd. v. GE, 150 F.R.D. 539, 545 (E.D.N.C. 1993). In general, the privilege protects the dissemination of legal advice and the solicitation of information for purposes of obtaining legal advice. See North Carolina Elec. Membership Corp., 110 F.R.D. at 514 ("It is important for corporations not only to be able to act on advice but

10

also to be able to communicate information held at every corporate level to counsel so that counsel can render informed advice."). Consistent with those principles, "privileged communications may be contained in discussions between or among non-attorney employees." Walgreen Co., 2020 WL 3977944, at *4. More specifically, the privilege applies "when documents specifically convey legal advice to the limited number of people necessary for the company to act on that legal advice." In re Zetia (Ezetimibe) Antitrust Litig., No. 2:18md2836, 2020 WL 1593544, at *4 (E.D. Va. Feb. 6, 2020) (unpublished); accord Deel v. Bank of Am., N.A., 227 F.R.D. 456, 460 (W.D. Va. 2005) ("A corporation does not waive its privilege when non-lawyer employees send or receive communications because corporate communications which are shared with those having need to know of the communications are confidential for purposes of the attorney-client privilege."). Similarly, "documents subject to the privilege may be transmitted between non-attorneys to relay information requested by attorneys." Santrade, Ltd., 150 F.R.D. at 545.

Additionally, "[t]he Fourth Circuit has recognized that 'persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims' without waiving privileged attorney-client communications." Lola Brown Tr. No. 1B, 230 F.R.D. at 415 (quoting In re Grand Jury Proceedings 89-3 & 89-4, 902 F.2d 244, 249 (4th Cir. 1990)). "The rationale

11

underlying th[is] joint defense privilege focuses not on when documents were generated, but on the circumstances surrounding the disclosure of privileged documents to a jointly interested third party." In re Grand Jury Proceedings 89-3 & 89-4, 902 F.2d at 249. In order to invoke the joint defense extension of the attorney-client privilege, "[a litigant] must first demonstrate that the communications at issue are in fact privileged . . . [and further] show that the alleged privileged communication was made in the course and furtherance of a joint legal effort between parties with an identical legal interest, and that the privilege has not been waived." Mainstreet Collection, Inc. v. Kirkland's, Inc., 270 F.R.D. 238, 243 (E.D.N.C. 2010).

Finally, when "a privileged document has attachments, each attachment must individually satisfy the criteria for falling within the privilege." Leonen v. Johns-Manville, 135 F.R.D. 94, 98 (D.N.J. 1990). Regarding documents sent via email or other means, "transmittal records that [neither] include legal advice nor disclose privileged matters are not subject to the attorney-client privilege." Shaffer v. Northwestern Mut. Life Ins. Co., No. 5:05CV1, 2006 WL 2432110, at *2 (N.D.W. Va. Aug. 21, 2006) (unpublished) (internal quotation marks omitted); accord Window World of Baton Rouge, LLC v. Window World, Inc., Nos. 15 CVS 1, 15 CVS 2, 2019 WL 3995941, at *26-27 (N.C. Super. Ct. Aug. 16, 2019) (unpublished) (collecting cases).

12

## II. Analysis

### A. Preliminary Matters

Despite the fact that the privilege log identifies each of the six disputed emails as "confidential" and "internal" (Docket Entry 220-1 at 1–4), such conclusory labels cannot sustain a claim of attorney-client privilege, <u>Lola Brown Tr. No. 1B</u>, 230 F.R.D. at 406 n.14. Moreover, although the privilege log characterizes Inmar's general counsel Megan Favreau[6] as "inside counsel" (Docket Entry 220-1 at 1–4), Inmar and CMS constitute separate entities (Docket Entry 145, ¶ 7; Docket Entry 148 ¶ 7). While acknowledging that Plaintiffs have not explicitly argued waiver of the attorney-client privilege on those grounds (<u>see</u> Docket Entries 220, 230), the Court notes that Defendants (who bear the burden as it relates to the Motion) have neither mentioned nor advocated for application of the joint defense doctrine (<u>see</u> Docket Entries 225, 226). Accordingly, the Court disregards the labels in the privilege log and considers below whether Defendants have demonstrated all the elements of attorney-client privilege (to include lack of waiver). For purposes of analyzing Defendants' claim of privilege as to each of the seven disputed documents, the Court groups those documents into four categories: communications involving non-lawyers, documents

---

6   Both Plaintiffs and Defendants have clarified that the privilege log alternately identifies Megan Favreau as Megan Edwards. (<u>See</u> Docket Entry 220 at 5; Docket Entry 225 at 4.) For clarity, the Court hereinafter refers to her as "Favreau," even where the privilege log uses her other surname.

13

"reflecting" legal advice, transmittal emails, and hard-copy documents.

## B. Communications Involving Non-Lawyers

### 1. Document No. 17

Document No. 17, dated October 10, 2000, consists of an email from Carter (CMS's president) to Favreau (Inmar's general counsel), John Whitaker, Steve Tarnok ("Tarnok"), Jennifer Mauldin Dawkins, and Cynthia Evans.[7]  (Docket Entry 220-1 at 1.)  The privilege log recounts the communication as follows: "Confidential internal email with no attachment to inside counsel [] Favreau, Esq., providing a summary of 10/10/200[0] conversation with [] Balsiger to aid the provision of legal advice regarding a response to Balsiger's comments about NCH letter and shipping consolidation, nondeductor chargebacks, and the market" (id.).

Plaintiffs have argued that the attorney-client privilege fails to shield Document No. 17 because the communication reflects a primary purpose other than obtaining legal advice.  (Docket Entry 220 at 5 (noting four non-lawyer recipients in addition to Favreau).)  In response, Defendants have stated that this communication "concerned a telephone discussion between [] Carter and the CEO of IOS, [] Balsiger, which occurred less than four months after Balsiger sent a letter to Carter threatening a lawsuit

_____

7  The privilege log elsewhere identifies Cynthia Evans as Cynthia Tessien ("Tessien") (see Docket Entry 225 at 4), which surname the Court uses hereinafter.

against CMS by IOS." (Docket Entry 225 at 2 (citing Docket Entry 226, ¶ 8).)

Neither the privilege log nor Defendants' memorandum (or Declaration) explains why CMS's president included four non-lawyer "executives" (to include Tessien, Inmar's CEO (Docket Entry 225 at 3)) in a communication purportedly seeking legal advice from Inmar's in-house counsel. Given the number of non-lawyer recipients and the lack of information about their interest in receiving such communication, Defendants have failed to demonstrate that the email primarily sought legal advice. For that reason, the Court will order Defendants to produce Document No. 17 for in camera inspection.

2. Document Nos. 77, 78

Document No. 77, dated June 7, 2011, contains an email from Carter to Tessien, with Favreau copied. (Docket Entry 220-1 at 2.) Document No. 78, likewise dated June 7, 2011, denominates the response from Tessien to Carter, again with Favreau copied. (Id.) The privilege log offers a singular description as to those two communications: "Confidential internal email chain with inside counsel [Favreau], transmitting information regarding business strategy and market conditions for legal advice and review by inside counsel and outside counsel, Womble Carlyle" (id.).

Plaintiffs have sought in camera review of Document Nos. 77 and 78 on the grounds that the primary purpose of such communications related to business strategy, not legal advice.

15

(Docket Entry 220 at 6.) Defendants have argued that Document No. 77 warrants protection from disclosure because such communication conveyed to Inmar's general counsel (whom "the salutation on the memorandum" includes (Docket Entry 225 at 3 n.1)) "a 'legal question' that the company would 'probably need help with from Mark H[oroschak ("Horoschak")] at Womble.'" (Id. (citing Docket Entry 226, ¶ 9).) Defendants also have noted the contemporaneous designation of the email as "Attorney Client Privilege/Confidential." (Id.) As concerns Document No. 78, Defendants have explained that such communication "simply adds a two-line non-responsive reply from [] Tessien to [] Carter in response to the primary communication in [] Document No. 77." (Id.)

As with Document No. 17, Defendants have attempted to invoke attorney-client privilege on behalf of one entity (CMS) that communicated with in-house counsel for another entity (Inmar), without any mention of the joint defense doctrine. In any event, because a non-lawyer (Tessien) received the communication as an addressee and because the substance evidently concerned "business strategy and market conditions" (Docket Entry 220-1 at 2), Defendants have failed to carry their burden to demonstrate that the pursuit of legal advice primarily motivated the communications. Therefore, the Court will order Defendants to produce Document Nos. 77 and 78 for in camera inspection.

16

### 3. Document No. 508

Document No. 508, dated January 26, 2007, contains an email from Carter to Tarnok (another CMS employee). (<u>Id.</u> at 4.) The privilege log characterizes the communication as follows: "Confidential internal email transmitting draft presentation on retail market prepared for outside counsel [] Horoschak, Esq., to aid the provision of legal advice regarding Joint Venture with IOS" (<u>id.</u>).

Plaintiffs have argued that dissemination of the presentation between non-lawyers suggests a primary purpose other than obtaining legal advice (even if the presentation reflected such purpose when originally prepared or transmitted). (Docket Entry 220 at 9-10.) Defendants have contended that the presentation (contemporaneously marked "Draft" and "Confidential/Attorney-Client Privileged") "concerns numerous legal issues" (Docket Entry 225 at 5 (citing Docket Entry 226, ¶ 13)).

Defendants have failed to show that a presentation shared between two non-lawyers bore the necessary relationship to legal advice (i.e., obtaining or conveying the same). In other words, Defendants have not explained how the goal of obtaining legal advice from Horoschak, a non-recipient lawyer, motivated Carter to send the presentation to Tarnok. Accordingly, Defendants must produce Document No. 508 for in camera inspection.

17

## C. Documents "Reflecting" Legal Advice

       1. Document No. 117

Document No. 117, dated January 24, 2002, indicates that Tarnok sent an email to Carter, Favreau, Tessien, Jennifer Mauldin Dawkins, and John Whitaker, a communication that the privilege log summarizes as follows: "Confidential internal email transmitting attached pdf presentation reflecting legal advice of inside counsel [Favreau], related to one-count implementation and associated fees" (Docket Entry 220-1 at 2).

Plaintiffs have asserted that the presentation warrants in camera inspection because the privilege log fails to establish that the presentation actually disseminates or discloses legal advice (as opposed to "merely 'reflect[ing]'" it). (Docket Entry 220 at 6–7.) Defendants have maintained that the seven-page presentation qualifies as privileged, arguing that one page of the presentation "references a 'potential lawsuit'" and that another "page lists as one of its 'Issues' a legal 'argument' that could be asserted by two of Inmar's competitors." (Docket Entry 225 at 3-4 (citing Docket Entry 226, ¶ 10).)

A neighboring court has noted the ambiguity that can result from the invocation of attorney-client privilege as to documents that "reflect" legal advice. <u>See</u> <u>McAirlaids, Inc.</u>, 2014 WL 12782814, at *4. In that case, representations during oral argument clarified that the "privilege log use[d] the term

'reflecting' legal advice synonymously with 'conveying,' 'providing,' or 'relaying' legal advice," id., thus rendering attorney-client privilege applicable to "[d]ocuments 'reflecting' legal advice," id. In other words, the substance of the communication, rather than the description in the privilege log, controlled whether the attorney-client privilege applied. See id. ("declin[ing] to find that otherwise privileged documents lose their privilege simply due to semantics of the privilege log descriptions").

Here, neither the privilege log nor the Declaration clarifies whether Document No. 117 actually reveals legal advice. Given that the Court must strictly construe the attorney-client privilege, In re Grand Jury Subpoena, 341 F.3d at 335, and only shield from disclosure communications that "convey legal advice to the limited number of people necessary for the company to act on that legal advice," In re Zetia (Ezetimibe) Antitrust Litig., 2020 WL 1593544, at *4, Defendants must produce Document No. 117 for in camera inspection.

2. Document No. 311

Document No. 311, dated November 3, 2000, consists of an email from Tessien to Carter and Tarnok, with Favreau copied. (Docket Entry 220-1 at 3.) The privilege log describes such communication as a "[c]onfidential internal email with inside counsel [] Favreau, Esq., reflecting legal advice of [] Favreau regarding conduct of negotiations with [a predecessor of IOS]" (id.).

19

Per Plaintiffs, the Court should review Document No. 311 and order disclosure to the extent such document neither "contain[s n]or reveal[s] legal advice." (Docket Entry 220 at 8.) Defendants have contended that the communication "references 'rules' concerning the scope of certain discussions with IOS and reflects [Favreau]'s views on that subject as well as the approach for the upcoming meeting agenda and topic list." (Docket Entry 225 at 4 (citing Docket Entry 226, ¶ 11).)

For the reasons stated in connection with Document No. 117, the Court will inspect Document No. 311 in camera to determine the extent to which the email explicitly conveys legal advice.

### D. Transmittal Emails

As explained above, Document Nos. 117 and 508 each consist of a purportedly privileged presentation sent via email. According to Plaintiffs, the transmittal emails remain subject to disclosure because Defendants have limited their claim of attorney-client privilege to the presentations attached to such emails. (Docket Entry 220 at 6, 9.) In response, Defendants have declined to address whether attorney-client privilege also protects the transmittal emails. (See Docket Entry 225 at 1–8.)

Because Defendants have failed to "expressly . . . claim," Fed. R. Civ. P. 26(b)(5)(A), attorney-client privilege as to the transmittal emails and because the privilege log does not indicate that such communications fall within the scope of the privilege,

20

Defendants must produce to Plaintiffs the emails transmitting the presentations in connection with Document Nos. 117 and 508.

**E. Hard-Copy Documents**

Document No. 502, dated January 1, 2007, identifies neither an author nor a sender. (Docket Entry 220-1 at 4.) The privilege log refers to that document as "[c]onfidential analysis of pre- and post-Joint Venture retail client movement between clearing agents prepared for outside counsel, [] Horoschak, Esq., to aid the provision of legal advice regarding unwinding of coupon sub-processing agreement. Date is estimated." (Id.)[8]

Plaintiffs have requested in camera inspection of Document No. 502 based on Defendants' incomplete assertion of attorney-client privilege, given that the privilege log fails to identify an author or any recipients other than Horoschak. (Docket Entry 220 at 8–9.) Per Defendants, Document No. 502 consists of a schedule to an agreement, a blank page depicting only a paper clip, and two substantive pages. (Docket Entry 225 at 5 n.3 (citing Docket Entry 226, ¶ 13 n.2).) Defendants already have provided to Plaintiffs (i) the schedule to the agreement and (ii) a document prepared by Horoschak based on the two substantive pages. (Id.)

Although the privilege log fails to identify an author or recipient (likely because Document No. 502 existed in paper form and does not reflect electronic creation or transmission),

---

8 Defendants have explained that Document No. 502 "was a paper document retrieved from Inmar." (Docket Entry 226, ¶ 12.)

Defendants have provided enough information to allow Plaintiffs to assess the claim of attorney-client privilege: an unknown employee prepared Document No. 502 to facilitate the provision of legal advice (Docket Entry 220-1 at 4), and outside counsel indeed received and relied upon Document No. 502 in creating another document that Defendants have produced to Plaintiffs (Docket Entry 225 at 5 n.3 (citing Docket Entry 226, ¶ 13 n.2)).  Insofar as Plaintiffs have speculated about broader dissemination of Document No. 502, thus resulting in a waiver of attorney-client privilege, that unsupported basis remains inadequate to justify in camera review.  See Anderson, 2017 WL 2313470, at *5.

## CONCLUSION

With respect to communications involving non-lawyers and documents reflecting (but not necessarily revealing) legal advice, Plaintiffs have justified their request for in camera inspection to determine the applicability of the attorney-client privilege as to Document Nos. 17, 77, 78, 117, 311, and 508.  In addition, because Defendants have failed to invoke the attorney-client privilege as to the transmittal emails related to Document Nos. 117 and 508, Defendants must produce those communications to Plaintiffs. Finally, the Court need not inspect Document No. 502, a hard-copy document prepared to facilitate legal advice by outside counsel.

**IT IS THEREFORE ORDERED** that the Motion (Docket Entry 219) is **GRANTED IN PART AND DENIED IN PART**, such that, on or before

September 7, 2021, Defendants (i) must provide Document Nos. 17, 77, 78, 117, 311, and 508 to the Court for in camera inspection and (ii) must serve Plaintiffs with the transmittal emails accompanying Document Nos. 117 and 508.

This the 30th day of August, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
