IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


MR. DEE'S INC., RETAIL              )
MARKETING SERVICES, INC., on       )
behalf of themselves and all       )
others similarly situated,         )
and CONNECTICUT FOOD               )
ASSOCIATION,                       )
                                   )
         Plaintiffs,               )
                                   )
    v.                             )        1:19CV141
                                   )
INMAR, INC., CAROLINA              )
MANUFACTURER'S SERVICES, INC.,     )
CAROLINA SERVICES, and            )
CAROLINA COUPON CLEARING, INC.,    )
                                   )
         Defendants.               )


**<u>MEMORANDUM OPINION AND ORDER</u>**

**OSTEEN, JR., District Judge**

Presently before this court is a Motion for Summary

Judgment filed by Defendants Inmar, Inc., Carolina

Manufacturer's Services, Inc., Carolina Services, and Carolina

Coupon Clearing, Inc. (together, "Defendants"). (Doc. 234.) For

the reasons stated herein, this court finds that the motion

should be denied.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

  A.   **Parties**

  Plaintiff Mr. Dee's, Inc. manufactures food products. (Third Am. Compl. Class Action ("TAC") (Doc. 145) ¶ 2.)[1] Mr. Dee's issues coupons to customers and purchases coupon processing services. (Id.) Plaintiffs Retail Marketing Services, Inc. and Connecticut Food Association are entities who purchase coupon processing services for retailers and members. (Id. ¶¶ 3–4.)

  Defendant Inmar, Inc. sells coupon processing services to manufacturers. (Id. ¶ 7.) Inmar's subsidiary, Defendant Carolina Manufacturer's Services, Inc. ("CMS"), sells coupon processing services to manufacturers. (Id.) Inmar's subsidiaries, Defendants Carolina Coupon Clearing, Inc. ("CCC") and Carolina Services ("CS"), sell coupon processing services to retailers. (Id.)[2] Inmar's president during the relevant time period was Robert Carter. (See Attach. 1, Decl. of Robert Carter ("Carter Decl.") (Doc. 234-1) ¶ 1.)

----

  [1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

  [2] This court at times uses "Inmar" to refer to either Inmar, CMS, CCC, and/or CS.

-2-

Non-party International Outsourcing Services, LLC ("IOS"), formerly known as International Data, LLC, acted as a processor in the coupon redemption process. (Id. ¶ 5.) IOS was initially a named party. (See Class Action Compl. ("Compl.") Doc. 1.) In November 2008, these proceedings were stayed on a motion by IOS pending resolution of a criminal case against its former officers and employees. (Doc. 72.) IOS filed a Suggestion of Bankruptcy in 2009. (Doc. 73.) IOS was later dismissed from these proceedings. (Doc. 77.)

### B. **Procedural History**

This action was initially brought in the Eastern District of Wisconsin in 2008. (See Compl. (Doc. 1).) In 2019, the case was transferred to this district. (See Doc. 112.) Plaintiffs amended their Complaint three times. (Doc. 33; Doc. 124; TAC (Doc. 145).) Defendants filed an Answer to the Third Amended Complaint. (Doc. 148.)

On August 2, 2021, Defendants filed a Motion for Summary Judgment, (Doc. 234), and accompanying brief, (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Br.") (Doc. 235)). Plaintiffs responded, (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Resp.") (Doc. 249)), and Defendants replied, (Defs.' Reply Mem. in Supp. of Mot. for Summ. J. ("Defs.' Reply") (Doc. 258)).

C.    **Factual Background**

A majority of the facts are described here, but additional relevant facts will be addressed as necessary throughout the opinion. This court reviews the facts and draws all reasonable inferences in the light most favorable to Plaintiffs. Scott v. Harris, 550 U.S. 372, 378 (2007). Antitrust law, however, "limits the range of permissible inferences from ambiguous evidence," such that "conduct at consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

The coupon processing industry began declining in the mid-1990s. (Ex. D, Excerpts of Dep. of Robert Carter ("Pls.' Carter Dep. Excerpts") (Doc. 249-4) at 14.) But despite the decline in coupon volume, Inmar's revenue levels remained consistent. (Id. ("[I]n spite of the value dropping by 200-and-some million coupons at CCC, we have been able to keep the revenue roughly flat-ish across that five-year period.").) Inmar and IOS offered coupon processing services to manufacturers and retailers. (TAC (Doc. 145) ¶¶ 5, 7.) In the early 2000's, there were three main competitors in the coupon processing market: Inmar, IOS, and NCH Marketing Services, Inc. ("NCH"). (Ex. A, Excerpts of Dep. of

-4-

Jennifer Mauldin ("Pls.' Mauldin Dep. Excerpts") (Doc. 249-1) at 3-4.)

Shipping fees are one of the fees assessed during coupon processing. (Pls.' Carter Dep. Excerpts (Doc. 249-4) at 7.) "It's a fee intended to be a reimbursement for the [] cost of moving the coupons around." (Id.) Shipping fees are not tied to the physical movement of coupons. (Id.) Rather, they are a "market level fee" where "manufacturers [are] effectively covering part of the cost of the retailer's processing." (Id. at 7-8.) Manufacturers were not contractually bound to pay these fees. (Id. at 8.) If manufacturers paid less than the full amount of the shipping fee, they would "chargeback" the unpaid fee amounts to retail processors, who would in turn deduct the unpaid shipping fee amounts from their retail clients or write off the shipping fee chargebacks. (Ex. I, Excerpts of Dep. of Thomas Chris Balsiger, ("Pls.' Balsiger Dep. Excerpts") (Doc. 249-9) at 12-13; Carter Decl. (Doc. 234-1) ¶¶ 16-18.)

IOS, as a retail coupon processor, charged shipping fees to manufacturers. (Pls.' Carter Dep. Excerpts (Doc. 249-4) at 16.) Inmar, in response to IOS's increased shipping fees, increased its chargebacks to IOS's retail clients. (Ex. N ("July 17, 2000 Letter") (Doc. 249-14).) IOS responded to Inmar's chargebacks by threatening a "price war" against Inmar. (Id.; Pls.' Balsiger

-5-

Dep. Excerpts (Doc. 249-9) at 31.) On October 10, 2000, IOS CEO Chris Balsiger spoke with CMS President Robert Carter. (Ex. P ("Oct. 10, 2000 Email") (Doc. 249-16) at 2.) Balsiger "made a number of references to 'our need for control.' He said 'you guys at Inmar are going to have to figure out that strategic alliances and mergers will make you rich.'" (Id.)

On April 11, 2001, Inmar and IOS entered into a series of related agreements: (1) an Asset Purchase Agreement; (2) a Proprietary Data Transfer Agreement; (3) a Coupon Sub-Processing Agreement; and (4) a Joint Marketing Agreement. (See Attach. 14, Asset Purchase Agreement ("APA") (Doc. 234-14); Attach. 16, Proprietary Data Transfer Agreement ("PDTA") (Doc. 234-16); Attach. 15, Coupon Sub-Processing Agreement ("CSPA") (Doc. 234-15); Attach. 17, Joint Marketing Agreement ("JMA") (Doc. 234-17).) The Asset Purchase Agreement allowed CMS to purchase all contracts for coupon processing between IOS subsidiary Consumer Response Company and its manufacturer customers. (See APA (Doc. 234-14).) The Joint Marketing Agreement combined IOS and Inmar's marketing efforts to solicit contracts with large mass merchandisers. (See JMA (Doc. 234-17).) The Proprietary Data Transfer Agreement established a "One-Count" program between IOS and CMS. (See PDTA (Doc. 234-16); Carter Decl. (Doc. 234-1) ¶ 19.) Finally, the Coupon Sub-Processing Agreement allowed CCC

-6-

to "obtain[] an additional flexible means of subprocessing coupons received by CCC from certain of its Retail Stores in order to satisfy the Retail Stores' needs and expectations during peak periods of usage of coupon promotion." (See CSPA (Doc. 234-15) at 1, § C.) Under the Coupon Sub-Processing Agreement, IOS would conduct the retail coupon processing services for CCC. (Id. at 1, § B.)

After these agreements, Inmar and IOS's fees increased. (Pls.' Carter Dep. Excerpts (Doc. 249-4) at 6-7.) IOS's CEO Balsiger maintained that IOS's fees were increasing prior to the execution of these agreements. (See Pls.' Balsiger Dep. Excerpts (Doc. 249-9) at 17-18.) Inmar's president denies that there were ever any discussions between IOS and Inmar about fixing shipping fees. (Carter Decl. (Doc. 234-1) ¶ 32.) During IOS CEO Chris Balsiger's criminal trial, he testified that he entered into a joint venture with Inmar "to head off a price war on coupons" which "allow[ed] [them] to escalate [their] freight revenue." (Ex. E, Tr. Excerpt of Bench Trial ("Balsiger Trial Tr.") (Doc. 249-5) at 9-10.) However, when deposed for this case, Balsiger denied discussions about fixing shipping fees. (Attach. 4, Excerpts of Dep. of Thomas Chris Balsiger (Doc. 234-4) at 18.)

## II. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. If the "moving party discharges its burden . . ., the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718–19 (4th Cir. 2003) (citing Matsushita, 475 U.S. at 586–87). Summary judgment should "be granted unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." Id. at 719 (citing Liberty Lobby, 477 U.S. at 247–48).

## III. **ANALYSIS**

Defendants move for summary judgment, contending that there is no basis in the record on which a jury could infer that Inmar and IOS conspired to fix shipping fees. (See Defs.' Br. (Doc. 235) at 1.) Defendants emphasize that this case rests

entirely on circumstantial evidence, and that "[a]ntitrust law
. . . 'limits the range of permissible inferences from ambiguous
evidence in a § 1 case.'" (Id. at 23, 26 (quoting Matsushita,
475 U.S. at 588).)

A.   **Market and Customer Allocation**

This court first addresses Plaintiffs' argument that
Defendants have failed to move for summary judgment on market
and customer allocation. Plaintiffs argue that Defendants "do[]
not seek summary judgment on, and fail[] to carry [their]
initial burden on, market and customer allocation, and other
anticompetitive restraints." (Pls.' Resp. (Doc. 249) at 20.) In
reply, Defendants assert that the Third Amended Complaint "is
rife with allegations that the Defendants conspired to fix
prices" and "[h]aving continually 'narrowed' their claims over
the 14-year pendency, it is disingenuous for Plaintiffs to seek
to benefit from a contention that Defendants did not address the
remnant of their ever-shrinking case." (Defs.' Reply (Doc. 258)
at 4, 5 n.3.)

Section 1 of the Sherman Act prohibits "[e]very contract,
combination . . . or conspiracy, in restraint of trade or
commerce among the several States, or with foreign nations." 15
U.S.C. § 1. The Supreme Court has interpreted this potentially
expansive language "to outlaw only unreasonable restraints."

-9-

State Oil Co. v. Khan, 522 U.S. 3, 10 (1997). One category of restraints that can trigger liability under § 1 is horizontal agreements—agreements between competitors in a relevant market. See United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972) (explaining that horizontal arrangements are between "competitors at the same level of the market structure"). Price-fixing agreements and market or customer allocation agreements are two types of horizontal agreements. See Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, . . . are per se unlawful); Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49–50 (1990) (holding horizontal agreements among competitors to divide markets are per se illegal).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323; see also LR 56.1(e) ("A party moving for summary judgment upon an opposing party's claim shall set out a statement of the nature of the matter before the Court, a statement of facts, and a statement of the questions presented as provided in LR 7.2(a)(1)–(3). The

-10-

party shall also set out the elements that the claimant must prove (with citations to supporting authority) and explain why the evidence is insufficient to support a jury verdict on an element or elements, or why some other rule of law would defeat the claim."). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

When a defendant fails to provide argument on why the court should rule in its favor, the court should deny any requested relief. Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC, No. 1:12CV27, 2014 WL 2559285, at *2 n.4 (M.D.N.C. June 6, 2014) (denying the movants relief where the movants "fail[ed] to develop any argument or cite any authority in support of [their] request" in accordance with LR 7.2(a)); Myers v. Saluda Cnty. Sch. Dist., Civil Action No. 8:08-cv-02976-RBH, 2010 WL 1664891, at *2 (D.S.C. Apr. 23, 2010) (denying summary judgment where the defendant "completely failed to address whether a genuine issue of material fact exist[ed] as to the Plaintiff's First Amendment claim"); The Carrolton of Fayetteville, Inc. v. Pine Manor Rest Home, Inc., 215 B.R. 341, 344 (E.D.N.C. 1997) (affirming the bankruptcy court's denial of summary judgment where the moving party's brief "fail[ed] to

-11-

specifically address the merits of its own motion for summary judgment" on four issues).

In this case, Plaintiffs' Sherman Act § 1 claim is based on two types of horizontal agreements between Inmar and IOS: (1) Defendants' alleged conspiracy "to allocate markets and customers"; and (2) Defendants' alleged conspiracy to "unreasonably fix, raise, maintain, or stabilize prices, in the United States market for" manufacturer and retail coupon processing services. (TAC (Doc. 145) ¶ 108.) Defendants' argument in their summary judgment brief focuses solely on shipping fees. (See Defs.' Br. (Doc. 235) at 19.) Although Defendants make passing references to Plaintiffs' allegation regarding market and customer allocation, (id. at 2, 5), Defendants "fail to develop any argument or cite any authority in support of [their] request," Champion Pro Consulting Grp., 2014 WL 2559285, at *2 n.4.

A horizontal price fixing agreement is distinct from an agreement to allocate markets or customers. Compare Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 647 (1980) (price fixing), with Palmer, 498 U.S. at 49 (market allocation). Here, while Plaintiffs bring only one Sherman Act claim, (TAC (Doc. 145) ¶¶ 106–15), they allege two theories for that violation: (1) allocating markets and customers, and (2) fixing

-12-

prices for retail and manufacturer coupon processing services,
(id. ¶ 108). Because a price fixing agreement and a market
allocation agreement are distinct types of unlawful restraints
on trade, compare Catalano, 446 U.S. at 647, with Palmer, 498
U.S. at 49, Defendants may be liable for violating Section 1 of
the Sherman Act because of a price fixing agreement, a market or
customer allocation agreement, or both, (see TAC (Doc. 145)
¶ 108).

Defendants attempt in their reply brief to bootstrap an
argument about market and customer allocation agreements to
their price-fixing argument. (See Defs.' Reply (Doc. 258) at 4-
6.) Defendants contend that the Third Amended Complaint "is rife
with allegations that Defendants conspired to fix prices." (Id.
at 4.) Defendants then try to paint Plaintiffs' allegations
about market and customer allocation agreements as a new
argument. (Id. at 5-6 ("Plaintiffs now argue that their case is
still viable even if there was not direct evidence on the actual
prices to be maintained, and that allocation of markets and
customers itself reduces competition and causes price increases,
without the need for further agreement on prices." (internal
citation and quotation marks omitted) (quoting Pls.' Resp.
(Doc. 249) at 23)).) Plaintiffs allege an agreement to allocate
markets and customers in their Third Amended Complaint, (TAC

-13-

(Doc. 145) ¶ 108), and contrary to Defendants' argument that Plaintiffs "hav[e] continually 'narrowed' their claims over the 14-year pendency" of this case, (Defs.' Reply (Doc. 258) at 5 n.3), Plaintiff's original Complaint is rife (to use Defendants' words) with allegations of an agreement to allocate customers and markets, (see, e.g., Compl. (Doc. 1) ¶¶ 1, 40, 57, 94, 101). Defendants attempt to cast blame on Plaintiffs for Defendants' failure to move for summary judgment as to a Sherman Act violation based on market and customer allocation agreements. Given that Defendants provided no argument to support this court granting summary judgment for Defendants on the market and customer allocation agreement allegations, it would be inappropriate for this court to find that issue no longer remains. Therefore, this court finds Plaintiffs' allegation of a § 1 violation because of customer and market allocation agreements remains, and that issue must be resolved at trial.

**B.** **Price Fixing**

Because Defendants failed to properly move for summary judgment on the issue of an anticompetitive agreement to allocate customers and markets, see discussion supra Section III.A, this court focuses the remainder of its analysis on Defendants' argument for summary judgment on allegations of price fixing.

-14-

"To establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 423-24 (4th Cir. 2015) (internal quotation marks omitted) (quoting N.C. State Bd. of Dental Exam'rs v. FTC, 717 F.3d 359, 371 (4th Cir. 2013)). "The essence of a § 1 claim is concerted action." Cooper v. Forsyth Cnty. Hosp. Auth., Inc., 789 F.2d 278, 280 (4th Cir. 1986).

Before analyzing whether there is direct or circumstantial evidence of an agreement to fix prices, this court will determine the legal effect of Balsiger's criminal trial testimony, (Balsiger Trial Tr. (Doc. 249-5)), as this court finds that testimony relevant to its analysis. Defendants contend Balsiger's criminal trial testimony is "hearsay," (Defs.' Br. (Doc. 235) at 19, 25), and is not direct evidence of antitrust activity because "when the time came for [Balsiger] to testify in this case, he denied all Plaintiffs' contentions concerning anticompetitive concerted action with Inmar," (id. at 25). Plaintiffs rely on Balsiger's trial testimony throughout their response brief, (see Pls.' Resp. (Doc. 249) at 8-10, 16-17, 26, 28-29, 35), and although they do not explicitly cite Balsiger's trial testimony as direct evidence of an agreement to fix prices between Inmar and IOS, at summary judgment "[t]he

-15-

court need consider only the cited materials, but it <u>may</u> consider other materials in the record," Fed. R. Civ. P. 56(c)(3).

In determining whether a genuine dispute of material fact exists, a court considers facts that could "be presented in a form that would be admissible in evidence" at trial. <u>See</u> Fed. R. Civ. P. 56(c)(2). It is true that Balsiger's criminal trial transcripts would be inadmissible hearsay at a trial in this case because Plaintiffs likely could not show that Balsiger is unavailable to testify, and even if he were unavailable, Defendants did not have "an opportunity and similar motive to develop" Balsiger's testimony at his criminal trial. <u>See</u> Fed. R. Evid. 804(b)(1)(B). However, this court sees no reason why the contents of Balsiger's criminal trial testimony could not "be presented in a form that would be admissible in evidence" at trial in this case. Fed. R. Civ. P. 56(c)(2). Plaintiffs presumably could subpoena Balsiger for live testimony or take a trial deposition and introduce that testimony. For that reason, this court finds it may properly consider Balsiger's criminal trial testimony in a manner similar to any other sworn affidavit

-16-

or declaration in analyzing whether to grant summary judgment on a Sherman Act § 1 claim based on price fixing.[3]

### 1.  **Direct Evidence of an Antitrust Conspiracy**

To survive summary judgment, an antitrust plaintiff must present "direct or circumstantial evidence that reasonably tends to prove that the [alleged conspirators] had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984). Conduct that is "as consistent with permissible competition as with [an] illegal conspiracy does not, standing alone, support an inference of [an] antitrust conspiracy." Matsushita, 475 U.S. at 588 (citing Monsanto, 465 U.S. at 764). Thus, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." Id. In other words, the plaintiff "must show that the inference of conspiracy is

_____

[3] The parties' arguments focused on the admissibility of the transcripts of Balsiger's criminal trial testimony, which is addressed in this opinion. The parties did not specifically address at summary judgment the effect of conflicting statements, if any, between Balsiger's trial testimony and his deposition testimony. After review of the portions of the transcripts presented, this court is not able to weigh that testimony to make any finding as to whether any conflicts in testimony should affect this analysis. To the contrary, drawing all reasonable inferences in favor of the non-moving party, this court is compelled to consider Balsiger's testimony in the light most favorable to Plaintiffs.

reasonable in light of the competing inferences of independent action." Id.

"Direct evidence is extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 226 (4th Cir. 2004) (quoting InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003)). Direct evidence must be "explicit and requires no inferences to establish the proposition or conclusion being asserted." Id. (internal quotation marks omitted) (quoting InterVest, 340 F.3d at 159); see also United Mine Workers of Am. v. Pennington, 381 U.S. 676, 720 (1965) (Goldberg, J., dissenting) ("Only rarely will there be direct evidence of an express agreement" in conspiracy cases.).

Plaintiffs assert there is direct evidence of written agreements regarding "allocation of customers and markets," but do not argue that there is also direct evidence of agreements to fix prices. (See Pls.' Resp. (Doc. 249) at 23.) The four written agreements between IOS and Inmar, which Plaintiffs point to as direct evidence of a conspiracy to allocate customers and markets, (id.), do not concern shipping fees, see discussion supra Section I.C. Although not explicitly raised by Plaintiffs, Balsiger's criminal trial testimony references an agreement between Inmar and IOS to fix prices. Balsiger testified that he

-18-

"proposed a joint venture to [Inmar]" which "consummate[d] around April of 2001." (Balsiger Trial Tr. (Doc. 249-5) at 9–10.) Balsiger further testified that the joint venture "was to head off a price war on coupons and . . . allow[ed] us to escalate our freight revenue." (Id. at 10.) The joint venture "created noncompetes by doing deals back and forth on subprocessing and the retail." (Id.) Balsiger admitted that he used that joint venture to "raise [IOS's] rates tremendously." (Id. at 12; see also id. at 14 ("I know as a fact that I increased my fees once we had that control, and I had a noncompete, I increased my fees dramatically.").)

This court finds Balsiger's testimony reflects a clear intent on the part of IOS to fix prices but does not reflect such intent on the part of Inmar. Although Balsiger's testimony could be interpreted as evidence Inmar entered the agreement with the intent to raise shipping fees, (see Balsiger Trial Tr. (Doc. 249-5) at 10 (stating that the purpose of the joint venture "was to head off a price war on coupons and . . . allow[ed] us to escalate our freight revenue" (emphasis added))), this court declines at this juncture to make such a finding; however, because this court will find that Plaintiffs have established a genuine dispute of material fact as to whether there is circumstantial evidence of a conspiracy to fix

-19-

prices, this court need not determine whether there is direct evidence of a price-fixing conspiracy.

## 2. Circumstantial Evidence of an Antitrust Conspiracy

If there is no direct evidence of an antitrust conspiracy, circumstantial evidence is sufficient to establish an antitrust conspiracy. Monsanto, 465 U.S. at 764. However, even where the alleged conspiracy is a plausible one, courts "have been cautious in accepting inferences from circumstantial evidence" if the alleged anticompetitive conduct can plausibly be explained by the rational, procompetitive conduct of businesses in an oligopoly. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 358–59 (3d Cir. 2004). Moreover, there are limitations on the inferences that can be drawn from circumstantial evidence: ambiguous evidence that could be as consistent with lawful behavior as unlawful competitive conduct cannot, standing alone, establish liability under § 1 of the Sherman Act. Matsushita, 475 U.S. at 588.

In a market dominated by a few entities, making it highly concentrated, "any single firm's 'price and output decisions will have a noticeable impact on the market and on its rivals.'" Flat Glass, 385 F.3d at 359 (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1429, at 206 (2d ed. 2000)). For this reason, "when a firm in a concentrated market (i.e., an

-20-

'oligopolist') is deciding on a course of action, 'any rational decision must take into account the anticipated reaction of the other [] firms.'" Id. (alteration in original) (quoting Areeda, supra, ¶ 1429, at 207). This concept, known as "conscious parallelism," is not on its own sufficient to support a finding of concerted action. See In re Titanium Dioxide Antitrust Litig., 959 F. Supp. 2d 799, 821–22 (D. Md. 2013); see also SD3, 801 F.3d at 424 (noting that "[n]ot even 'conscious parallelism' is enough" to state a violation of § 1 of the Sherman Act (quoting Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993))).

Put another way, "[e]vidence of parallel conduct in an oligopoly, without more, is insufficient to withstand a motion for summary judgment." Titanium Dioxide, 959 F. Supp. 2d at 822; see also Matsushita, 475 U.S. at 588 ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."). Rather, "[P]laintiffs must demonstrate, in addition to merely parallel conduct, the exist of certain 'plus factors' that are indicative of a conspiracy. Id. (quoting Flat Glass, 385 F.3d at 360.)

Courts have identified at least three types of plus factors indicative of a conspiracy: (1) "evidence that the defendant had

-21-

a motive to enter into a price fixing conspiracy"; (2) "evidence that the defendant acted contrary to its interests"; and (3) "evidence implying a traditional conspiracy," such as "non-economic evidence that there was an actual, manifest agreement not to compete." Flat Glass, 385 F.3d at 360–61 (internal quotation marks omitted) (quoting Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 948 F.2d 1224, 1244 (3d Cir. 1993); In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 661 (7th Cir. 2002)); see also Albert v. Global Tel*Link Corp., Civil Action No. 20-cv-01936-LKG, 2021 WL 4478696, at *7–9 (D. Md. Sept. 30, 2021) (denying motion to dismiss where "th[e] plaintiffs sufficiently allege[d] facts to demonstrate the existence of plus factors that would suggest that defendants' parallel conduct resulted from concerted action").

### a.   Evidence of Increase in Prices

Defendants assert that years before there was any agreement between Inmar and IOS to fix prices, shipping fees were rising. (Attach. 5, Excerpts of Dep. of Robert Carter (Doc. 234-5) at 8–9.) On the other hand, Plaintiffs' expert contends that "[s]hipping rates increased substantially during the class period as a result of the conspiracy." (Pls.' Resp. (Doc. 249) at 15–16 (citing Ex. 32, Suppl. Expert Report of Kathleen Grace (Doc. 193-2) ¶¶ 11, 13).) She opines that shipping fees rose

-22-

because of the reduced competition, "put[ting] upward pressure on pricing." (Ex. FF, Merits Rebuttal Expert Report of Kathleen Grace ("Grace Rebuttal Report") (Doc. 249-32) ¶ 11.)

Additionally, Plaintiffs offer evidence that after the agreements, both Inmar and IOS's price strategy was to increase fees billed to manufacturers. (Ex. KK (Doc. 249-37); Ex. LL (Doc. 249-38) at 3 ("Strategy: Industry volume declines have been countered with higher fees billed to manufacturers with increases in S&H per 1000 . . . .").) Plaintiffs' expert opines that absent a conspiracy to fix prices, shipping fees would have declined because of reduced demand. (Grace Rebuttal Report (Doc. 249-32) ¶¶ 11-15.)

This court finds Plaintiffs have offered evidence of parallel increases in shipping fees after the alleged agreement between IOS and Inmar. This court makes no determination on whether Defendants' or Plaintiffs' interpretation of the evidence is more persuasive. But viewing the evidence in the light most favorable to Plaintiffs, as the non-moving party, this court finds Plaintiffs have offered evidence that shows parallel increases in shipping fees from Inmar and IOS. Whether those price increases are the result of independent or collusive

-23-

behavior is a factual dispute inappropriate to resolve at summary judgment.

###### b.  <u>Motive</u>

This court finds the first plus factor, "motive to enter into a price fixing conspiracy," <u>Flat Glass</u>, 385 F.3d at 360, is satisfied. "[E]vidence that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion," is indicative of a motive to enter a price fixing conspiracy. <u>Id.</u> This court finds that the coupon processing industry, as relevant here, is fairly described as an oligopoly.[4] There are three main competitors: IOS, NCH, and CCC. (Defs.' Br. (Doc. 235) at 24; Pls.' Mauldin Dep. Excerpts (Doc. 249-1) at 4, 7.)

At this stage, Defendants do not appear to genuinely dispute Plaintiffs' evidence of reduced demand in the market.

---

[4] The Third Circuit in <u>Flat Glass</u> defined an "oligopolist" as "a firm in a concentrated market." 385 F.3d at 359.
> For example, in a market of one hundred sellers of equal size, an expansion in output of 20 percent by one of them will result in an average fall in output of only about .2 percent for each of the others, so a seller need not worry in making his pricing decisions about the reactions of his rivals. But if there are three sellers of equal size, a 20 percent expansion in the sales of one will cause the sales of each of the others to fall by an average of 10 percent—a sales loss the victims can hardly overlook.

<u>Id.</u> at 359 n.10 (internal citation and quotation marks omitted) (quoting Richard A. Posner, <u>Antitrust Law</u> 56 (2d ed. 2001)).

-24-

Reduced demand is a market condition "that favor[s] price cuts, rather than market increases," Flat Glass, 385 F.3d at 361, and thus when there is evidence of price increases in a market of reduced demand, that is evidence of a motive to conspire to fix prices. Because the coupon processing market is highly concentrated with only three main competitors, (Pls.' Mauldin Dep. Excerpts (Doc. 249-1) at 4, 7), meaning "the market is controlled by a limited number of sellers," In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 65 (2d Cir. 2012), this court finds that Plaintiffs have sufficiently shown that the market for coupon processing made it such that Defendants had a motive to enter a price fixing conspiracy.

### c.  **Actions Against Self-Interest**

This court further finds that Plaintiffs have shown there is evidence that Defendants may have acted contrary to their economic self-interest. "[P]rice increases that are not correlated with principles of supply and demand may be especially probative of behavior contrary to self-interest." Titanium Dioxide, 959 F. Supp. 2d at 827 (citing Flat Glass, 385 F.3d at 362). Plaintiffs have offered evidence that Defendants' prices increased despite a drop in demand. (Pls.' Carter Dep. Excerpts (Doc. 249-4) at 7, 14.) That is because "absent increases in marginal cost or demand, raising prices generally

-25-

does not approximate—and cannot be mistaken as—competitive conduct." Flat Glass, 385 F.3d at 358. In response, Defendants have put forth evidence presenting possible pro-competitive business reasons for Defendants' actions. (See Attach. 2, Defs.' Resps. to Pls.' Second Set of Interrogs. (Doc. 234-2) at 4-6.) Thus, this court is faced with competing explanations for Defendants' behavior: Plaintiffs argue the evidence shows collusion, while Defendants argue there were procompetitive benefits to their actions. It is for a jury to decide which party's interpretation of the evidence carries the day. See, e.g., Publ'n Paper, 690 F.3d at 55, 65 (denying summary judgment despite the fact that the plaintiffs' "evidence admits of alternative interpretations," because "it is the province of the jury to determine how much weight to accord" that evidence).

> d. **Evidence Implying a Traditional Conspiracy**

Because the first two plus factors may "largely restate the phenomenon" of conscious parallelism, the third plus factor carries greater weight. See, e.g., Flat Glass, 385 F.3d at 360-61. The third factor is "non-economic evidence 'that there was an actual, manifest agreement not to compete.'" Id. at 361 (quoting High Fructose Corn Syrup, 295 F.3d at 661). An example of such evidence includes "proof that the defendants got together and exchanged assurances of common action or otherwise

-26-

adopted a common plan even though no meetings, conversations, or exchanged documents are shown." Id. (quoting Areeda, supra, ¶ 1434b, at 243). Upon analyzing the third plus factor, this court finds there is evidence Defendants "adopted a common plan" to fix prices.

"Ambiguous statements by competitors, taken as a whole, may support the inference of a price-fixing conspiracy." Titanium Dioxide, 959 F. Supp. 2d at 829. But "mere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence [of] . . . an antitrust conspiracy." Cooper, 789 F.2d at 281. In High Fructose Corn Syrup, the Seventh Circuit cited the following as evidence implying a traditional conspiracy: the defendants' statements regarding "an understanding within the industry not to undercut each other's prices" and "support" for their efforts to limit pricing, references to competitors as friends and customers as enemies, a defendant's statement that there was an "understanding between the companies . . . that makes us not . . . make irrational decisions," and a statement that "entry of new entrants (barriers) and will they play by the rules (discipline)." 295 F.3d at 662 (alteration in original) (internal quotation marks omitted).

Case 1:19-cv-00141-WO-LPA   Document 271   Filed 03/18/22   Page 27 of 33

Like the defendants in <u>High Fructose Corn Syrup</u>, Plaintiffs
have put forth evidence supporting Plaintiffs' allegations of a
price-fixing conspiracy between Inmar and IOS. First, in October
2000, IOS CEO Balsiger and CMS's President Carter had a phone
meeting. (Ex. P, Oct. 10, 2000 Email (Doc. 249-16).) Carter
wrote in an internal email that he "spoke with Chris Balsiger
today. The call was a result of the letter I sent [IOS] for
their comment on the NCH S&H letter." (<u>Id.</u> at 2.) In detailing
his conversation with Balsiger, Carter noted Balsiger "made a
number of references to 'our need for control.' . . . He made a
comment that the market was a three player market but it could
be a two player market." (<u>Id.</u> at 2-3.) When Carter relayed his
conversation to others at Inmar, his suggestion was to "use this
as a way to move the one count process along." (<u>Id.</u> at 3.) The
Proprietary Data Transfer Agreement, executed between Inmar and
IOS six months later, served to formalize the one count program
between Inmar and IOS. (PDTA (Doc. 234-16); Carter Decl.
(Doc. 234-1) ¶ 19.)

In addition, Plaintiffs have offered Balsiger's criminal
trial testimony in support of their allegations of a price-
fixing conspiracy. (<u>See</u> Pls.' Resp. (Doc. 249) at 26, 28-29,
35.) Balsiger's criminal trial testimony suggests that Inmar
and IOS agreed to coordinate to increase shipping fees. Balsiger

-28-

testified during his criminal trial that he "proposed a joint venture to Carolina [(Inmar)] . . . . That deal [] consummate[d] around April of 2001." (Balsiger Trial Tr. (Doc. 249-5) at 9-10.) Balsiger testified that the deal "was to head off a price war on coupons" and "allow[ed] [them] to escalate [their] freight revenue." (Id. at 10.) He further testified that the deal "created noncompetes by doing deals back and forth on subprocessing and the retail." (Id.) After the deal was consummated, Balsiger "raise[d] rates tremendously . . . on processing . . . [and] on chargeback fees because [he] had the market." (Id. at 12.) Balsiger acknowledged that his "number one competitor . . . on a fair-playing-field basis was Carolina. . . . Once [they] did the joint venture the combined market share . . . gave [them] 87 percent control of the market." (Id. at 13-14.) After the deal, Balsiger "increased [his] fees . . . had a noncompete, [and] [he] increased [his] fees dramatically." (Id. at 14.)

Defendants argue that that no such conversations or communications to fix prices occurred. (See Defs.' Br. (Doc. 235) at 25.) In Carter's declaration, he stated that "[a]s President of CMS (and Carolina Promotion Services, a company that managed functions within CMS and CCC), I would have been aware of any such communications had they taken place. None

-29-

did." (Carter Decl. (Doc. 234-1) ¶ 32.) Carter further stated,
"[g]iven the fact that payment of shipping fees was not a
contractual obligation . . . it is not even clear to me how IOS
and Inmar could have engaged in some joint activity that
resulted in the fixing of fees assessed to manufacturers." (Id.
¶ 3.)

        In sum, there is some evidence before this court of
evidence "that the defendants got together and exchanged
assurances of common action or otherwise adopted a common plan."
Flat Glass, 385 F.3d at 361 (quoting Areeda, supra ¶ 14346, at
243). Although Balsiger's criminal trial testimony can fairly be
labeled "[a]mbiguous," Titanium Dioxide, 959 F. Supp. 2d at 829,
that testimony, in combination with evidence of the other two
plus factors, leads this court to find that Plaintiffs have met
their burden of establishing that a genuine dispute of material
fact exists, cf. Am. Chiropractic Ass'n, 367 F.3d at 227
(affirming the district court's grant of summary judgment where
the plaintiff failed to show evidence of concerted action
between the defendant and a third party, and the plaintiff
failed to explain the defendant's economic motive to enter the
alleged antitrust conspiracy).

        At summary judgment, this court does not weigh the evidence
or make credibility determinations. Liberty Lobby, 477 U.S. at

255. Because there is evidence before this court of a rise in IOS's and Inmar's prices, combined with the structure of the coupon-processing industry and other evidence implying a price-fixing conspiracy, this court finds that Plaintiffs have offered sufficient evidence tending to exclude the possibility of independent action.

### 3. **Unreasonable Restraint on Trade**

Only unreasonable restraints on trade violate § 1 of the Sherman Act. <u>State Oil</u>, 522 U.S. at 10. Some practices are considered to, in and of themselves, unreasonably restrain trade and "are deemed unlawful <u>per se</u>" under § 1. <u>Leegin Creative Leather Prod., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 886 (2007) (internal quotation marks omitted) (quoting <u>State Oil</u>, 522 U.S. at 10). This "small group of restraints are unreasonable <u>per se</u> because they 'always or almost always tend to restrict competition and decrease output.'" <u>Ohio v. Am. Express Co.</u>, 138 S. Ct. 2274, 2283 (2018) (quoting <u>Bus. Elecs. Corp. v. Sharp Elecs. Corp.</u>, 485 U.S. 717, 723 (1988)).

"Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable <u>per se</u>." <u>Id.</u> at 2283–84 (quoting <u>Bus. Elecs.</u>, 485 U.S. at 730); <u>see also</u> <u>Topco Assocs.</u>, 405 U.S. at 608 (explaining that horizontal arrangements are between "competitors at the same level of the

-31-

market structure"). The Supreme Court has recognized that horizontal agreements among competitors to fix prices are per se illegal. See Texaco, 547 U.S. at 5; Catalano, 446 U.S. at 647.

In this case, Plaintiffs have supplied sufficient evidence to create a genuine dispute of material fact as to whether there is evidence of an antitrust conspiracy. See discussion supra Section III.B.2. The alleged conspiracy is a horizontal conspiracy between competitors IOS and Inmar to fix prices. Supra Section III.B.2. Because horizontal price-fixing conspiracies are per se unreasonable restraints on trade, Texaco, 547 U.S. at 5, no further inquiry is required, see Catalano, 446 U.S. at 647 (reasoning that because "price-fixing agreements have been adjudged to lack any 'redeeming virtue,' it is conclusively presumed illegal without further examination under the rule of reason"). Plaintiffs have created a genuine dispute of material fact as to whether Defendants violated § 1 of the Sherman Act.

In conclusion, this court finds Plaintiffs have offered sufficient evidence to establish that genuine issues of material fact exist as to whether Defendants violated § 1 of the Sherman Act. See Liberty Lobby, 477 U.S. at 247. Plaintiffs have come forward with specific facts showing that there was an agreement between Inmar and IOS to fix prices, which created an

unreasonable restraint on trade. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587–88. Therefore, this court will deny Defendants' motion for summary judgment.

**IV.   <u>CONCLUSION</u>**

For the foregoing reasons, this court finds that Defendants' Motion for Summary Judgment, (Doc. 234), should be denied.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 234), is **DENIED**.

This the 18th day of March, 2022.

_____
United States District Judge

-33-