

Exhibit 9

> Merits Rebuttal Expert Report of
>
> Kathleen Grace
>
> in the matter of
>
> *Mr. Dee's, Inc., et al. v. Inmar Corporation, et al.*
>
> July 13, 2021

## I.      Introduction

1.   I submit this rebuttal report in response to the Merits Expert Report of Michael Kheyfets dated June 1, 2021, and his May 12, 2021 Supplemental Expert Report, which he incorporated by reference into his Merits Expert Report.  As explained below, his criticisms are largely irrelevant, misplaced, or are taken out of context, and I stand by my original conclusions.  I first address criticisms Mr. Kheyfets first raised in his Supplemental Report (some of which were also raised in his Merits Report), and then address the criticisms he raises in his Merits Report.

## II.     Mr. Kheyfets' Flawed Criticisms Regarding My Supplemental Expert Report.

### A.  My Calculations Assume That Damages Offsets Are Not Relevant to Overcharges.

2.   Mr. Kheyfets criticizes my damages model because he assumes that price reductions on separate transactions are "negative damages" or "undercharges" that should be offset from transactions on which there are overcharges, even when they involve separate products.  Kheyfets Supplemental Report ("Kheyfets Supp.") ¶¶ 12, 49. For example, he assumes that reduced prices on Apex/one-count coupons should be offset from overcharges on non-Apex/two-count coupons. Mr. Kheyfets cites the example of plaintiff Mr. Dee's (*id*. ¶ 49), which paid overcharges for non-Apex coupons, but not for Apex coupons.  As Plaintiffs stated in a recent filing, however:

1

The Supreme Court has held, however, that indirect offset benefits generally should not be considered, as they would overly complicate overcharge calculations. *Hawaii v. Std. Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968). Under the antitrust laws, the overcharge is the difference between the price the plaintiff actually paid and the but-for price, multiplied by the quantity paid. ABA, Proving Antitrust Damages § II(4)(B) & n.19 (citing cases). And Inmar is not entitled to a damages offset based on a change in quantity paid compared to the but-for world. *Id.* at n.19.

"In a horizontal price-fixing case, . . . mitigation and offset generally do not affect the ultimate measure of damages," even if it "result[s] in a windfall to plaintiffs." *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. 283, 286-87 (D. Minn. 1996). Rather, "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (citing *Adams v. Mills,* 286 U.S. 397, 407 (1932)).

Pls.' Br. in Opp'n to Defs.' Mot. to Exclude at 15-16 (ECF 221). Consistent with these statements, my damages calculation assumes that offsets from price reductions on separate transactions are not relevant.

3. Moreover, there are hidden costs of the Apex/one-count program which is a different product than the 2-count program. Because the manufacturer's agent did not conduct an independent audit of the physical coupons under that program, more coupons would have been paid that were not properly redeemed, including coupons that were subject to IOS's fraudulent scheme. As a result, there may not have been any overall economic benefit from switching to a one-count program, even if it lowered shipping costs. Thus, my original calculations were appropriate, and demonstrate substantial overcharges.

**B. My Calculations Assume That Deductions Are Not Relevant to Overcharges.**

4. Mr. Kheyfets criticizes my analysis for failing to "account for any retailer deductions, meaning the 'damages she has calculated simply do not represent economic injury to Albertsons (or any retailer) that resulted from the alleged conduct." Kheyfets Supp. ¶ 11. In other words, Mr.

2

Kheyfets assumes that antitrust overcharge calculations should deduct any amounts that a retailer that directly paid a shipping fee overcharge was able to pass on to a manufacturer after the manufacturer initially charged back the fees to the retailer. And he asserts that damages calculations need to go a step further and determine whether manufacturers fought the deductions and were able to recover them back from retailers in another way. *Id*. ¶ 74 (stating that some manufacturers "fight aggressively to recover funds" from deductions and that analysis of "multiple bilateral interactions" would be necessary to determine damages).

5. The data provided by Defendants does not allow me to track deductions retailers took from manufacturer invoices related to shipping fees, if any were taken, such that the analysis suggested by Mr. Kheyfets would be not be possible based on the existing data. But my calculations assume that such a complicated analysis is not necessary in calculating damages. As explained in the American Bar Association's Proving Antitrust Damages, which is repeatedly cited by Mr. Kheyfets as authoritative, direct purchasers of products from horizontal conspirators are entitled to "overcharge damages, which are measured as the difference between the price the plaintiff actually paid and the price that would have prevailed in the absence of the antitrust violation (the 'but-for' price), multiplied by the quantity of the product that was actually purchased.'" ABA, Proving Antitrust Damages § II(4)(B) & n.19 (3d ed. 2017). And as stated in one of the cases cited therein, *id.* n.20, the ability of a plaintiff to pass on an overcharge – "the so-called passing-on defense" – is irrelevant to the calculation of overcharge damages. *Hanover Shoe,* 392 U.S. at 488. Otherwise, antitrust price-fixing cases "would often require additional long and complicated proceedings involving massive evidence and complicated theories." *Id.* at 493; *see also* ABA, Proving Antitrust Damages § II(4)(D) n.62 ("'[I]n a horizontal price-fixing case, . . . mitigation and offset generally do not affect the ultimate measure of damages.'" (quoting *In re Airline Ticket*

3

*Comm'n Antitrust Litig.*, 918 F. Supp. 283, 286 (D. Minn. 1996))).  Assuming that Mr. Kheyfets is incorrect about the need to calculate deductions to offset damages to retailers, his criticism about my decision not to calculate offsets for deductions is misplaced.

### C. My Calculations Properly Assume That Rebates Are Not Relevant to Overcharges.

6.  Mr. Kheyfets asserts that my analysis is flawed because it does not account for rebates. Kheyfets Supp. ¶ 6.  For example, according to Mr. Kheyfets, CMS paid rebates to Nestlé when Nestlé paid shipping fees to CCC that were higher than a specified rate, if Nestlé agreed not to charge back those fees.  *Id*. ¶¶ 29-30; Kheyfets Merits ¶ 15.  The agreement required Nestlé to "pay[] in full all such fees as billed by CCC" up front, and would later receive a rebate on a quarterly basis.  INMAR0025000-10 at 02.

7.  Mr. Kheyfets has not calculated the value of any such rebates.  And Defendants have not provided data that would permit me to undertake such a calculation, even though Plaintiffs requested "All coupon processing transactional data . . . ."  Pls.' Third Set of Reqs. for Production of Docs. to Defs. at Req. 1 (Jan. 3, 2020).  To the extent that CMS and manufacturers negotiated for rebates, manufacturers may have been forced to give up something else of value (e.g., high processing rates) in return for the rebates, such that the economic benefit from the rebate may have been negated by other provisions.  Determining the benefit of rebates would require the type of long and complicated proceedings that I understand the *Hanover Shoe* decision directed should be avoided.

8.  Further, the formula set forth in the American Bar Association's Proving Antitrust Damages does not require me to take into account rebates paid by CMS when calculating the amount of an overcharge paid to CCC.  Rather, Proving Antitrust Damages instructs that: "[t]he plaintiffs' overcharge injury is deemed complete at the time it paid the overcharge on its actual purchases."  ABA, Proving Antitrust Damages § II(4)(B) n.19.  Thus, my damages calculations

4

assume that rebates are not relevant to the measure of damages. With Nestlé, the contract required that Nestlé pay the full amount of the shipping fees to CCC up front, and that rebates from CMS would subsequently be paid on a quarterly basis. But assuming the overcharge injury was complete at the time it was paid, subsequent reimbursements by another party would not negate the injury.

### D. My Calculations Properly Accounted For Chargebacks.

9. Mr. Kheyfets repeatedly suggests that I failed to account for chargebacks. *E.g.*, Kheyfets Supp. ¶¶ 26, 51. But I properly accounted for chargebacks, as my damages analysis was based on amounts directly *paid* by manufacturers and retailers. To the extent that manufacturers refused to pay shipping fees and charged them back, those charges were not included in my damages analysis of overcharges to manufacturers.

10. For example, Mr. Kheyfets points to 1,960 manufacturer accounts that paid no shipping fees during the class period. *Id.* ¶ 26. Some manufacturers refused to pay the inflated shipping fees and charged them back. These manufacturers were excluded from the class because they did not suffer a direct economic injury from the inflated shipping fees. But this does not undermine my conclusion that shipping fee rates were inflated because of the conspiracy, or that other manufacturers suffered economic damages when they paid shipping fee overcharges.

### E. Decreased Competition Provides a Causal Link to Increased Shipping Fees.

11. In my Supplemental Report, I calculated increases in shipping fees that were correlated with the conspiracy period and found that nothing exogenous happened in the market that would have accounted for the increased shipping fees using NCH as a benchmark. Mr. Kheyfets suggests that there is "no economically coherent causal link between the alleged conduct and [increased shipping fees]." Kheyfets Supp. ¶ 27; *see also* Kheyfets Merits ¶¶ 17, 21. Economic principles hold that an agreement to reduce competition will put upward pressure on pricing. That is the whole point of a conspiracy not to compete. This is true even though shipping fees were charged

5

by retailer processors to manufacturers instead of to retailers. Retailers would have wanted to maintain good working relationships with their manufacturer suppliers, and chargebacks and deductions related to high shipping fees could strain the relationships between retailers and manufacturers. Vontsolos Dep. Tr. 50:24-52:24 (May 26, 2021). In a competitive market there would also have been more pressure from manufacturer agents, including CMS, for retailer processors to reduce shipping fees and there would have been increased chargebacks of shipping fees.

12. Under the Proprietary Data Transfer Agreement, instead of competing and acting as a fiduciary for its clients, IOS gave Inmar IOS clients' proprietary deduction methodologies, which would help Inmar identify retailers that would not deduct for high shipping fees and allow Inmar to maximize chargebacks to retailers. INMAR0000882-99 at 83.

13. Under the subprocessing agreement, the parties agreed to a non-disparagement provision, which would have prevented each from criticizing each other's high shipping fees. *Id.* at 95. If CMS disparaged IOS's high shipping fees to its manufacturer customers, they would have been more likely to push back on the fees.

14. These principles are confirmed by the evidence in this case, such as testimony of IOS's CEO that the agreements were intended to allow an increase in shipping fees, and that he raised prices when he gained market power after the agreements. Grace Merits ¶ 10 ("The deal . . . was to head off a price war on coupons and . . . allow us to escalate our freight revenue." (quoting Balsiger Trial Tr. 2511:22-2512:15)); Balsiger Trial Tr. 2551:1-6, 2548:11-14, 19-20 (stating that the agreements increased IOS's market power, which IOS used to "raise rates tremendously"). Similarly, former CMS President Robert Carter testified that the disproportionate effect of shipping fees on small manufacturers was "just a question of market power. . . . [T]he small

6

manufacturers probably had to deal with a lot of retailer stuff that they didn't want to deal with." Carter Dep. Tr. 152:9-13 (May 5, 2021).

15. Prior to the agreements, both NCH and CMS were actively pushing back on IOS's ancillary fees. Plaintiffs Production – Coupons – 0000340-44 at 42 (July 17, 2000 Ltr. from IOS to CMS threatening "hurricane" would be unleashed on CMS if it continued to chargeback ancillary fees at high rates); SH_INMAR 017816-19 at 16 (complaining that Inmar was defaming IOS to retailers "to the effect that International Data is dishonest, incompetent, untruthful, and engages in dishonest and fraudulent processing practices"); SH_INMAR_025044-314 at 065, 192 (reflecting that in late 1996 or early 1997 NCH predecessor manufacturer agent NuWorld developed a "shipping strategy" to market itself to manufacturers for its refusal to pay minimum shipping charges to retailer processors, and that NCH adopted such a strategy in late 1997). And internal documents reflect that increases in shipping fees could lead manufacturers to leaving CMS. INMAR0051407 (stating that high "postage [fees] . . . [could] push CMS clients right up to the brink of a mass exit").

### F. The Three Methodologies Are Consistent and Reinforcing.

16. Mr. Kheyfets criticizes the variation in results between the three methodologies in my Supplemental Report. But the correlations across the three methodologies is very high, ranging from 96% to 99%. The high correlations reinforce the validity of my conclusions. It shows that in any of the 3 models, the same manufacturers and retailers experience damages (the crossover of which firms are damaged is 96-99% in each model). I know, with high accuracy which clients were damaged, and the amount of damages depends on which of the three model specifications most accurately reflects the real world.

17. Only the before-during methodology allows me to calculate damages for overcharges to retailers. And the difference-in-differences methodology cannot be used to calculate damages for

IOS's shipping fees. But the difference-in-differences methodology controls for exogenous factors and for the higher starting point for CCC's fees compared to NCH. A factfinder may find that a combination of the three methodologies is preferred for calculating the three sets of overcharges that I calculate – CCC overcharges to manufacturers, IOS overcharges to manufacturers, and overcharges to retailers.

### G. The Methodologies Properly and Conservatively Account for Predictions of Substantial Price Declines.

18. Mr. Kheyfets suggests that my methodologies do not properly account for instances in which my methodologies find that the downward pricing pressure exceeds the amount of the shipping fee. Kheyfets Supp. ¶ 56. In the case of Apex coupons, the coupons were not physically shipped to manufacturers, and access to the data that was transferred had a value to processors outside of the specific transactions at issue such that but-for pricing of close to zero or even negative is not an inherently unreliable prediction. In those instances, I conservatively adjusted the fee to a small positive value. Such an adjustment is accepted practice among economists. The issue of replacing negative predicted shipping costs with a small positive number is largely one of conservative discretion. However, modifying data in statistical analysis has precedent. One of the most common cases is using a log transformation when some values are non-positive. Since the log of a non-positive number is undefined, researchers commonly resort to substituting an arbitrary small positive number. *See* Thomas E. MaCurdy & John H. Pencavel, *Testing between Competing Models of Wage and Employment Determination in Unionized Markets*, Journal of Political Economy at S3-S39 (1986). While that is not our cause here, it illustrates the point. In our case, negative shipping costs show up in the data and contribute to the forecasting equation. We know that shipping costs cannot be universally negative and that their occasion is likely due to accounting and the vagaries of the timing of charges and refunds. We also know that negative shipping charges

8

are in the tail of the distribution of outcomes and hence have a higher forecasting error. *See* Norman R. Draper & Harry Smith, *Applied Regression Analysis*, New York: John Wiley & Sons at 23 (1966). So as a conservative step in estimating damages we replace negative forecast shipping charges with the arbitrarily small value, 0.001.

### H. Various Other Criticisms of the Three Methodologies Are Misplaced.

19. Mr. Kheyfets offers miscellaneous other criticisms of my methodologies, none of which has merit. For example, he points out that a number of manufacturers did not directly pay any shipping fees during the class period (and therefore are not class members). He points to my findings regarding the shipping fees that they would have paid in the but-for world. He suggests that these manufacturers also would not have paid any shipping fees in the but-for world, and that my analysis of pricing for these manufacturers in the but-for world is therefore flawed because it fails to account for their chargeback behavior. Kheyfets Supp. ¶¶ 42, 55, 62. But basic economic theory indicates that if prices were lower, fewer manufacturers would have refused to pay (or charged back) all of their shipping fees. Moreover, my model predicts *pricing* in the but-for world. It is not intended to predict *payments* in the but-for world, as he mistakenly assumes. Thus, his criticism is misplaced.

20. Mr. Kheyfets asserts that some manufacturers, like Kimberly Clark, were able to dictate the amount of shipping fees that they would pay. *Id.* ¶ 48. But even if Kimberly Clark demanded that it only pay a certain level of shipping fees as he suggests, the amount that a manufacturer would request, or dictate, would have been informed by market conditions. For example, if other manufacturers were paying less than Kimberly Clark in a competitive market, Kimberly Clark would likely have requested and received lower pricing. Moreover, the smaller manufacturers had less bargaining power, and most of the manufacturers affected by the overcharges were small manufacturers.

21. Mr. Kheyfets suggests that my benchmark model "assumes the only factors relevant for determining shipping fees paid are the volume of coupons processed and the amount of time passed since January 1, 2000." *Id.* ¶ 51. But the benchmark model controls for volume, and uses NCH's prices as a benchmark, thereby controlling for external conditions that may have affected price, such as changes in costs or demand.

22. Mr. Kheyfets argues that NCH is not a relevant benchmark because it focused on a different customer base. But NCH is an appropriate benchmark because NCH was the only major coupon processing company during the conspiracy period besides IOS and Inmar, and NCH faced the same market conditions that affected the conspirators, such as the cost of labor or postage. While Mr. Kheyfets points out Defendants' higher starting prices, the difference-in-differences analysis controls for that difference. Mr. Kheyfets does not, and cannot, identify another entity that would be a more appropriate benchmark than NCH.

23. Mr. Kheyfets asserts that the control variables lack statistical significance when looking narrowly at one-count coupons in the benchmark analysis. Even if that were true, a lack of statistical significance of a control variable in one specification does not undermine the results of the analysis. The models I present are the strongest specifications the data could provide. Mr. Kheyfets is unable to identify a better specification or a better model. Further, when properly looking at the significance of the models as a whole, the three methodologies have R-squared values of 0.5 (before-during), 0.025 (benchmark), and 0.212 (difference-in-differences). The control variables for volume are highly significant, at greater than 99%, in all three specifications. For example, in the before-during model the t-statistics are 52.37 and -27.12 for volume and volume[2], respectively. Unlike two-count coupons, one-count coupons were not physically shipped twice, such that one would expect less correlation between volume and shipping costs. And Mr.

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 11 of 36

Kheyfets did not demonstrate that controlling for any other variables would have affected the results of my analyses. Furthermore, when I include a test dummy in the model, the strength of the model declines, which suggests all important variables have been included.

24. Mr. Kheyfets conducted a mean absolute percentage prediction error test in an effort to measure the accuracy of my methodology. Kheyfets Supp. ¶ 60. Mr. Kheyfets reports results separately for one-count and two-count coupons, rather than applying the test to the methodologies as a whole. And the mean absolute percentage test is "biased" and is "not symmetric," and "in selecting a forecasting model" is "an unreliable selection criterion" or an "'invalid evaluation criterion.'" Chris Tofallis, *A Better Measure of Relative Prediction Accuracy for Model Selection and Model Estimation*, Journal of the Operational Research Society at 1-3 (2015) (citation omitted), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2635088.

25. Mr. Kheyfets criticizes my difference-in-difference methodology because I was unable to use it to reliably measure IOS's shipping fees. Kheyfets Supp. ¶ 61. This is because I lacked sufficient data for IOS, not because there was any inherent flaw with the methodology.

26. Mr. Kheyfets criticizes the number of class members for which the data shows a low amount of damages. *Id*. ¶ 79. But the overall results of the analysis are statistically significant, and the damages numbers for individual class members are driven by the data. Mr. Kheyfets offers no alternative analysis.

**I. Kheyfets' "False Positives" Analysis Is Flawed**

27. Mr. Kheyfets points to five situations where he asserts that manufacturers could not possibly have paid supracompetitive prices because plaintiffs do not "allege[]" overcharges in this litigation for those situations. *Id*. ¶ 67. These five situations are shipping fees paid to CCC and IOS during the benchmark period, and paid to NCH, pay direct retailers, and direct submitter retailers during the class period.

11

28. But Mr. Kheyfets is wrong in assuming that retailers in these categories could not have been harmed, and in some cases was wrong about harm not being alleged. For example, Plaintiffs, in fact, allege that retailers suffered harm from shipping fees during the class period, without excluding pay direct retailers. *See, e.g.*, Third Am. Compl. ¶¶ 14-15, 63, 66 (ECF 145). And I would have expected that pay direct retailers had been harmed, but I excluded them from my analysis only because I did not have data for pay direct retailers during the pre- period. Mr. Kheyfets asserts that pay direct retailers set their own shipping fees. Kheyfets Supp. ¶ 67 n.130. But there is evidence that the retailer processors negotiated shipping fees with pay direct retailers. *See, e.g.*, INMAR0051602-16 at 09 (CS Pricing Strategy: "Increase S&H fees to Pay Direct retailers upon contract renewal."); INMAR0006496-504 ¶ 2.8 (guaranteeing minimum "shipping consolidation" and other fees to be generated by CCC from manufacturers). Mr. Kheyfets' finding that up to 93% of pay direct retailers suffered impact supports rather than undermines Plaintiffs' theory that anti-competitive conduct led to supracompetitive pricing.

29. Similarly, I would expect that in an economic environment where IOS and CCC's shipping fees were artificially inflated, other competitors, including NCH and direct submitter retailers, would increase shipping fees to greater than a competitive level as higher shipping fees would gain greater acceptance in the industry and there would be less downward competitive pricing pressure. This effect would imply actual damages are higher than estimated damages, making my damages estimates conservative.

30. While Plaintiffs do not seek to recover for IOS's conduct prior to April 2001, they have, in fact, alleged that IOS committed fraud prior to the class period, leading to supracompetitive pricing. Third Am. Compl. ¶¶ 25, 31, 59 (ECF 124). And Plaintiffs have identified evidence that IOS and Defendants entered into a "strategic alliance" prior to April 2001 that may have reduced

12

competition.  Pls.' Br. in Opp'n to Defs.' Mot. to Exclude at 14 & n.4 (ECF 221).

**J.   Retailers Who Paid Shipping Fee Chargebacks Suffered Harm.**

31. Mr. Kheyfets asserts that "Dr. Grace has not even shown that all proposed retailer class members were charged these fees, much less that any actually paid them."  Kheyfets Supp. ¶ 10. According to Mr. Kheyfets, my analysis of damages paid by retailer class members is flawed in two ways: first, because he claims that I analyzed the amounts charged back to retailers rather than the amounts paid by retailers; and second, because I did not account for deductions by retailers from the amounts that the retailers owed to manufacturers.  He asserts that named plaintiff Connecticut Food Association, for example, never paid shipping fee chargebacks during the class period.  *Id.* ¶ 71; Kheyfets Merits ¶ 15.

32. Mr. Kheyfets' criticism is flawed on both counts.  First, my damages analysis examined the amounts paid by retailers for shipping fees, not simply the amounts charged.  Per my emails with Inmar, the company explains the following in response to my question "How can we tell whether CCC's shipping fees were paid by manufacturers, charged back to retailers, or written off (in whole or in part) by CCC?"

> **RESPONSE:  The AMT PAID field shows the total amount paid.  If shipping ("ship / handling" or "postage"), two-count fees ("two count surcharge"), or hard-to-handle fees ("special handling surcharge) was written off or charged back, it is indicated in one of the following fields.  Otherwise, the amount was paid.**

| Excel Column | Column Name | Action |
|---|---|---|
| **T** | **Mfr. has not paid/ship/handling** | **Chargeback** |
| **U** | **C/R Adjustment - Postage** | **Writeoff** |
| **V** | **Special Handling Surcharge** | **Chargeback** |
| **W** | **Two Count Handling Surcharge** | **Chargeback** |

13

|  |  |  |
|---|---|---|
| **AP** | **Special Handling Surcharge** | **Writeoff** |
| **BG** | **Two-Count Surcharge** | **Writeoff** |

From this information, we clearly observe that if a charge was not written off in one of the above accounts, it was paid either as a chargeback or invoiced amount.

33. The amount that the retailers paid in overcharges is reflected in Appendix B to my Supplemental Report, including overcharges paid by named plaintiff Connecticut Food Association. Grace Supp. App. B at 2. Second, as discussed above, once retailers paid overcharges for shipping fees, the overcharge was complete, and retailers' efforts to recover those overcharges from manufacturers through deductions are not relevant to calculating damages. Mr. Kheyfets points out that "who ultimately 'pays' a shipping fee chargeback is complex and inherently specific to individual manufacturers and retailers." Kheyfets Supp. ¶ 74. But such complex calculations are one of the reasons antitrust law deems them irrelevant. *Hanover Shoe*, 392 U.S. at 493. Furthermore, even if the damages were ultimately borne by manufacturers, because of deductions, rather than by retailers, the total amount of damages would be unchanged.

### K. The Before-During Retailer Regression Analysis Is Valid.

34. Again, Mr. Kheyfets criticizes my before-during model for retailer chargebacks by arguing that my model is invalid because it predicts chargebacks should have been higher than actual observed chargebacks. Mr. Kheyfets refers to these as "negative" damages and wants the negative price predictions to net out positive damages. I have not seen any authority supporting calculation of antitrust overcharge damages in this manner. Rather, damages are to be presented in full and not netted against any purported "discounts," as discussed above.

## III. Merits Report Opinions

### A. My Analysis Accounted for Economic Conditions in the Coupon Industry.

35. Mr. Kheyfets asserts that the analysis in my Merits Report failed to account for

14

characteristics of the coupon processing industry, such as the impact of chargebacks, deductions, and rebates, and that fees are initially charged by retailer processors to manufacturers rather than directly to their clients. But as discussed above, deductions and rebates are not relevant to calculating overcharges. And my analysis accounted for the impact of chargebacks, as my analysis of damages is limited to the overcharges directly *paid* by manufacturers or retailers, not what they were *charged*. Grace Supp. ¶ 17.

**B. Mr. Kheyfets Misrepresents My Analyses.**

36. Mr. Kheyfets offers several misplaced criticisms of my damages analysis in his Merits Report. Mr. Kheyfets suggests that my analysis does not "isolate the effect of the alleged conspiracy from the effects of ordinary economic factors." Kheyfets Merits ¶ 17. But the benchmark and difference-in-differences methodologies did exactly that – controlling for non-conspiratorial economic factors that would have affected price, using NCH as a benchmark. Grace Supp. ¶¶ 29, 34.

37. Mr. Kheyfets suggests that I attempted, but failed, to construct a "but-for world that reliably reflects a 'price war.'" Kheyfets Merits ¶ 19. But I did not attempt to model a but-for world that included a price war. Rather, I observed that my estimates were conservative because they did not take into consideration the price war that would have occurred absent an agreement. Grace Supp. ¶ 42.

38. Mr. Kheyfets suggests that competition was entirely irrelevant to the pricing of shipping fees because they were charged by retailer processors to manufacturers. But this is inaccurate, as I discussed in paragraph 11, above. Moreover, if competition were irrelevant to the pricing of shipping fees, they presumably would have reached and maintained a much higher level, even prior to the conspiracy period.

### C. Conscious Parallelism Is Irrelevant Where There Was an Explicit Agreement.

39. Mr. Kheyfets suggests that plaintiffs need to demonstrate that price increases did not result from conscious parallelism, as opposed to conspiracy. Kheyfets Merits ¶¶ 22-23. But conscious parallelism has no applicability to the facts of this case, which involves explicit written agreements not to compete. When parties explicitly agree not to compete for certain customers, the supply and demand curves for those customers shift, and it becomes the economic self-interest of each party to charge higher prices, even if they did not agree on the specific prices to charge. The higher prices result from the agreement to reduce competition, which is conspiratorial conduct and not mere conscious parallelism. Moreover, the but-for world in my analysis already assumes an oligopolistic industry and not a perfectly competitive market; which is demonstrated by the relatively low damages estimates.

### D. Competitors' Discussions of Pricing Strategies Can Lead to Supracompetitive Pricing.

40. Mr. Kheyfets states that he is unable to understand how discussions between IOS and Inmar regarding "pricing strategies" for mass merchant retailers could be anticompetitive as it relates to shipping fees. *Id.* ¶ 24. But discussions about pricing strategies for any set of retailers presumably would have included the amounts to charge for shipping fees, and the reasons for setting shipping fees at those rates. Discussions between direct horizontal competitors about strategies around pricing of their products, or a component thereof, can lead to increased pricing because it reduces uncertainty about how the competitor will respond to a price increase.

41. For example, decision-making in raising prices can be analyzed under the "prisoner's dilemma" economic framework. Assume that IOS had already set shipping fees to the maximum level that would be profitable if CCC did not follow IOS's lead. In that scenario, if IOS increased shipping fees and CCC did not follow, IOS would lose customers to CCC and the price increase

16

would result in reduced profits for IOS and increased profits for CCC. But if both companies simultaneously raised fees, both would be better off than if neither increased fees. Being a price-leader in that situation would be risky for IOS, as CCC may determine that it would be more profitable for CCC not to follow IOS's lead. But if CCC removed the uncertainty to IOS during the discussions of pricing strategies by indicating that it would follow an IOS-led fee increase, then the fee increase would become profitable for both IOS and CCC, and it would be rationale for IOS to serve as the price leader.

### E. Mr. Kheyfets Fails to Identify Efficiency-Enhancing Integration from the Agreements.

42. Mr. Kheyfets questions my assessment that the written agreements between the parties resulted in no meaningful economic integration, did not create a separate entity, a pooling of resources, or risk sharing. In analyzing whether joint ventures comply with the antitrust laws, "the [antitrust enforcement] agencies' primary concern has been whether the venture involves some form of meaningful economic integration, or whether the venture is just a 'sham' for some market allocation or price-fixing agreement." Dennis Yao, *The Analysis of Hospital Mergers & Joint Ventures: What May Change?*, 1995 Utah L. Rev. 381, 394 (1995). "Courts have distinguished 'sham' from legitimate joint ventures on the basis of the existence of integrative efficiencies such as risk sharing." *Id.* at 394 n.66 (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 356-57 (1982)). Such a legitimate joint venture includes when "competitors pool their capital and share the risks of loss as well as the opportunities for profit." *Maricopa Cnty.*, 457 U.S. at 356.

43. Mr. Kheyfets identifies no separate entity that was created as a result of the joint venture agreements. He asserts that one of the agreements, the Joint Marketing Agreement, involved a pooling of "marketing resources" "from Inmar's perspective." Kheyfets Merits ¶ 25. Mr. Kheyfets offers no opinion or economic analysis of his own on whether capital or other resources were

17

pooled, and instead states that "Inmar indicated that *it believed* a benefit of this agreement to be . . . 'additional resources through collaborative joint marketing activity.'" *Id.* ¶ 25 n.48 (emphasis added). But the Joint Marketing Agreement provided that IOS would be solely responsible for soliciting the retailers, contracting, and providing all necessary services. INMAR0000916-30 at 17-18 (Joint Marketing Agreement ¶¶ 3, 5). While the agreement provided that IOS and Defendants would coordinate pricing strategies, neither Defendants nor Mr. Kheyfets have identified any resources that were devoted to coordinating pricing strategies, the agreement did not provide for the pooling of capital, or sharing the risks of loss. And Mr. Kheyfets does not identify any pooling of capital associated with the other agreements.

44. Mr. Kheyfets asserts that one of the agreements, the Coupon Subprocessing Agreement, involved a sharing of risk "from Inmar's perspective." Kheyfets Merits ¶ 25. But again, Mr. Kheyfets offers no independent opinion or economic analysis on whether the agreement involved the sharing of risk. And the "Inmar perspective" that he cites to does not directly relate to the sharing of risk, but states only that sub-processing creates "efficiency improvements" by allowing CCC to outsource coupon processing during "peak processing periods." *Id.* ¶ 25 n.49. It's unclear what "risk sharing" he's referring to, and he does not point to any sharing of "the risks of loss as well as the opportunities for profit." *Maricopa Cnty.*, 457 U.S. at 356.

45. In some asset sale agreements, reasonable ancillary restraints on competition can be permitted to protect goodwill accompanying the sale of the business. ABA, Antitrust Law Developments § 1-1(C)(5)(b) (6th ed. 2007) ("[T]he temporary loss of competition due to a covenant not to compete is considered ancillary to the sale of a business when the covenant is necessary to protect the purchaser in his enjoyment of the fruits of his purchase of the business and its goodwill."). In my Merits Report, I pointed out that, "[w]hile certain manufacturer and retailer

18

clients were sold, *those agreements* did not include the sale of a trade name, or the transfer of related coupon processing equipment or employees." Grace Merits ¶ 20 (emphasis added). Under the April 2001 agreements, IOS did not transfer any manufacturer agent processing equipment or employees when it sold its manufacturer clients to Inmar, and there was no provision for Inmar to transfer retailer processing equipment to IOS. *See generally* INMAR0000821-48 (Asset Purchase Agreement). Mr. Kheyfets points to a subsequent sale of a "'CMS[] processing plant *with equipment* and *trained employees* in Muzquiz, Mexico." Kheyfets Merits ¶ 25 n.47 (quoting SF 104330 at 412). But the sale of the manufacturer coupon processing plant was not part of any of the April 2001 written agreements, and it was done "[i]n conjunction with the sub-processing agreement," SF 104330-478 at 412, not in conjunction with an asset purchase agreement. Moreover, the sale of the Muzquiz plant did not occur at the time of the April 2001 asset sales, but subsequently "was purchased in October [2001] from CMS." SV00078696-755 at 698. Thus, it does not appear that the ancillary restraints in the April 2001 agreements intended to protect goodwill associated with the assets sold in April 2001.

46. Finally, in his analysis regarding economic integration, Mr. Kheyfets does not address attorney notes of the Inmar-IOS negotiation, which suggest, among other things, that the purpose of the arrangement was to restrict competition and increase prices. *See, e.g.,* SH_INMAR 002525-672 at 670 ("We now need to construct a reason for ID not to attack CCC's retail accts."); *id*. at 644 ("JP – Parties would not have agreed to retailer restrictions as a part of Data Transfer Agr. which is part of the One Step/One Count/Accord Programs. If this is true, why are the Parties doing it here!"); *id*. at 654 ("Protection: During term of payment, ID does not provide 'Mfgr Agent Svr' and CMS does not solicit ID retail accts."); *id*. at 648 ("Food Lion acquired Hanniford, which is CMS' client. ID will be rebidding Food Lion on 25 Jan. ID will get it. . . . CMS would agree

19

not to bid Food Lion."); *id*. at 614 ("ID would hope to raise prices to account for <u>enhanced product</u>, not because it could do so w/ impunity."); *id*. at 615 ("IDC would include code on invoice info showing when/how much retailer will deduct. Also – show whether retailer will deduct for face, freight or both."); *id*. at 650 ("Before either party will acquire a coupon/redemption firm, we will discuss in good-faith how to split up."); SH_INMAR 002392 (explaining non-compete interrelationships); SH_INMAR 002525-672 at 570 ("If PDTA retail non-compete is held invalid, then the sub-processing K non-compete is also invalid. On the other hand, if the non-compete protecting ID in Sub-processing K are held invalid, then Inmar @ its option can elect to keep PDTA in effect."); *id*. at 583 (explaining non-competes and considerations of "cross-defaults"); *id*. at 625 ("They are ok w/ some of the deal – but their attys are not comfortable w/ retail non-compete portion of the deal."); *id*. at 627 ("They are concerned that the existing case law does not necessarily get us to a rule of reason analysis on the retail restraints."); *id*. at 639 ("(3) Joint Marketing – . . . What advantage to anyone (other than our clients) for this joint effort re Mass Marketers? Why do we need to combine to do this, rather than doing independently?"); *id.* at 640 ("(4) Freight Proposal –> Int'l would have opportunity to develop relationships which could be competitively used by ID against Inmar's retail base – this the justification for Noncompete?").

47. Nor does Mr. Kheyfets address the fact that Inmar was concerned about how to explain to retailers the existence of the parties' non-compete arrangement, that the parties appeared to have kept aspects of their arrangement oral rather than commit them to writing, and, upon finalization of the arrangement, that the parties destroyed documents in an effort to create a list of "approved files" – all of which underscore that the Inmar/IOS arrangement was not designed to be efficiency enhancing. *See, e.g.*, *id*. at 609 ("Inmar is concerned about what they tell a retailer who requests a quote who is subject to the non-compete."); SH_INMAR 002516-24 at 16 ("Closing List 4-11-

01 . . . 2. Does Chris have 'oral agreements' list[?]"); *id*. at 522 ("Closing List 1. Does Chris have his 'oral agreements' or 'side agrs' list?"); SH_INMAR 002525-672 at 604 ("Clean up old papers/shred all old docs; come up with 'approved files.'")._

**F. Mr. Kheyfets' Criticism of My Direct Competitive Effects Analysis Is Flawed**

48. In my Merits Report, I found that direct anticompetitive effects included supracompetitive shipping fees during the class period, reduced output levels, and margin and revenue increases. Grace Merits ¶¶ 47-52. Mr. Kheyfets levels a variety of criticisms of my analysis of overcharges, many of which repeat flawed criticisms he raised earlier. For example, he mistakenly assumes that calculation of antitrust overcharge damages requires that I take into account indirect benefits that accrued to the direct purchaser of shipping and handling fees, such as deductions and chargebacks, and purported offsetting benefits from separate transactions on different products, Kheyfets Merits ¶¶ 27-28, contrary to how overcharge damages should be calculated. And he asserts that I did not control for non-collusive economic factors that may have affected shipping fees, *id.*, but my benchmark and difference-in-differences analyses did so. Mr. Kheyfets criticizes the variations between the results of the three methodologies, *id.* ¶ 27, but ignores that the results are highly correlated across methodologies, at 96 to 99%. He asserts that my methodologies would find "false positives," *id.* ¶¶ 27-28, but these are situations where the positive results are likely correct, as discussed in paragraphs 27-30 above. Mr. Kheyfets claims I analyzed what retailers were charged in shipping fees, *id.* ¶ 28, but in fact, I analyzed the amounts they *paid*, not simply what they were charged.

49. For the decrease in output levels, Mr. Kheyfets points out that CMS processing volume increased slightly, from 1.541 billion in 2001 to 1.545 billion in 2007. *Id.* ¶ 31 & n.65.[1] But an

---

[1] I had inadvertently transposed the two numbers in my original Merits Report, paragraph 49.

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 22 of 36

increasing number of coupons processed by CMS were one-count coupons for which CMS did not conduct an independent audit of the coupons, such that the processing output declined when measured by independent manufacturer auditing:





Mr. Kheyfets argues that neither IOS nor Inmar controls how many coupons are issued by manufacturers, but ignores that higher shipping fees increase the cost to manufacturers of issuing coupons, and that such cost increases would be expected to drive down demand for coupons. *See,*

*e.g.*, SH_INMAR 019998 ("Recently, . . . the costs of couponing have risen dramatically. Consequently, . . . some manufacturers . . . have sought other, more cost-efficient promotional vehicles, to the detriment of the coupon industry").

50. Mr. Kheyfets misstates and misrepresents my direct effects analysis. For example, he inaccurately represents that I stated that demand for coupons did not decline during the class period, misquoting my report. Specifically, he states that I "claim[] that a decline in demand 'did not happen in the coupon processing industry.'" Kheyfets Merits ¶ 33 (quoting Grace Merits ¶ 50). But what I stated "did not happen in the coupon processing industry" was "industry demand declin[ing], [accompanied by] both output and *price decrease*." Grace Merits ¶ 50 (emphasis added). There was an *increase* in price during the class period, which is why the quoted scenario "did not happen." Similarly, he argues that I found that a one-third decline in industry coupon processing occurred because of the agreements, "and for no other reason," Kheyfets Merits ¶ 34, but offers no citation to such a statement in my report, as there isn't such a statement. Similarly, he asserts that I confuse capacity reductions from the closure of processing plants with output reductions, but my discussion of the closure of processing plans explicitly stated that the closures "mean[t] *capacity* was reduced between the companies." Grace Merits ¶ 50 (emphasis added).

51. Mr. Kheyfets states that shipping fees could not have affected manufacturers' demand for coupons because shipping fees constitute only a small percentage of the cost of coupons. The September 2000 analysis he cites assumes, however, that shipping fees were $0.0076 per coupon. SH_INMAR004696. But my analysis shows shipping fees for 2-count coupons averaged approximately $0.20 per coupon in the pre-period and $0.47 per coupon during the conspiracy period. For the conspiracy period, this amounts to an average per coupon shipping fee of 62 times what was assumed in the analysis cited by Kheyfets. For 1-count coupons, shipping fees were

23

$0.35 and $0.67 per coupon, respectively, or up to 88 times higher than Kheyfets' assumes. *See also* SH_INMAR011727 (finding that one manufacturer was billed an average of 13 cents per coupon in 2002, and 20 cents per coupon in 2005, and that IOS billed the manufacturer over $1 per coupon in shipping on behalf of some of its retailers); SH_INMAR004673 ("Shipping charges, for [manufacturer's agent] CRS clients, have become a major and disproportionate portion of overall coupon redemption costs."). Moreover, the analysis cited by Mr. Kheyfets includes the face value of the coupons, which constitutes the majority of the cost, and would not be relevant to manufacturers seeking more cost-efficient methods of distributing promotional discounts to customers. SH_INMAR 004696.

52. In analyzing IOS and Defendants' output, Mr. Kheyfets seeks to define output as "how many coupons manufacturers issued or how many coupons consumers redeemed." Kheyfets Merits ¶ 36. But what is relevant to determining the output of the coupon processing industry is the number of coupons processed by retailer processors, and the number processed (including a full independent audit) by manufacturer processors. If a coupon is issued by a manufacturer or is redeemed by a consumer but is never processed, that coupon is not relevant to IOS or Defendants' coupon processing output.

53. Mr. Kheyfets disputes my finding that CMS's total operating expenses decreased during the conspiracy period by an average of 4.7% per year. Grace Merits ¶ 51. He points to modest increases in 2004 and 2005 compared to the prior year, ignoring that operating expenses were still lower than in 2001, and that there was an overall downward trend: $26.7 million in 2001, $24.2 million in 2002, $22.7 million in 2003, $22.8 million in 2004, $23.3 million in 2005, and $20.4 million in 2006. *Id.*, App. A, Table 1.

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 25 of 36

### G. Defendants' Margins Increased During the Class Period.

54. Mr. Kheyfets disputes my analysis of margins, in which I found that Defendants' margins increased during the conspiracy period, despite declining volume and costs. For example, Mr. Kheyfets suggests that I misinterpreted INMAR0051964, and internal Inmar analysis of the impact of the Gemini agreements and Inmar's shipping and handling strategy on pre-tax income. The first tab of the spreadsheet states: "S&H Strategy worth approximately $35.7 million through 2003 and projected $46.9 million through 2004." *Id*. Mr. Kheyfets suggests that margin increases related to decreased expenses rather than increases in shipping fees. But for purposes of my margin analysis, it is irrelevant whether the margins increased because of lower costs or higher fees and under collusive-pricing, *both* will typically occur simultaneously because fewer units are sold at higher prices. Furthermore, CCC's prices for shipping and handling fees *increased* during the conspiracy period compared to the but-for world, while costs were declining.

### H. Mr. Kheyfets Misunderstands the DOJ/FTC Merger Guidelines.

55. Economists often assess market concentration using the Herfindahl-Hirschman Index ("HHI"). In a highly concentrated market, an increase in HHI of over 200 points is presumed to be likely to enhance market power. DOJ/FTC Horizontal Merger Guidelines § 5.3 (2010). I found that the HHI for both the retailer and manufacturer coupon processing markets increased by over 200 points, indicating that market power was likely enhanced. Grace Merits ¶¶ 59-60. Mr. Kheyfets does not dispute my HHI calculations.

56. The guidelines state that: "In evaluating market concentration, the Agencies consider both the post-merger level of market concentration and the change in concentration resulting from a merger." DOJ/FTC Horizontal Merger Guidelines § 5.3. In disputing my conclusions, Mr. Kheyfets suggests that the Merger Guidelines consider a third factor: the pre-merger level of

25

market concentration. Specifically, he relies on the Merger Guidelines' statement that "[m]ergers *resulting in* highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power," *id.* (emphasis added), and posits that this presumption only applies if the market was not highly concentrated pre-merger, and the merger caused a change from, e.g., a moderately concentrated market to a highly concentrated market*,* "resulting in" a highly concentrated market. Kheyfets Merits ¶ 46 (arguing that a merger does not "result" in a highly concentrated market if "the market was *already* . . . highly concentrated").

57. Mr. Kheyfets offers no citation or support for his novel interpretation of the Merger Guidelines. The Department of Justice routinely applies a different interpretation, relying on increases in HHI scores as indicative of an increase in market power in markets that are "already highly concentrated."[2] In at least one such filing, the DOJ omitted Mr. Kheyfets "resulting" requirement in explaining the HHI guidelines, stating that: "If the post-transaction HHI *would be* more than 2,500 and the change in HHI as a result of the merger would be more than 200, the market is highly concentrated and the transaction is presumed likely to enhance market power and substantially lessen competition."[3] Hence, Mr. Kheyfets misapplies the Merger Guidelines.

---

[2] *See, e.g.*, Complaint ¶¶ 15-16, *United States v. Aon plc*, No. 1:21-cv-01633 (D.D.C. June 16, 2021) (citing increases in HHI scores "in markets that are already highly concentrated" in challenging proposed merger as anti-competitive), *available at* https://www.justice.gov/opa/press-release/file/1404951/download; Complaint ¶¶ 35, 37, 41-42, *United States v. Republic Servs., Inc.*, No. 1:21-cv-883 (D.D.C. Mar. 31, 2021) (citing increases in HHI scores "in markets that are already highly concentrated" in challenging proposed merger as anti-competitive), *available at* https://www.justice.gov/atr/case-document/file/1382031/download; Complaint ¶¶ 18, 20-22, *United States v. The Walt Disney Co.*, No. 1:18-cv-05800 (S.D.N.Y. June 27, 2018) (citing increases in HHI scores in markets that are "already highly concentrated" in challenging proposed merger as anti-competitive), *available at* https://www.justice.gov/atr/case-document/file/1075201/download.

[3] Complaint ¶ 15, *United States v. Aon* (emphasis added).

26

58. Mr. Kheyfets points out that the presumption of an increase in market power may be rebutted with "'persuasive evidence showing that the merger is unlikely to enhance market power.'" Kheyfets Merits ¶ 46 (quoting Merger Guidelines). But Mr. Kheyfets offers no such "persuasive evidence." While Mr. Kheyfets points to the existence of NCH as a large competitor in the market, *id.*, NCH's presence was already taken into consideration in the HHI calculation. Similarly, Mr. Kheyfets points to the bargaining power of large retailers, *id.* ¶ 48, but ignores that such bargaining power is reduced in a more highly concentrated market.

59. Mr. Kheyfets represents that I improperly excluded in-house processing from my HHI analysis. *Id.* ¶ 47. But in-house processors were included. *See id.* ¶ 43 Ex. 1; INMAR0044635-39 at 37 (Memo Regarding Market Share). Mr. Kheyfets correctly points out that switching to in-house processing would allow a manufacturer to avoid overcharges on coupon processing fees imposed by a manufacturer processor but would not allow it to avoid an overcharge on shipping fees imposed by a retailer processor.

### I. Mr. Kheyfets Offers No Alternative Market Definition

60. In my report, I defined the relevant markets as the U.S. markets for retailer coupon processing services and for manufacturer coupon processing services. Grace Merits ¶¶ 23-39. I based my opinion on economic analysis, and IOS and Defendants' internal documents. Mr. Kheyfets offers a number of flawed criticisms of how I define the relevant market, but offers no opinion of his own on the relevant market definition, and never explicitly disagrees that there is a distinct market for retailer coupon processing services and manufacturer coupon processing services in the U.S.

61. Mr. Kheyfets suggests that I identified a number of sub-markets, ignoring that I simply cited an internal IOS document and testimony breaking down market shares by segment without analyzing or suggesting whether these segments were relevant submarkets. Kheyfets Merits ¶ 50

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 28 of 36

(citing Grace Merits ¶ 56). Mr. Kheyfets himself does not assert that there were relevant submarkets. *Id.*

## J. Barriers to Entry Existed

62. I found, based on market conditions and contemporaneous documents, that there were significant barriers to entry for both retailer and manufacturer coupon processing in the U.S. In criticizing my finding, Mr. Kheyfets points out that NCH was already a large competitor in these markets, but cites no evidence contradicting the existence of barriers to entry. *Id.* ¶ 51. He also suggests that barriers to entry were irrelevant to whether there were competitive alternatives. But barriers to entry are relevant to the existence of market power for competitors that were already competing within the relevant market.

## K. The Restraints on Competition Were Not Reasonably Necessary to Achieve Pro-Competitive Benefits or Outweighed the Pro-Competitive Virtues

63. Mr. Kheyfets does not offer an opinion on whether the restraints on competition in IOS and Defendants' agreements were reasonably necessary to achieve the pro-competitive benefits, or whether the anticompetitive effects substantially outweighed the pro-competitive virtues. Instead, he offers several misplaced criticisms of my analysis.

64. For example, he cites my opinion in paragraph 84 of my Merits Report regarding the necessity of the competitive restraint in the subprocessing agreement, which precluded IOS from competing for designated IOS customers, precluded the parties from making disparaging statements about each other, and imposed substantial penalties for terminating the agreement. Grace Merits ¶ 84. These anti-competitive constraints were not reasonably necessary to facilitate the pro-competitive benefits offered by sub-processing. *Id.* (stating that the noncompetition agreement "was not reasonably necessary to the creation of the[] pro-competitive benefits"). Mr. Kheyfets argues that identifying less restrictive alternatives "does not inform the question of the

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 29 of 36

costs and benefits of the *actual* agreements." Kheyfets Merits ¶ 54. But this criticism overlooks that my opinion about the availability of less restrictive alternatives was not an analysis of "costs and benefits," but of whether the restraints were "reasonably necessary," such that his criticism is misguided. Grace Merits ¶ 84.

65. Mr. Kheyfets also asserts that the one-count program offered as a result of the Proprietary Data Transfer Agreement ("PDTA") offered substantial pro-competitive benefits. But the PDTA included an agreement that Inmar would not compete for any IOS retail customer. Mr. Kheyfets offers no opinion on whether this anticompetitive restraint was reasonably necessary to achieve the pro-competitive benefits. I found that it was not, and that other one-count programs had no such restrictions. *Id.* ¶ 73. Mr. Kheyfets attempts to measure pro-competitive benefits by the number of manufacturers who purportedly switched to the one-count program because of the PDTA. But manufacturers switched to one-count processing partly because of the inflated shipping fees for not using CMS's one-count program, *id.* ¶ 76, and Mr. Kheyfets offers no reliable comparison of the number of manufacturers who would have switched to one-count in the absence of inflated shipping fees. In addition, Mr. Kheyfets makes no attempt to examine the costs of the anticompetitive restraints in the PDTA.

66. In summary, I stand by my original opinions, and find that Mr. Kheyfets opinions are largely irrelevant and misplaced, or are based on a misunderstanding of how antitrust overcharges are calculated under the antitrust laws.


July 13, 2021                                      /s/Kathleen Grace
                                                  Kathleen Grace, Ph.D.

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 30 of 36

**Appendix A: Materials Considered**

| | |
|---|---|
| *Mr. Dee's, Inc. v. Inmar Corp.,* Third Amended Complaint. | |
| *Mr. Dee's, Inc. v. Inmar Corp.,* Plaintiffs' Brief in Opposition to Defendants' Motion to Exclude | |
| *Mr. Dee's, Inc. v. Inmar Corp.,* Plaintiffs' Third Set of Requests for Production of Documents | |
| *Mr. Dee's, Inc. v. Inmar Corp.,* Inmar's Responses to Plaintiffs' Second Set of Interrogatories | |
| Merits Expert Report of Michael Kheyfets (June 1, 2021) | |
| Supplemental Expert Report of Michael Kheyfets (May 12, 2021) | |
| Industry and Inmar Data files: | CCC Full-Service Data 2001-2003, 2005-2009 (including supplemental data). CCC Pay Direct Data 2001-2003, 2005-2009 (including supplemental data). CMS Transactional Data 1999-2009. CCC data dictionaries (two total). |
| Trial Transcript, *United States v. Thomas Chris Balsiger*, No 07-cr-57 (E.D. Wis.). | |
| P&G Enlists Inmar to Process its US Coupons (Apr. 5, 2016) | *available at* https://www.globalcosmeticsnews.com/p-g-to-outsource-coupon-processing-to-inmar/ |
| DOJ/FTC Horizontal Merger Guidelines | *available at* https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 |
| ABA, Proving Antitrust Damages (3d ed. 2017) | |
| ABA, Antitrust Law Developments (6th ed. 2007) | |
| Inmar's Quarterly Volume and Market Share Reports | |
| Costello Dep. Tr. (Sept. 18, 2020) | |
| Vontsolos Dep. Tr. (May 26, 2021) | |
| Carter Dep. Tr. (May 5, 2021) | |
| CFA 30(b)(6) | |
| Declaration of J. Degutis | |
| "How do store coupons work?" | *available at* https://money.howstuffworks.com/personal-finance/budgeting/question4261.htm |
| Thomas E. MaCurdy & John H. Pencavel, *Testing between Competing Models of Wage and* | |

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 31 of 36

| | |
|---|---|
| *Employment Determination in Unionized Markets*, Journal of Political Economy (1986) | |
| Norman R. Draper & Harry Smith, *Applied Regression Analysis*, New York: John Wiley & Sons (1966) | |
| Chris Tofallis, *A Better Measure of Relative Prediction Accuracy for Model Selection and Model Estimation*, Journal of the Operational Research Society (2015) | |
| Dennis Yao, *The Analysis of Hospital Mergers & Joint Ventures: What May Change?*, 1995 Utah L. Rev. 381 (1995) | |
| Complaint, *United States v. Aon plc*, No. 1:21-cv-01633 (D.D.C. June 16, 2021) | *available at* https://www.justice.gov/opa/press-release/file/1404951/download |
| Complaint, *United States v. Republic Servs., Inc.*, No. 1:21-cv-883 (D.D.C. Mar. 31, 2021) | *available at* https://www.justice.gov/atr/case-document/file/1382031/download |
| Complaint, *United States v. The Walt Disney Co.*, No. 1:18-cv-05800 (S.D.N.Y. June 27, 2018) | *available at* https://www.justice.gov/atr/case-document/file/1075201/download. |
| A16-000070-72 A16-000080-81 | |
| INMAR0000273-930 INMAR0000821-48 INMAR0000882-99 INMAR0000916-30 INMAR 0001362-1391 INMAR0005350-368 INMAR0006112-199 INMAR0006496-504 INMAR0007214-296 INMAR0009115-149 INMAR0010664-731 INMAR0011535-2699 INMAR0018977-987 INMAR0023240-906 INMAR0025000-048 INMAR0026672-704 INMAR0032328-330 INMAR0040056-057 INMAR0044429 INMAR0044485-831 INMAR0044635-39 INMAR0048032 | |

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 32 of 36

| | |
|---|---|
| INMAR0050253-899 | |
| INMAR0051407 | |
| INMAR0051429 | |
| INMAR0051602-16 | |
| INMAR0051627 | |
| INMAR0051964 | |
| INMAR0052259 | |
| INMAR0053043 | |
| INMAR0054782 | |
| INMAR0056522 | |
| INMAR0056755 | |
| IOS-EDD-00004102 | |
| Plaintiffs-000011-750 | |
| Plaintiffs-0000925 | |
| Plaintiffs-0001032-99 | |
| Plaintiffs-0002287-400 | |
| Plaintiffs-0002448 | |
| Plaintiffs-003706-900 | |
| Plaintiffs-00004320-400 | |
| Plaintiffs-0012460-500 | |
| Plaintiffs-Coupons-000416-9 | |
| Plaintiffs Production – Coupons – 0000340-44 | |
| SF 100844 | |
| SF 103076 | |
| SF 103339 | |
| SF 104330 | |
| SH_INMAR 001617 | |
| SH_INMAR 002392 | |
| SH_INMAR 002525-672 | |
| SH_INMAR 002516-24 | |
| SH_INMAR002673 | |
| SH_INMAR 004107 | |
| SH_INMAR 004194 | |
| SH_INMAR004673 | |
| SH_INMAR004696 | |
| SH_INMAR011727 | |
| SH_INMAR 017597 | |
| SH_INMAR 017816-19 | |
| SH_INMAR 019998 | |
| SH_INMAR 022383 | |
| SH_INMAR 023174 | |
| SH_INMAR025044-314 | |
| SH_INMAR 026641 | |
| SH_INMAR051860 | |
| SH_INMAR071943 | |
| SH_INMAR089135 | |

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 33 of 36

| | |
|---|---|
| SV00077222<br>SV00077291<br>SV00077822<br>SV00078696<br>SV00079425<br>SV00079551<br>SV00080950 | |
| Balsiger, T. Tr. Exhibits 233, 100, 98, 94, and 29 | |

33

## Appendix B: Publications from last 10 years

*("Player" is former last name)*

Grace, Kathleen & Oran Wilson. "After the V.C. Summer Iceberg—which lifeboat is safe?" *Palmetto Promise Institute.* January 2020. Can be found at: https://palmettopromise.org/after-the-v-c-summer-iceberg-which-lifeboat-is-safe/

Grace, Kathleen & Joshua Hall. "The Efficiency of Residential Community Associations: Evidence from Spartanburg County" *International Advances in Economic Research,* January 19, 2019.

Player, Katie G. "Which ratepayers will pay more? SCE&G vs. Santee Cooper". *Palmetto Promise Institute, June 2018.*

Player, Katie G. & MT Maloney. "Santee Cooper Rate Increase Projections 2018". *Palmetto Promise Institute, May 2018.*

Player, Katie G. & MT Maloney. "Santee Cooper's uncertain future". *Palmetto Promise Institute,* April 2018.

Player, Kathleen. "The Impact of Personal Income Tax Rates on the Employment Decisions of Small Businesses." Journal of Entrepreneurship and Public Policy. February 2018.

Case 1:19-cv-00141-WO-LPA   Document 279-10   Filed 05/29/22   Page 35 of 36

**Appendix C: Expert witness and consulting work in last 10 years**

**2019**

**Expert Witness—valuation:** served as plaintiff's expert providing DCF valuation and damages analysis for breach of contract suit. Valuation complete and deposition scheduled mid-September 2020.

**Expert Witness Support:** Generated expert report for plaintiff on a S&P 500 company's financial stability and cash flow. Analyzed publicly available financial and cash flow performance, as well as lobbying activity and charitable contributions of top S&P 500 companies and target firm. *Report admitted. Settled out of court.*

**2018**

**Economic valuation consultant to Palmetto Promise Institute**
Analyzed Santee Cooper's financial position and the electricity rate increases needed to maintain financial solvency as well as damages to South Carolina customers. Used various sources of data in calculations. Provided four reports, testimony and presentations, as well as media support.

**2013**

**Expert Witness:** Served as plaintiff's expert witness to address valuation and valuation methods for minority shareholder lawsuit that settled for over $500 million in 2013, provided two expert reports and 9 hours of deposition testimony on financial valuation. *Confidential. Qualified as expert witness. Deposed. Settled out of court.*