

Exhibit 25

<div style="border:1px solid black;">

Expert Report of

Kathleen Grace

in the matter of

*Mr. Dee's, Inc., et al. v. Inmar Corporation, et al.*

June 2020

</div>

## I.     Introduction

I am Kathleen Grace, PhD an economic and financial consultant. I earned a B.A. degree in economics and finance in 2006 from Wofford College and a master's degree and PhD degree in quantitative economics from Clemson University in 2012. I was an investment banking analyst for Raymond James from 2006-2007. I was an Assistant Professor of Business and Accounting at Furman University from 2012-2015 and a Visiting Professor of Finance at Wofford College from 2018-2019.    As a professor, I taught undergraduate students in the areas of economic theory, financial economics, corporate finance, and corporate valuation. In my advanced corporate finance class, I taught students how to value a company using various methods: discounted cash flow, multiples and net asset value. As a finance and economics expert, I have provided expert opinions and support on corporate valuation techniques, partnership valuation, cash flow and liquidity for multi-national corporations as well as partnerships.

*Expertise*

I have training and experience in analyzing economic incentives, analyzing economic actions, and reviewing corporate financial records including both publicly available materials as

1

well as internal company documents. I am prepared to explain economic, accounting and financial terms to a jury and to help educate a jury on how to read and understand regression analysis, balance sheets, income statements and other accounting and financial documents as well as damages estimates. My publications include the following:

Grace, Kathleen & Oran Wilson. "After the V.C. Summer Iceberg—which lifeboat is safe?" *Palmetto Promise Institute.* January 2020. Can be found at: https://palmettopromise.org/after-the-v-c-summer-iceberg-which-lifeboat-is-safe/

Grace, Kathleen & Joshua Hall. "The Efficiency of Residential Community Associations: Evidence from Spartanburg County" *International Advances in Economic Research,* January 19, 2019.

Player, Katie G. "Which ratepayers will pay more? SCE&G vs. Santee Cooper". *Palmetto Promise Institute, June 2018.*

Player, Katie G. & MT Maloney. "Santee Cooper Rate Increase Projections 2018". *Palmetto Promise Institute, May 2018.*

Player, Katie G. & MT Maloney. "Santee Cooper's uncertain future". *Palmetto Promise Institute,* April 2018.

Player, Kathleen. "The Impact of Personal Income Tax Rates on the Employment Decisions of Small Businesses." <u>Journal of Entrepreneurship and Public Policy</u>. February 2018.

In my series of publications on Santee Cooper with Palmetto Promise Institute, I estimated the overcharges (damages) to Santee Cooper customers due to increased electricity rates from the nuclear plant abandonment in 2017. My estimates were the quoted rates used by Santee Cooper itself, NextEra (a potential buyer), and the South Carolina legislature.

1. I have been retained by the Plaintiffs to analyze the issues of impact, damages, and economic conditions in the Plaintiffs' case against Defendants. I am compensated at the rate of $300 per hour. My compensation for my work in this matter is not contingent upon my findings or the outcome of this litigation.

2. This analysis is based on my current understanding of Defendants' data, data from

International Outsourcing Services, Inc., and documents either produced by Defendants or provided by Plaintiffs. These data files and documents are listed and described in Appendix B of my report. It is possible that I will learn more about Defendants' data, documents, and other matters in the course of this case, which could lead to changes in the analysis and findings.

3. Other materials I considered are listed in Appendix B. Appendix C of my report provides a curriculum vita listing my publications from the last 10 years. Appendix D of my report details my expert witness and consulting work in the last 10 years.

## II. Summary of Findings

7. To summarize the evidence, I find the following:

   a. Between April 11, 2001 and March 28, 2007, manufacturers serviced by Carolina Manufacturing Services, Inc. ("CMS") were overcharged in the amount of $63.325 million in shipping fees, $28 million in service fees, and $5.6 million in new fees, for total overcharges of $96.93 million.

   b. Between April 11, 2001 and March 28, 2007, retailers serviced by Carolina Coupon Clearing Corp. ("CCC") were overcharged in the amount of $225.2 million

   c. Between the second quarter of 2001 through the first quarter of 2007, retailers serviced by International Outsourcing Services, Inc.'s ("IOS") were overcharged in the amount of $424.675 million.

   d. Defendants' and IOS' overcharges occurred when demand for coupon processing services was decreasing and when costs were declining. Overcharging clients under such industry conditions would have been contrary to the economic interest of both Defendants and IOS. Based on my analyses, I am of the opinion that economic conditions indicate that the overcharges stem from the loss of competition between Defendants and IOS.

3

### III.  Industry Overview[1]

8.  Coupon processors fulfill a need of assisting consumer goods' manufacturers and retailers in extending price discounts to consumers.  Manufacturers extend price discounts on products by issuing coupons to consumers.  When consumers redeem coupons, retailers collect the coupons and give the coupons' price discounts to consumers.  Retailers then seek reimbursement from manufacturers for the price discounts given to consumers and add an eight-cent handling fee on redeemed coupons to pay for the services of coupon processors.[2]  Retailers retain coupon processors to secure reimbursement from manufacturers for the price discounts given to consumers.  Manufacturers retain their own coupon processors to ensure the appropriateness of reimbursements sought by retailers.  Retailer and manufacturer processors ensure the accuracy and legitimacy of coupons for which price discounts were given and need to be reimbursed.

9.  Large coupon processors have clearinghouses where coupons are shipped, sorted by manufacturer, counted, and audited to determine the appropriate reimbursement from a manufacturer to a retailer.

10.  Retailers contract with coupon processors for coupon processing services.  Retailer processors charge retailers processing fees for their services.[3] Retailer processors may also charge manufacturers fees for their services, such as a fee for shipping coupons to manufacturers. Manufacturers that do not agree to pay the retailer processor fees will chargeback the fee amounts

---

[1] This section of my report is based on review of documents, testimony of former IOS executives, and interviews of industry participants.

[2] See INMAR 0050343 (spreadsheet of invoices that show each coupon charged $0.08 handling fee.)

[3] Comparing retailer coupon processing agreements shows that minimum volume increases result in price per 1000 rate decreases. *See* INMAR0006114 (stating "Minimum processing volume 12,000" at "$60.00/1000 coupons processed.")*;* INMAR0006191 (stating "Minimum processing volume 72,000" at "$36.00/1000 coupons processed.").

4

to retailers.[4]

11. For the relevant time period of my analyses,[5] there were three primary companies that provided coupon process services to retailers: (a) NCH, which focused on offering coupon processing services to large retailers, (b) an Inmar subsidiary named Carolina Coupon Clearing Corporation ("CCC") d/b/a Carolina Services ("CS"), which focused on offering coupon processing services to large and small retailers; and (c) International Outsourcing Services, Inc. ("IOS") d/b/a International Data until 2003, which focused on offering coupon processing services to small retailers.

12. Like retailers, manufacturers also contract with coupon processors for coupon processing services.[6] Manufacturer processors charge processing fees and other fees that often decrease as the volume of coupons processed increases.

13. For the relevant time period of my analyses, there were three primary companies that provided coupon process services to manufacturers: (a) NCH Services, Inc., which focused on competing for the business of large manufacturers; (b) an Inmar subsidiary named Carolina Manufacturer Services, Inc. ("CMS"), which focused on competing for the business of large and small manufacturers; and (c) IOS, which focused on competing for the business of small manufacturers. Each of these companies had clearinghouse operations in Mexico and contracted

---

[4] Trial Transcript. (Balsiger T.) 2639:11-17. "[M]anufacturer agents and miscellaneous manufacturers when they deny payments, no, we don't get the face value or handling fee. That would be correct. **Q**. And you don't get paid freight or postage if the payment is -- if the coupons are denied; is that accurate? **A**. Yes, I believe so.").

[5] As discussed below, the Non-Compete Agreements challenged in this case – which were entered on April 11, 2001 – expired in whole or in part on March 28, 2007. I was provided data going back to 1999. Therefore, the relevant time period of my analyses (at least at this juncture) is 1999 through March 28, 2007.

[6] Procter & Gamble handles coupon processing internally without the assistance of a manufacturer processor. See INMAR0048032 (IOS mistakenly sends box of coupons to Inmar and requests that they forward the coupons directly to Proctor & Gamble for processing.)

5

with manufacturers for coupon processing services.

14. The relevant markets for coupon processing services are no broader than a United States market for coupon processing services for manufacturers and a United States market for coupon processing services for retailers. Processors compete for the business of manufacturers separately than for the business of retailers, as a manufacturer processor ensures the accuracy of coupons submitted by retailers and a retailer processor ensures retailers are being compensated for the coupons redeemed at their stores. Internal CMS and CCC analyses show that the companies analyzed a national manufacturer processing market separately from a national retailer processing market.[7]

15. Within these markets, competition can focus on the types of manufacturers and retailers that the processors seek to serve. For example, considering that they both competed for small retailers, documents and testimony reflect that Inmar (CCC) and IOS were each others' closest competitors in the retail processing market.[8] By 2003, after CCC agreed not to compete with IOS, IOS's former CEO testified that the company "basically achieved a hundred percent control of the independent market," which included small "mom and pop" grocery stores.[9]

16. For the relevant time period, the markets for coupon processing services were in decline.[10]

---

[7] *See, e.g.* INMAR0044671-676 (retailer market share report); *See. e.g*. INMAR0044826-831 (manufacturer market share report)..

[8] Trial Transcript. (Balsiger T.) 2550:24-25, "My competition, my number one competitor at that point on a fair playing field basis was Carolina [CCC], they were very good."; *see also* International Data Memo, "ID's only major competitor is CMS which has two programs: Couponics and Millenium and per Lance [Furr] is the only other player in this market." Coupons-0000137.

[9] Trial Transcript. (Balsiger T.) 2511:11-12, ("[B]y the time we get to 2003, there had been consolidation where IOS basically achieved a hundred percent control of the independent market."); Trial Transcript. (Balsiger, T.) 2499:22-24, ("They represent independent ma and pops as you guys liked to say. I like to say independent grocers who work hard.")

[10] Trial Transcript. (Balsiger T.) 2507:22-24, "But coupons are continuing to decline, If I had a chalkboard I'd be up there. And coupons are going from about 5.5 billion to 5 billion to 4 billion, they're dropping"; *id*. 2510:25, "Bear in

6

Fewer coupons were being processed, as reflected in documents and testimony about coupon processing volumes.[11]

17. Barriers to entry existed in markets for coupon processing services. Markets required substantial investments in processing facilities – such as clearinghouses in Mexico for large processors – as well as the ability to secure enough business over time to achieve sufficient volume levels to meaningfully compete against the primary companies offering coupon processing services.[12] In addition, business practices instituted by CMS, CCC, and IOS imposed additional hurdles to processors seeking to secure meaningful entry in the manufacturer processor market. Specifically, IOS and CCC agreed to charge certain higher fees only to manufacturers that did not use CMS as their manufacturer processor, which would create financial disincentives for manufacturers to use a small processor to fulfill the manufacturers' processing needs.[13]

## IV. Post-Agreement Price Increases

18. I understand that CMS, CCC, and IOS entered agreements on April 11, 2001 that involved, among other things, the transfer of IOS manufacturer clients to CMS and the transfer of a number of CCC retailer clients to IOS along with agreements that IOS would not compete for manufacturer clients and that CCC would not compete for IOS's retailer clients.[14] I refer to these agreements as the "Non-Compete Agreements." I also understand that Non-Compete Agreements were

---

mind you got a declining market"; *id*. 2512:25, "coupons are declining", *id*. 2501:12, "coupons were declining, and it was very evident")

[11] *See* A16-000080; INMAR0044732; INMAR0044826.

[12] *See* INMAR0050774 and INMAR0050775; *see also* INMAR0050647 and INMAR0050649

[13] *See, e.g.*, INMAR0000273 (observing that client switching to another manufacturer processor would be hit with a substantial "retailer fee impact" that would be "a disaster for these clients"); INMAR0032328 (email exchange that CCC would "increase the invoice fee from $3.75 to $4.65 for 2 count invoices for non CMS clients").

[14] *See* INMAR0005350-68; INMAR0000882-99; INMAR0000821-48; INMAR0000916-30.

Case 1:19-cv-00141-WO-LPA   Document 279-26   Filed 05/29/22   Page 8 of 30

terminated in whole or in part on March 28, 2007.[15]

19. Based on available data, I analyzed whether clients for CMS, CCC and IOS were overcharged for coupon processing services from April 11, 2001 until March 28, 2007, the period in which the Non-Compete Agreements were in place. As discussed below, and based on my analyses, I am of the opinion that each class member was overcharged by Defendants or IOS and that economic conditions indicate that these overcharges stem from the loss of competition between Defendants and IOS.

*CMS*

20. I was provided client transactional data for the period 1999 through March 28, 2007. The data contained transactions of 341 CMS manufacturer clients before April 11, 2001 (the date of the Non-Compete Agreements) and 1,110 CMS manufacturer clients after April 11, 2001.

21. CMS's transactional data has three categories of prices: (a) shipping fees, which are fees for shipping imposed by retail processors that CMS passes on to its manufacturers on a per invoice basis;[16] (b) service fees, which encompass fees that CMS charged manufacturers before and after the Non-Compete Agreements for coupon processing services;[17] and (c) "New Fees," which are fees CMS started charging manufacturers after it entered the Non-Compete Agreements.[18]

22. To analyze the issue of manufacturer overcharges, I first look at overall price changes before and after the Non-Compete Agreements for the firms in which CMS has pricing data in both periods. This analysis shows a median per coupon price increase of $0.0189 per coupon, meaning that market prices increased after the Non-Compete Agreements. This price increase

---

[15] *See* INMAR0000352-58 and INMAR0000398-00.

[16] The transaction codes associated with shipping fees are identified in Appendix A.

[17] The transaction codes associated with service fees are identified in Appendix A.

[18] The transaction codes associated with new fees are identified in Appendix A.

8

occurred both in (a) median shipping fees of $.036 per coupon, a 138% increase and (b) in median service fees of $.083 per coupon, a 119% increase. Higher prices also occurred with new fees, considering that the new fees did not exist before the Non-Compete Agreements. As discussed in Paragraphs 16 and 39, these price increases occurred when both coupon processing demand was decreasing and CMS's costs were decreasing, signifying that the higher prices can be attributed from the loss of competition between Defendants and IOS.

23. For each fee category, I then analyze the amount each manufacturer client was overcharged, applying the prices that existed in the "pre-period" (the period before the Non-Compete Agreements) to the pricing that existed in the "post-period" (the period after the agreements). This analysis yields an overcharge amount for each manufacturer.

24. First, I analyzed shipping fees. My shipping fee analysis started with the 292 manufacturers CMS serviced both before and after the Non-Compete Agreements. Because I had data of the actual amount each of these clients paid in shipping fees, comparing the change in the amount of shipping fees for each client was a simple exercise: I calculated how much each client paid in shipping fees per coupon (net of adjustments) before and after the Non-Compete Agreements. The results of this calculation are presented in Exhibit 1 (CMS-Shipping Fees Tab). The median price per coupon for these manufacturers increased by $0.009. This increase was driven by increases in shipping fees to 195 manufacturers comparing the post-period to the pre-period, which paid $42.8 million more in shipping fees in the post-period compared to the pre-period. Shipping fees for 97 manufacturers decreased on a per coupon basis (in absolute terms) in the post period, which, as discussed below, would have fallen further for 96 of the firms in the post-period had the pre-period pricing prevailed.

25. I then had to model what firms in the post-period would have been charged had the pre-

9

period pricing model prevailed in the post-period, using a regression analysis to control for volume. Because CMS began servicing 805 new manufacturer clients after the Non-Compete Agreements, data were only available on what these clients paid in shipping fees from April 11, 2001 onward. To determine if these clients paid elevated shipping fees after the Non-Compete Agreements, I calculated what the clients would have paid absent the agreements. To do this, I calculated shipping fee prices that existed prior to the Non-Compete Agreements and applied those prices to the coupons each of 805 clients that CMS processed after the Non-Compete Agreements. This calculation required that I control for volume, as shipping fees tend to be higher for lower volume manufacturers.

26. To perform this calculation, I used the following regression equation:

$$\%\Delta \textit{ Shipping Price} = a + b * \log(\textit{Coupons})$$

Variables in this equation are defined as follows:

- "%Δ *Shipping Price*" is the percentage change in shipping price from before and after April 11, 2001, the date of the Non-Compete Agreements for the 195 customers that experienced an increase in shipping fees;

- *"log(Coupons)"* is the coupon volume for each of these manufacturer clients in the period following the Non-Competition Agreements.

This regression estimates how coupon volume is related to the percentage shipping price changes before and after April 11, 2001. The regression yields the following estimates:

$$\%\Delta \textit{ Shipping Price} = 0.69 - 0.011* \log(\textit{Coupons})$$

These estimates show that the *y*-intercept in the equation is 0.69.[19] This says that the baseline

---

[19] The corresponding t-statistics are $t = 7.73$ and $t = -1.88$ for the y-intercept and coefficient, respectively. The regression R-squared is 0.0179

Case 1:19-cv-00141-WO-LPA   Document 279-26   Filed 05/29/22   Page 11 of 30

increase in shipping fees was 69%. The estimates show that shipping fees were lower for customers with larger coupon volume. Essentially, doubling volume reduces shipping fees by 1%. In other words, a manufacturer's fees are higher per coupon when the firm processes fewer coupons (e.g. volume declines).

Using this estimated effect of the Non-Compete Agreement, I can then forecast the higher prices that were paid by firms who were only served after the Non-Compete Agreements. There are 805 manufacturers in the database operating only after April 11, 2001. For these manufacturers, I use the price change information generated from regression results above, to calculate shipping fee changes, and multiply the percentage change in shipping fees by the prices actually paid, as follows:

$$\%\Delta \ Shipping \ Price * Shipping \ Price = \Delta \ Shipping \ Price$$

The forecast %$\Delta$*Shipping Price* for these firms has a median value of 0.57. This says that based on the results on the regression, the median firm operating only in the Non-Compete period saw shipping fees rise by 57%.

27. This equation provides an amount by which shipping fees changed before and after April 11, 2001 for each of the 805 manufacturers for which shipping fee data before April 11, 2001 is unavailable. As reflected in Exhibit 1 (CMS-Shipping Fees Tab), each of these manufacturers paid more in shipping fees per coupon with the post-period pricing than they would have paid with the pre-period pricing. In aggregate, the shipping fee overcharges for these manufacturers amount to $16.5 million, and the median shipping fee increased by roughly $0.044/coupon after April 11, 2001.

28. Similarly, with respect to the 97 manufacturers that paid less per coupon (in absolute amounts) in shipping fees in the post-period, the model shows that pricing for 96 of these firms

would have decreased even further if the pre-period pricing had prevailed.[20]  That is, when controlling for volume and adding to the analysis the new manufacturers serviced by CMS in the post-period, the 96 firms would have paid even less in the post-period than they actually did in the amount of $4.025 million, as reflected in Exhibit 1 (CMS-Shipping Fees Tab).

29. Higher shipping fees arose when invoicing practices drastically changed after the Non-Compete Agreements.  Shipping fees are charged on a per invoice basis.  CMS's data show that, before April 11, 2001, the median number of coupons included in each invoice charged to CMS's clients was 6,608.  *See* Exhibit 1 (CMS-Shipping Fees Tab).  After CMS, CCC, and IOS entered their Non-Compete Agreements, the median number of coupons included in each invoice fell to 687.  *Id.*  Sending manufacturers more invoices with fewer coupons per invoice had the effect of driving up shipping fees charged to CMS manufacturers.

30. After entry of the Non-Compete Agreements, industry participants observed a stark change in CCC and IOS's shipping fee charges and invoicing practices, but did not observe a change in NCH's shipping fee charges or invoicing practices.[21]  Following the Non-Compete Agreements, both CCC's and IOS's invoices to manufacturers consisted of few coupons with high shipping fees, consistent with the changing of invoicing practices reflected in CMS's transaction data.[22]

31. Second, I analyzed service fees.  Service fees encompass the following fees that CMS charged its client for processing services, which were in existence both before and after the Non-Compete Agreements: service fee, minimum volume fee, minimum fee, retroactive fee, coupon

---

[20] The one manufacturer that I cannot conclude paid less in the post period in shipping fees is North American Nutrition, which received a $100,000 "credit to shipping" in the post period that cannot be incorporated in the model.  This manufacturer paid higher service fees as well as new fees, meaning that it suffered overcharges and was thus impacted by \the loss of competition between Defendants and IOS.

[21] Declaration of J. Degutis, Para. 5-6.

[22] *See, e.g.,*Plaintiffs-Coupons-000416-8; Plaintiffs-0001262; Plaintiffs – 0000693-700; Plaintiffs - 0001032-33.

12

management fee. I use the same methodology to analyze any change in service fees as I do to analyze changes in shipping fees.

32. Specifically, CMS has data from the 304 manufacturer clients that CMS served and that paid service fees before and after April 11, 2001. For these manufacturers, I analyzed what each manufacturer paid in service fees on a per coupon basis in the pre-period compared to the post period. The results of this calculation are presented in Exhibit 1 (CMS-Service Fees Tab). The median firm paid $0.0046 per coupon more in service fees. This increase was driven by increases in service fees to 191 manufacturers comparing the post-period to the pre-period, which paid $10.8 million more in service fees in the post-period compared to the pre-period. Service fees for 113 manufacturers decreased on a per coupon basis (in absolute amounts) in the post period, which, as discussed below, would have fallen further in the post-period for 112 of the firms had the pre-period pricing prevailed.

33. I then had to calculate service fee prices for 806 manufacturers CMS started serving after it entered the Non-Compete Agreements. As with shipping fees, to determine if these clients paid elevated service fees after the Non-Compete Agreements, I calculated what the clients would have paid absent the agreements. To do this, I calculated CMS's service fee per coupon that existed prior to the Non-Compete Agreements and applied those rates to the coupons of the 806 clients that CMS processed after the Non-Compete Agreements. This calculation required that I control for volume, as service fees tend to be higher for lower volume manufacturers.

34. To perform this calculation, I used the following regression equation:

$$\%\Delta\ Service\ Price = \text{a} + \text{b} * \log(Coupons)$$

Variables in this equation are defined as follows:

13

- "%Δ *Service Price*" is the percentage change in service fees per coupon from before to after April 11, 2001, the date of the Non-Competition Agreements for the 191 customers that experienced an increase in service fees;
- *"log(Coupons)"* is the coupon volume for each of these manufacturer clients in the period following the Non-Compete Agreements.

This regression estimates how coupon volume is related to percentage price changes between the periods. This gives the resulting estimates:

$$\%\Delta \text{ } Service \text{ } Price = 1.164 - 0.057 * \log(Coupons)$$

These estimates show that the *y*-intercept in the equation is 1.164.[23] This says that the baseline increase in service fees was 122%. The estimates show that service fees were lower for customers with larger coupon volume. Essentially, doubling volume reduces service fees by 5.7%., In other words, a manufacturer's damages are higher per coupon when the firm processes fewer coupons (e.g. volume declines).

35. Using these results, I then calculate prices that were paid by firms who were only served after the Non-Compete Agreements just like I did for shipping fees. There are 806 such firms in the database. I use the price change results set forth in Paragraph 34 to calculate prices for these firms. The forecast %Δ*Service Price* for these firms has a median value of 0.565. This says that, based on the results of the regression analysis, the median firm operating only after the Non-Compete Agreements is expected to have paid 56.5% higher service fees than what it would have paid prior to the Non-Compete Agreements. I then multiply this forecast percentage change in price for these firms by the service prices they actually paid to determine what the firms' service

---

[23] The corresponding t-statistics are $t = 16.03$ and $t = -10.77$ for the y-intercept and coefficient, respectively. The regression R-squared is 0.3805.

14

fees would have been if the pricing that existed prior to the Non-Compete Agreements prevailed after the Non-Compete Agreements. That is:

$$\%\Delta \ Service\ Price * Service\ Price = \Delta \ Service\ Price$$

The calculated change in service fees per coupon has a median value of $0.12, meaning that service fees per coupon for these firms were 12 cents higher at the median. Exhibit 1 (CMS-Service Fees Tab) lists the before and after service fee prices for each of the 806 manufacturers CMS began serving after April 11, 2001. As reflected in Exhibit 1, each of these manufacturers but one experienced higher service fees between April 11, 2001 and March 28, 2007, for total damages of $10.1 million.

36. Similarly, with respect to the 113 manufacturers that paid less per coupon (in absolute amounts) in service fees in the post-period, the model shows that pricing for 112 of these firms would have decreased even further if the pre-period pricing had prevailed.[24] That is, when controlling for volume and adding to the analysis business of the new manufacturers serviced by CMS in the post-period, the 112 firms would have paid even less in service fees in the post-period than they actually did in the amount of $7.1 million, as reflected in Exhibit 1 (CMS-Service Fees Tab).

37. Third, I analyzed New Fees, which include the fees CMS started charging manufacturers only after the Non-Compete Agreements. Between April 11, 2001 and March 28, 2007, CMS charged manufacturers 18 new fees, which are identified in Exhibit 1 (CMS-New Fees By Firm Tab). This exhibit reflects the amount each manufacturer paid in new fees, which total $5,646,351 in new fees.

---

[24] The one manufacturer that I cannot conclude would have paid even less in the post period in service fees is RAI PMS, which is CMS's highest volume manufacturer. This manufacturer paid new fees of $366,575, meaning it suffered overcharges and was thus impacted by the loss of competition between Defendants and IOS.

38. In sum, aggregation of the above estimates yields total overcharges to manufacturers stemming from the Non-Compete Agreements in the following amounts:

Observed shipping fee overcharges (*n=195*):          $42.8 million
Forecasted shipping fee overcharges (n=805)           $16.5 million
Adjusted shipping fee overcharges (n=97)              $4.025 million
Observed service fee overcharges (*n=191*):           $10.8 million
Forecasted Service Fee damages (*n=806*)              $10.1 million
Adjusted service fee overcharges *(n=113)*            $7.1 million
New fee overcharges                                   $5.6 million

                                        Total:        $96.93 million

39. My calculation of CMS overcharges to manufacturers is conservative. From 2001 to 2006, CMS's expenses were declining, on average, by around 5% each year, for a total of a 23% decrease in expenses. *See* Exhibit 2. Similarly, as discussed above in Paragraph 16, coupon processing demand was declining during this time. In a competitive market, CMS's prices would decrease to account for the reduction in expenses and reduction in demand. I did not factor these reductions into overcharges.

*CCC*

40. In addition to serving as a coupon process for manufacturers through CMS, Inmar also served as a coupon processor for retailers through CCC. I was provided CCC transactional data. In the data, retailer clients took one of two forms: "Full-Service" or "Pay Direct" clients. Full-Service retailers mailed their redeemed coupons to CCC for CCC to count, process and collect payment from manufacturers. CCC would then submit reimbursement to Full-Service retailers, after taking CCC's share of any fees from the amount it had been paid by manufacturers. Pay Direct retailers differed from Full-Service retailers in that CCC never took possession of monies

16

that manufacturers owed the retailers, as manufacturers paid the Full -ervice retailers directly and the retailers would then pay CCC processing fees.

41. Full-Service retailers appear to be small retailers that do not have the ability to deduct chargebacks from manufacturers, whereas Pay-Direct retailers appear to be large retailers that purchase product directly from manufacturers and have the ability to deduct for manufacturer chargebacks. I calculate damages for Full-Service retailers only because data are only available for Pay-Direct retailers beginning in 2002.

42. With respect to the Full-Service retailers, CCC's transactional data do not reflect CCC's charges to retailers. Instead, the data show, starting January 5, 2000, the number of coupons, coupon face value, the industry-standard eight cent handling charge, and redemption amount CCC passes on to its retail clients from what manufacturers pay CCC for coupons redeemed at CCC's Full-Service retailers. For example, for the period 2000 through April 11, 2001, the data show that CCC, reimbursed its Full-Service Retailers $0.60 cents for each dollar of redeemed coupon at the median for regular coupons.[25] This amount will encompass charges CCC collects from retailers for its coupon redemption services. Because I know how much compensation each retailer actually received from CCC for each invoice's total face value, I can compute CCC's change in price to its retailers by comparing any change in the amount retailers received before and after April 11, 2001, the date of the Non-Compete Agreements. For example, after the Non-Compete Agreements, if CCC increased its charges that Full-Service retailers paid, the amount the retailers received back from CCC for each dollar of coupon redeemed would be lower. After April 11, 2001, CCC reimbursed retailers $0.555 per dollar of face value at the median. This equates to a reimbursement decline of around $0.045 per dollar of face value, which shows the market was harmed. This

---

[25] This summary focuses on regular coupons; Apex coupons are discussed in my working papers.

decrease in reimbursement affected 222 retailers that received less in coupon reimbursement in the post period of $85 million compared to the pre-period. Reimbursements to 112 retailers increased on a per dollar of face value amount in the post period, which, as discussed below, would have increased even more had the pre-period pricing prevailed.

43. In the following paragraphs, I use an analysis similar to that used with manufacturers to assess changes in pricing and associated overcharges.

44. I first compute the total reimbursement per dollar of face value for each retailer before April 11, 2001 and after April 11, 2001 to find the difference in reimbursement between the periods. Total damages for a given retailer is simply the change in reimbursement the retailer experienced multiplied by its total coupon face value after April 11, 2001.

$$Damages\ per\ firm = \Delta Reimbursement * Total\ Coupon\ Face\ Value_{PostApril2001}$$

These per firm damages are then aggregated to estimate total damages. There are 343 retailers in the database which exist both before and after April 11, 2001, 222 of which I only have post period reimbursement rates. The median reimbursement before April 11, 2001 is $0.623 and the median reimbursement after April 11, 2001 is $0.494. *See* Exhibit 1 (CCC-Regular Coupons Tab). This says that the median firm received around 12 cents on the dollar less after April 11, 2001 for the coupons they accepted from their customers. Multiplying each firm's change in price by its total face value yields a damage estimate of $142.7 million[26].

As in the CMS section above, there are 79 clients which are only serviced by CCC after April 11, 2001. To estimate damages for retailers without relevant reimbursement data before April 11, 2001, I apply the same methodology I used with the CMS manufacturers. I estimate the following regression equation:

---

[26]This estimate does not include damages for 2004 because of missing data. I estimate these in Paragraph 47.

$$\Delta \textit{Reimbursement} = \text{a} + \text{b} * \log(\textit{Coupons})$$

The resulting estimates are:

$$\Delta \textit{Reimbursement} = -0.249 + 0.008 * \log(\textit{Coupons})$$

This says that the baseline decrease in the reimbursement rate was 23.8%.[27] Doubling coupon volume increases the reimbursement by 1%. In other words, a retailer's damages are higher per coupon when the firm redeems fewer coupons (e.g. volume declines).

45. Using this estimated effect of the Non-Compete Agreements, I then forecast pre-April 11, 2001 prices for firms without relevant pre-period data, just like I did in the CMS section. There are 79 firms in the database without relevant pre-April 11, 2001 data. I use the reimbursement regression equation referenced in Paragraph 44 to forecast reimbursements for these firms. The forecasted reimbursement decrease for these firms is 0.156 at the mean. Multiplying the forecasted decline by the face value of coupons after April 11, 2001 for all 79 firms yields a damage estimate of $17.2 million, as reflected in Exhibit 1 (CCC-Regular Coupons Tab).[28]

46. With respect to the 112 retailers that received more in reimbursement for each dollar of coupon face value in the post-period compared to the pre-period, the model shows that all of these retailers would have received more in reimbursement if the pre-period pricing had prevailed. That is, when controlling for volume and adding to the analysis business of the new retailers serviced by CCC in the post-period, the 112 firms would have received an additional $28 million in reimbursement in the post period, as reflected in Exhibit 1 (CCC-Regular Coupons Tab).

47. The CCC database does not include transactional data for any retailers in 2004 even though CCC operated the business normally during the year. (I understand that Inmar confirmed that 2004

---

[27] The corresponding t-statistics are $t = 7.23$ and $t = 3.52$ for the y-intercept and coefficient, respectively. The regression R-squared is 0.053. The mean value of the dependent variable is -0.126.

[28] This estimate does not include damages in 2004 because of missing data.

19

data is unrecoverable). To estimate damages for 2004, I assume that companies doing business in 2003 and in 2005 also did business in 2004. I total their business for the second half of 2003 through the first half of 2005. This provides an estimate of the face value of coupons the retailer accepted in 2004. I then multiply the face value of these coupons by the actual increase in price for those firms suffering overcharges. There were 239 retailers accepting regular coupons spanning 2004. Their additional damages are estimated to be $37.2 million.

48. In sum, aggregation of the above estimates yields total overcharges to retailers in the following amounts:

| | |
|---|---|
| Observed damages (n=222): | $142.7 million |
| Forecasted damages (n=*79 firms*): | $17.2 million |
| Adjusted damages *(n=112)* | $28 million |
| Estimated Damages for missing 2004 data: | $37.2 million |
| Total: | $225.2 million |

49. As with my calculation of manufacturer damages, my calculation of retailer damages is conservative. Just as with CMS, from 2001 to 2006, CCC's expenses were declining, on average, by around 5% each year, for a total of a 23% decrease in expenses. *See* Exhibit 2. Similarly, as discussed above in Paragraph 16, coupon processing demand was declining during this time. In a competitive market, CCC's prices would decrease to account for the reduction in expenses and reduction in demand. I did not factor these reductions into overcharges.

*IOS*

50. Pricing data from IOS are unavailable. I have IOS data on market share, coupon volume processed and summary income statement amounts. Given that this is the only IOS data available, I use the data to calculate overcharges as follows:

51. I first use the financial information on revenue for IOS for all available years (2000-2006)

20

and I treat IOS's year 2000 as a benchmark for revenue. This was IOS's last year before entering the Non-Compete Agreements. I assume that all revenues in excess of the amount of revenue in 2000 are due to higher prices paid by IOS clients (coupon volume during the same period is declining, so increases in revenues are not from processing more coupons). To calculate an estimate for damages, as reflected in Exhibit 3, I find the difference in revenue between each year and the benchmark year, 2000. The damage estimates from 2001-2007[29] are then aggregated to yield a total IOS damage estimate of $488 million, as reflected in Exhibit 3 and the below chart.

| | IOS Damages Estimate Based on Benchmark Revenue in 2000 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2000 | 2001* | 2002 | 2003 | 2004 | 2005 | 2006 | 2007* |
| Revenue | 102,800,000 | 90,375,000 | 146,600,000 | 172,716,387 | 190,509,073 | 191,429,961 | 265,037,106 | 48,314,626 |
| Less: 2000 Revenue | NA | 77,100,000 | 102,800,000 | 102,800,000 | 102,800,000 | 102,800,000 | 102,800,000 | 25,700,000 |
| Damages Estimate | | 13,275,000 | 43,800,000 | 69,916,387 | 87,709,073 | 88,629,961 | 162,237,106 | 22,614,626 |
| Total Damages: | $ 488,182,153 | | | | | | | |

*2001 and 2007 revenues are pro-rated to include revenue after April 11, 2001, and before March 28, 2007, respectively.

52. From the data in the chart, I can use yearly revenue and IOS volume to compute an average amount that IOS received per coupon processed from customers. In 1999, IOS was receiving around $0.03 per coupon processed. In 2003, IOS was receiving $0.09 per coupon and by 2006, IOS was collecting $0.17 per coupon processed.[30] (This estimate is conservative, as I assume an IOS average face value per coupon of $1, whereas the CCC average value was closer to $1.11.). In addition, to make this damage estimate even more conservative, I subtract from the damage estimate all shipping fee overcharges CMS manufacturers paid, to ensure that shipping fee overcharges imposed by IOS are not counted twice in my damage analyses. As a result, IOS

---

[29] IOS Revenue in 2007 is not available, I estimate 2007 revenue by taking the average value of years 2002-2006. Revenue in 2001 and 2007 is pro-rated for the dates of the non-compete agreements: post-April 11, 2001 and pre-March 28, 2007, respectively.

[30] Furthermore, I can provide an additional estimate for IOS damages by taking the median per coupon reimbursements obtained in the CCC section, -$0.045, and applying it to IOS coupon volume during the April 11, 2001 to March 28, 2007 period. Pro-rated coupon volume for IOS during the period is almost 10.6 billion coupons yielding a general damage estimate of $476.55 million.

Case 1:19-cv-00141-WO-LPA   Document 279-26   Filed 05/29/22   Page 22 of 30

damages should be reduced by $63.325 million. The net IOS damage amount thus is $424.675 million.

## V. Actions Against Economic Self Interest

53. For three reasons, I am of the opinion that the overcharges discussed above are contrary to the economic self-interest of CMS, CCC, and IOS in a competitive market and that economic conditions indicate that the overcharges stem from the loss of competition between Defendants and IOS. First, the overcharges arose during a time in which coupon volumes were declining, as discussed in Paragraph 16. In competitive markets, economic factors dictate that firms should not increase prices when demand is decreasing. Second, the price increases arose when CMS's costs were declining. As discussed Paragraphs 39 and 49, CMS's and CCC's costs decreased roughly 23% between 2001 and 2006. Similarly, Mr. Balsiger testified that IOS's costs were declining. Trial Tr. 2512:16-25 (testifying that IOS moved coupon processing operations to a lower-wage area of Mexico "which also plummeted our operating costs"). In competitive markets, firms decrease prices when costs decline—firms do not increase prices when costs are declining. Third, CMS, CCC, and IOS all increased prices following the Non-Compete Agreement (when coupon volume was declining) and, with respect to CCC and IOS, in similar manners (e.g., increasing shipping fees and issuing more invoices). In competitive markets, firms will seek to secure more market share if a competitor raises its prices. The fact that CMS, CCC, and IOS raised prices and changed invoicing practices at the same time suggests that the change in pricing and practices was coordinated, as any such change would have been against each competitor's own economic interest if practices were instituted unilaterally. Based on the foregoing, I am of the opinion that economic conditions indicate that Defendants' and IOS's overcharges stem from the loss of competition between them.

22

June 29, 2020

_____
Kathleen Grace

23

June 29, 2020

Kathleen Grace

23

**Appendix A**

The shipping fees I analyzed in my report are listed as follows in the transaction data:

'TOTPOST'     Retailer DDM Reimbursement,

'PO'     DDM Fee,

'PC'     Refund DDM Fee,

'PA'     Submitter DDM Adjustment,

'SA'     Reimburse Sub DDM Adj

'PR'     Refund Ck Stock/DDM Fee

The service fees I analyzed in my report are listed as follows in the transaction data:

'FEEMIN'     Service Fee - Minimum,

'FEESERV'     Service Fees,

'RM'     Refund Service Fee,

'RB'     Service Fee Rebate,

'FI'     Retro-active Fee Increase,

'CM'     Coupon Management Fee,

'RC'     Refund Coupon Management Fee,

'MV'     Minimum Volume Fee

'RV'     Refund Minimum Volume Fee,

'RF'     Refund check processing fee,

The new fees I analyzed in my report are listed as follows in the transaction data:

24

| Transcodes existing only post-April 11, 2001 | | | | |
|---|---|---|---|---|
| *New fee & rebate accounts* | CODE | FREQ | | Amount |
| Misc Funding credit | ADF | 1 | $ | (4,733) |
| Analytical Services | AF | 5 | $ | 9,950 |
| Rebate Check Funding | BA | 3 | $ | 2,753 |
| Bank Fee | BC | 67 | $ | 197,444 |
| Rebate Fee - disqualified | BD | 7 | $ | 324 |
| Rebate postage | BP | 5 | $ | 223 |
| Rebate Fee - qualified | BQ | 4 | $ | 490 |
| Rebate telephone fee | BT | 1 | $ | 3 |
| Contract fee - misc adj. | CA | 2 | $ | 16,071 |
| conversion incentive/signing | CB | 10 | $ | (98,500) |
| Check/envelope stock fee | CE | 815 | $ | 205,750 |
| Coupon Imaging-Mexico | CI | 37 | $ | 57,081 |
| Credit for retailer job error | CR | 215 | $ | (247,000) |
| reverse credit for retailer job error | DR | 7 | $ | 95,656 |
| Misredepmtion recovery fee | EM | 287 | $ | 126,582 |
| Refund misredemption recovery fee | ES | 10 | $ | (12,082) |
| Refund rebate check funding | GA | 3 | $ | (2,753) |
| Refund rebate fee qualified | GF | 11 | $ | (815) |
| Refund rebate minimum fee | GO | 1 | $ | (3) |
| refund rebate postage | GP | 4 | $ | (213) |
| refund late payment fee | LR | 310 | $ | (41,255) |
| CMS misredemption services | MSR | 69 | $ | 263,541 |
| Misc. refund | MX | 6 | $ | (69,454) |
| Nonconformity offer fee | NC | 4 | $ | 5,000 |
| Reverse Payment NSF | NF | | $ | 4,881,541 |
| Offer entry/edit fee #/month | OE | 8364 | $ | 377,878 |
| Refund Contract fees misc. adj. | RA | 6 | $ | (42,147) |
| Refund deduction research fees | RDF | 2 | $ | (8,400) |
| Refund Gmap fee | RG | 1 | $ | (17,800) |
| Refund name and address keying | RN | 18 | $ | (73,879) |
| Refund offer entry/edit fee | RO | 68 | $ | (11,921) |
| Refund special reporting fee | RP | 2 | $ | (2,000) |
| Refund programming charge | RPG | 1 | $ | (800) |
| Refund consumer code keying | RZ | 34 | $ | (90,375) |
| Special Mailing - process fee | SMF | 9 | $ | 40,662 |
| Special Mailing - postage fee | SMP | 3 | $ | 51,485 |
| Coupon processing fee | SN | 14 | $ | 37,928 |
| UPS fee | UP | 18 | $ | 119 |
| VD Rebate check reimbursement | VCR | 1 | $ | (1) |
| | | New Fees Count: | | 18 |
| | | Total New Fees: | $ | 5,646,351 |

Case 1:19-cv-00141-WO-LPA   Document 279-26   Filed 05/29/22   Page 27 of 30

## Appendix B: Materials Considered

| | |
|---|---|
| *Mr. Dee's, Inc. v. Inmar Corp.,* Third Amended Complaint. | |
| Industry and Inmar Data files: | CCC Full-Service Data 2001-2003, 2005-2009 (including supplemental data). CCC Pay Direct Data 2001-2003, 2005-2009 (including supplemental data). CMS Transactional Data 1999-2009. CCC data dictionaries (two total). |
| Trial Transcript, *United States v. Thomas Chris Balsiger*, No 07-cr-57 (E.D. Wis.). | |
| Declaration of J. Degutis. | |
| "How do store coupons work?" available at: https://money.howstuffworks.com/personal-finance/budgeting/question4261.htm. | |
| Plaintiffs-000011-750; Plaintiffs - 0001032-99; Plaintiffs-0002287-400 Plaintiffs-003706-900; Plaintiffs – 00004320-400 Plaintiffs-0012460-500 Plaintiffs-Coupons-000416-9; | |
| IOS-EDD-00004102 | |
| A16-000070-72 A16-000080-81 | |
| INMAR0000273-930 INMAR 0001362-1391 INMAR0005350-68 INMAR0006112-99 INMAR0007214-96 INMAR0009115-49 INMAR0010664-731 INMAR0011535-12699 INMAR0018977-87 INMAR0023240-906 INMAR0025000-48 INMAR0026672-704 INMAR0032328-30 INMAR0040056-57 INMAR0044485-831 INMAR0048032 INMAR0050253-899 | |
| Balsiger, T. Tr. Exhibits 233, 100, 98, 94, and 29 | |

26

**Appendix C: Publications from last 10 years**

*("Player" is former last name)*

Grace, Kathleen & Oran Wilson. "After the V.C. Summer Iceberg—which lifeboat is safe?" *Palmetto Promise Institute.* January 2020. Can be found at: https://palmettopromise.org/after-the-v-c-summer-iceberg-which-lifeboat-is-safe/

Grace, Kathleen & Joshua Hall. "The Efficiency of Residential Community Associations: Evidence from Spartanburg County" *International Advances in Economic Research,* January 19, 2019.

Player, Katie G. "Which ratepayers will pay more? SCE&G vs. Santee Cooper". *Palmetto Promise Institute, June 2018.*

Player, Katie G. & MT Maloney. "Santee Cooper Rate Increase Projections 2018". *Palmetto Promise Institute, May 2018.*

Player, Katie G. & MT Maloney. "Santee Cooper's uncertain future". *Palmetto Promise Institute,* April 2018.

Player, Kathleen. "The Impact of Personal Income Tax Rates on the Employment Decisions of Small Businesses." <u>Journal of Entrepreneurship and Public Policy</u>. February 2018.

Case 1:19-cv-00141-WO-LPA   Document 279-26   Filed 05/29/22   Page 29 of 30

**Appendix D: Expert witness and consulting work in last 10 years**

**2019**

**Expert Witness—valuation:** served as plaintiff's expert providing DCF valuation and damages analysis for breach of contract suit. Valuation complete and deposition scheduled mid-September 2020.

**Expert Witness Support:** Generated expert report for plaintiff on a S&P 500 company's financial stability and cash flow. Analyzed publicly available financial and cash flow performance, as well as lobbying activity and charitable contributions of top S&P 500 companies and target firm. *Report admitted. Settled out of court.*

**2018**

**Economic valuation consultant to Palmetto Promise Institute**
Analyzed Santee Cooper's financial position and the electricity rate increases needed to maintain financial solvency as well as damages to South Carolina customers. Used various sources of data in calculations. Provided four reports, testimony and presentations, as well as media support.

**2013**

**Expert Witness:** Served as plaintiff's expert witness to address valuation and valuation methods for minority shareholder lawsuit that settled for over $500 million in 2013, provided two expert reports and 9 hours of deposition testimony on financial valuation. *Confidential. Qualified as expert witness. Deposed. Settled out of court.*