IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MR. DEE'S INC., RETAIL MARKETING SERVICES, INC., and CONNECTICUT FOOD ASSOCIATION, <br><br>   Plaintiffs, <br><br>   v. <br><br> INMAR, INC., CAROLINA MANUFACTURER'S SERVICES, INC., CAROLINA SERVICES, and CAROLINA COUPON CLEARING, INC., <br><br>   Defendants. | 1:19CV141 |

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Plaintiffs Mr. Dee's Inc., Retail Marketing Services, Inc., and Connecticut Food Association's Motion to Exclude Certain Opinions of Mr. Kheyfets. (Doc. 263.) Defendants Inmar, Inc., Carolina Manufacturer's Services, Inc., Carolina Services, and Carolina Coupon Clearing, Inc. responded in opposition. (Doc. 267.) For the reasons that follow, this court will grant in part the motion.

I.  **BACKGROUND**

This case concerns an alleged conspiracy between competing coupon processors to allocate markets and customers and fix shipping fees in violation of the Sherman Act. (See Third Am.

Class Action Compl. (Doc. 145) ¶ 1.)[1] Both parties have offered expert opinions regarding antitrust impact and damages.

Plaintiffs' expert, Dr. Kathleen Grace, analyzed data showing the prices paid by manufacturers and retailers to Defendants and non-party International Outsourcing Services for shipping fees. (See Ex. 25, Expert Report of Kathleen Grace (Doc. 255-26) ¶ 24 ("My shipping fee analysis started with the 292 manufacturers CMS serviced both before and after the Non-Compete Agreements. Because I had data of the actual amount each of these clients paid in shipping fees, comparing the change in the amount of shipping fees for each client was a simple exercise: I calculated how much each client paid in shipping fees per coupon (net of adjustments) before and after the Non-Compete Agreements.").) Specifically, Dr. Grace conducted regression analyses to determine the prices those manufacturers and retailers would have paid absent a conspiracy and compared that amount to what they were charged. (See Ex. 24, Suppl. Expert Report of Kathleen Grace ("Grace Suppl. Report") (Doc. 255-25) ¶¶ 17-45.) Dr. Grace did not consider offsets or reimbursements in her analyses. (See Mem. in Supp. of Pls.' Mot.

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

to Exclude Certain Opinions of Mr. Kheyfets ("Pls.' Br.") (Doc. 264) at 5-6.)

Dr. Grace also used the Herfindahl-Hirschman Index ("HHI") to analyze the coupon processing market. The HHI is "a commonly accepted measure of market concentration" used by federal antitrust agencies. U.S. Dep't of Just., Antitrust Div., Herfindahl-Hirschman Index, https://www.justice.gov/atr/herfindahl-hirschmanindex#:~:text=The%20term%20%E2%80%9CHHI%E2%80%9D%20means%20the,then%20summing%20the%20resulting%20numbers (last updated July 31, 2018). "Transactions that increase the HHI by more than 200 points in highly concentrated markets are presumed likely to enhance market power under the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission." Id.

Dr. Grace first analyzed market concentration for the manufacturer coupon processing market. (See Ex. 1, Merits Expert Report of Kathleen Grace (Doc. 221-1) ¶ 59.) According to Dr. Grace, before the alleged anticompetitive agreements, the HHI for that market "was over 4000, making it a highly concentrated market." (Id.) After the agreements, "the HHI increase[d] by approximately 205 points." (Id.) Dr. Grace then analyzed the HHI for the retailer coupon processing market. (Id. ¶ 60.) Prior to the agreements, the HHI "was over 4850." (Id.) After the

agreements, "the HHI increase[d] by over 450 points." (Id.) Because both markets' HHI's increased by over 200 points, she opined that "[t]his increased concentration would be expected to reduce competition, increase market power, and result in higher prices in both the manufacturer and retailer processing market." (Id. ¶ 61.)

Defendants' expert, Michael Kheyfets, also provided an opinion on antitrust damages. He argues offsets and reimbursements must be analyzed to determine "who ultimately 'pays' a shipping fee." (Ex. 1, Suppl. Expert Report of Michael Kheyfets ("Kheyfets Suppl. Report") (Doc. 261-1) ¶¶ 72–75.) Mr. Kheyfets criticizes Dr. Grace's analysis of shipping fees as an assessment, arguing she failed to account for retailers' ability to deduct payment for fees they deemed inappropriate. (Id. ¶ 72; see also id. ¶ 73.) He also criticizes her for failing to assess chargebacks. (Id. ¶ 74.) Mr. Kheyfets argues that to accurately calculate antitrust damage to the retail class, Dr. Grace would have to, inter alia, "[s]how that proposed . . . class members actually paid more in shipping fee chargebacks and did not increase their deductions to manufacturers or receive higher rebates to offset any increase in these charges." (Id. ¶ 75.) He criticizes Dr. Grace for failing to "attempt to study the issue of retailer deductions or rebates at all." (Id.)

-4-

Mr. Kheyfets also opined on the HHI. He contends that the effect of the alleged anticompetitive agreements "did not result in a highly concentrated 'manufacturer processing market'" because "the market was already a highly concentrated oligopoly before the alleged conduct." (Ex. 2, Merits Expert Report of Michael Kheyfets ("Kheyfets Merits Report") (Doc. 266-2) ¶ 46.) Therefore, according to Mr. Kheyfets, the fact the HHI increased after the agreements "is not proof that market power was necessarily 'enhanced.'" (Id.)

Plaintiffs moved to exclude portions of Mr. Kheyfets' opinion, (Doc. 263), and filed a brief in support of their motion, (Pls.' Br. (Doc. 264)). Defendants responded, (Mem. in Opp'n to Pls.' Mot. to Exclude Certain Opinions of Mr. Kheyfets [Daubert Hearing Requested] ("Defs.' Br.") (Doc. 267)), and Plaintiffs replied, (Reply in Supp. of Pls.' Mot. to Exclude Certain Opinions of Mr. Kheyfets ("Pls.' Reply") (Doc. 269)).

## II. ANALYSIS

"Federal Rule of Evidence 702 appoints trial judges as 'gatekeepers of expert testimony' to protect the judicial process from 'the potential pitfalls of junk science.'" Sardis v. Overhead Door Corp., 10 F.4th 268, 275 (4th Cir. 2021) (quoting United States v. Bonner, 648 F.3d 209, 215 (4th Cir. 2011)). Rule 702 permits expert testimony if that testimony is

-5-

(1) helpful to the jury in understanding the evidence or determining a fact at issue, (2) "based on sufficient facts or data," (3) "the product of reliable principles and methods," and (4) the product of a reliable application of those "principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 thus "imposes a special gatekeeping obligation on the trial judge to ensur[e]" "that an expert's testimony both rests on a <u>reliable</u> foundation and is <u>relevant</u> to the task at hand." <u>Nease v. Ford Motor Co.</u>, 848 F.3d 219, 229-30 (4th Cir. 2017) (internal quotation marks omitted) (quoting <u>Daubert v. Merrell Dow Pharms.</u>, 509 U.S. 579, 597 (1993)).

An expert's opinion must be both relevant and reliable. <u>See id.</u>, at 229. "An expert's opinion is relevant if it has 'a valid scientific connection to the pertinent inquiry.' . . . Simply put, if an opinion is not relevant to a fact at issue, <u>Daubert</u> requires that it be excluded." <u>Sardis</u>, 10 F.4th at 281 (quoting <u>Belville v. Ford Motor Co.</u>, 919 F.3d 224, 232 (4th Cir. 2019)). An expert's opinion is reliable if it is "based on scientific, technical, or other specialized <u>knowledge</u> and not on belief or speculation." <u>Oglesby v. Gen. Motors Corp.</u>, 190 F.3d 244, 250 (4th Cir. 1999).

<u>Daubert</u> provides four, non-exhaustive "guideposts" to aid courts in analyzing reliability: (1) whether the expert's theory

-6-

or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise. Nease, 848 F.3d at 229 (quoting Daubert, 509 U.S. at 593-94). These factors "neither necessarily nor exclusively appl[y] to all experts or in every case," as the relevance of some factors can "depend[] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 150 (1999) (internal quotation marks omitted) (quoting Br. for U.S. as Amicus Curiae at 19). "Accordingly, trial courts are typically given 'broad latitude' to determine which of these factors (or some other unspecified factors) are 'reasonable measures of reliability in a particular case.'" Sardis, 10 F.4th at 281 (quoting Nease, 848 F.3d at 229). "[T]hat broad discretion does not allow a district court to delegate the issue to the jury." Id.

Plaintiffs move to exclude two portions of Mr. Kheyfets' expert report. First, Plaintiffs argue Mr. Kheyfets' opinions about offseting benefits are not relevant. (Pls.' Br. (Doc. 264)

-7-

at 14–27.) Second, Plaintiffs argue Mr. Kheyfets' opinions about the HHI are unreliable. (Id. at 27–31.)

### A. Timeliness

No deadline has been set in this case for filing Daubert motions. (See Doc. 246 at 34–35.) The record reflects that expert discovery in this case closed on August 2, 2021. (Doc. 128 at 2; Text Order 06/14/2019; Text Order 02/03/2021.) Approximately four months later, and before this court issued any opinions on pending class certification and summary judgment motions, Plaintiffs filed their Daubert motion. (See Doc. 263.)

Defendants argue that Plaintiffs' motion should be denied because it is untimely. (See Defs.' Br. (Doc. 267) at 12–13.) This court finds Defendants' timeliness concerns provide no basis for denial. Plaintiffs' motion generally seeks to exclude portions of Mr. Kheyfets' opinion related to antitrust damages, (see Doc. 263), which will be relevant at trial because one of the elements Plaintiffs must prove is that they suffered damages, see In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 348 (D. Md. 2012) ("The final element Plaintiffs will have to prove at trial is that they suffered 'measurable damages.'" (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008))). Even if the fact that expert discovery has closed is relevant to determining whether a Daubert motion is

-8-

untimely, (see Defs.' Br. (Doc. 267) at 12-13), this court finds Defendants have not been prejudiced by the timing of Plaintiffs' motion. There is no impending trial date making Plaintiffs' motion prejudicial and untenable for the court to address. Cf. Bryant v. Trexler Trucking, Inc., Civil Action No. 4:11-cv-02254-RBH, 2013 WL 643768, at *5 (D.S.C. Feb. 21, 2013) (denying Daubert motion when motion was filed months after deadline for filing Daubert motions); Rybas v. Riverview Hotel Corp., Civil Action No. ELH-12-3103, 2015 WL 10096189, at *2, *7 (D. Md. Jan. 15, 2015) (denying Daubert motion when motion was filed several weeks after the deadline set by the court for filing Daubert motions). Moreover, this court is mindful of the Fourth Circuit's preference to decide cases on their merits and not technicalities. See, e.g., Choice Hotels Int'l, Inc. v. Goodwin & Bone, 11 F.3d 467, 471-72 (4th Cir. 1993). Therefore, this court declines to deny Plaintiffs' motion on timeliness grounds.

**B. Offsetting Benefits**

Both experts present their opinions on appropriate antitrust damages by calculating overcharge damages—the difference in the price Plaintiffs paid in shipping fees during the alleged conspiracy and the price Plaintiffs would have paid but for the conspiracy. (See Grace Suppl. Report (Doc. 255-25) ¶¶ 19-45; Kheyfets Suppl. Report (Doc. 261-1) ¶¶ 1-4 (describing

-9-

Kheyfets task of analyzing Dr. Grace's analysis of overcharge damages).) Mr. Kheyfets believes that offsetting benefits should be included in antitrust damages calculations. (See Kheyfets Suppl. Report (Doc. 261-1) ¶¶ 72-75.) Plaintiffs argue offsetting benefits are irrelevant as a matter of law in the context of overcharge damages. (See Pls.' Br. (Doc. 264) at 14-27.)

"[O]vercharge damages . . . are measured as the difference between the price the plaintiff actually paid and the price that would have prevailed in the absence of the antitrust violation (the 'but-for' price), multiplied by the quantity of the product that was actually purchased." ABA, Proving Antitrust Damages 90 (3d ed. 2017). The difference between the price actually paid and the but-for price is called the "overcharge." Id. at 90-91 (citing Ill. Brick Co. v. Illinois, 431 U.S. 720, 724-25 (1977); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 489 (1968)).

Courts regularly disallow antitrust defendants from arguing that plaintiffs otherwise benefitted from the alleged conspiracy and that such benefit should be subtracted from the damages calculation. See, e.g., In re Airline Ticket Comm'n Antitrust Litig., 918 F. Supp. 283, 286-87 (D. Minn. 1996). In In re Airline Ticket Commission Antitrust Litigation, the defendants

-10-

argued that any benefits the plaintiffs received because of the alleged conspiracy should be subtracted from the damages calculation. Id. at 285-86. The court disagreed, finding evidence of offsetting benefits "lies beyond the exceptions to Hanover Shoe's exclusionary rule." Id. at 287.

In Hanover Shoe, the defendant argued the plaintiff had not been injured because the plaintiff has passed on any overcharge to its own customers. See Dickson v. Microsoft Corp., 309 F.3d 193, 213-14 (4th Cir. 2002). The Hanover Shoe court "held that an antitrust defendant would not be permitted to defend against a damages suit on the ground that the plaintiff had shifted the cost of the defendant's wrongdoing to the plaintiff's customers." Id. at 214.

> Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable.

Hanover Shoe, 392 U.S. at 493. The principle articulated in "Hanover Shoe precludes not only the 'passing on' defense, but also . . . subtle variation[s]" of that defense "which might be termed the 'otherwise benefitting' defense." Meijer, Inc. v.

-11-

Warner Chilcott Holdings Co. III, 246 F.R.D. 293, 303 (D.D.C. 2007) (some internal quotation marks omitted) (quoting In re Relafen Antitrust Litig., 346 F. Supp. 2d 349, 369 (D. Mass. 2004)).[2]

More recent caselaw has confirmed the application of the Hanover Shoe principle. In In re Delta/AirTran Baggage Fee Antitrust Litigation, the court found that offsets were irrelevant to determining damages in a price-fixing case. 317 F.R.D. 675, 684–85 (N.D. Ga. 2016). The court recognized that "[a]s a result of the anti-competitive nature of price-fixing, courts have refused to allow defendants . . . to assert claims that their unlawful conduct in some way benefitted the plaintiffs." Id. at 684. Thus, the defendants could not argue "that offsetting benefits could negate a class member's antitrust injury or damages, at least in the context of a price-

---

[2] Under Hanover Shoe, direct purchasers are permitted to recover the full amount of the overcharge, and mitigation and offset generally do not affect the measure of damages except for in two limited circumstances. See Ill. Brick, 431 U.S. at 745–46. Those limited exceptions are (1) when an overcharged buyer is party to "a pre-existing 'cost plus' contract," and (2) when a buyer is able to offset capital expenses it would have incurred but for the overcharge. See Hanover Shoe, 392 U.S. at 494, 504. The Supreme Court crafted those exceptions for situations in which "it [is] easy to prove that [the plaintiff] has not been damaged." Id. at 494. This court finds this case does not present such a situation and thus finds the general rule in Hanover Shoe controls.

-12-

fixing claim." Id. at 685. Although the court recognized that there may be some relevance of offsets to damages, the court went on to find that "the nature of price-fixing is such that it would be inappropriate to allow a defendant to rely on alleged benefits of its anticompetitive conduct to reduce any damages it owes." Id. at 685–86. Therefore, the court granted the Daubert motions and excluded expert testimony that accounted for offsets in calculating damages. See id. at 689–90.[3]

This court recognizes Defendants' concern that barring evidence of offsets, deductions, and rebates carries the risk of Plaintiffs receiving a windfall. But the Supreme Court in Hanover Shoe recognized that risk and still held that the plaintiff was allowed to recover its full damages even though it has passed off some of the excessive costs to its customers. See 392 U.S. at 494 ("Our conclusion is that Hanover proved injury and the amount of its damages . . . when it proved that United had overcharged it during the damage period and showed the amount of that overcharge; United was not entitled to assert a

---

[3] Defendants argue In re Delta/AirTran Baggage Fee Antitrust Litigation is irrelevant because it "is limited to price-fixing claims which claims Plaintiffs have now abandoned." (Defs.' Br. (Doc. 267) at 17–18 (citation omitted).) However, this court found in denying summary judgment that Plaintiffs' price-fixing claim survived summary judgment, (see Mem. Op. & Order (Doc. 271)), so Defendants' attempt to distinguish that case is unpersuasive.

-13-

passing-on defense."); see also Royal Printing Co. v. Kimberly-Clark Corp., 621 F.2d 323, 327 (9th Cir. 1980) ("Hanover Shoe teaches that in such situations there is nothing wrong with the plaintiff winning a windfall gain . . . ."). In light of the Hanover Shoe principle, this court concludes that Mr. Kheyfets should be precluded from offering testimony that offsets, deductions, or rebates should be deducted in calculating antitrust damages.

The cases relied on by Defendants do not persuade this court that evidence of offsets, deductions, or rebates is relevant to calculating damages. In Burlington Industries v. Milliken & Co., the Fourth Circuit held "that the district court erred in using the actual royalties paid as the measure of damages without considering whether royalties or some other compensation would have been payable absent the illegal conspiracy." 690 F.2d 380, 386 (4th Cir. 1982). The Fourth Circuit instructed the district court, on remand, to consider "the difference, if any, between the overall price which [plaintiffs] were required to pay in the context of the . . . conspiracy and the overall price they would have paid in an untainted market." Id. Contrary to Defendants' argument that Burlington Industries requires damages be reduced by offsets, (see Defs.' Br. (Doc. 267) at 14-15), this court finds nothing

in that case to require offsets or other potential benefits of the alleged conspiracy to be considered in determining antitrust damages.

Defendants also argue Los Angeles Memorial Coliseum Commission v. National Football League, 791 F.2d 1356 (9th Cir. 1986), allows for evidence of offsets. (Defs.' Br. (Doc. 267) at 15-16.) This court finds that case unpersuasive for several reasons. First, that case dealt with determining lost profits damages, see L.A. Mem'l Coliseum Comm'n, 791 F.2d at 1366, and this case concerns overcharge damages, (see Grace Suppl. Report (Doc. 255-25)). Second, even if offset arguments bear some relevance to damages, that relevance is outweighed by the nature of price-fixing schemes such that it would be inappropriate for Defendants to argue damages should be reduced. See In re Delta/AirTran Baggage Fee, 317 F.R.D. at. 685–86 (citing Los Angeles Memorial Coliseum Commission for the proposition that offsetting benefits may be relevant to calculation of damages, but ultimately finding evidence of offsetting benefits should be precluded). Similarly, this court is unpersuaded that the other cases relied on by Defendants, (see Defs.' Br. (Doc. 267) at 17), permit this court to allow evidence of offsets, rebates, and other deductions in assessing overcharge damages, and to the

-15-

extent those cases do, this court finds those cases contradict Hanover Shoe and its progeny.

In summary, this court finds offsetting benefits are not relevant to overcharge damages in an antitrust case. Because they are not relevant, evidence of offsetting benefits will not be helpful to the trier of fact. See Fed. R. Evid. 702(a). Therefore, this court will grant Plaintiffs' motion to exclude Mr. Kheyfets' opinions about offsetting benefits for purposes of calculating antitrust damages at trial.

Although Mr. Kheyfets' opinions about offsetting benefits is not relevant to antitrust damages, offsetting benefits may be relevant in assessing Federal Rule of Civil Procedure 23's requirements for class certification. See In re Delta/AirTran Baggage Fee, 317 F.R.D. at 683–84 ("[O]ffsets do remain relevant—even in the context of price-fixing claims—to the Rule 23(a)(4) adequacy analysis, for they may indicate that some class members benefitted from the challenged conduct so much that their interests are not aligned with those of other class members."). Thus, while this court will grant Plaintiffs' motion and exclude the portions of Mr. Kheyfets opinions that address offsetting benefits for purposes of a damages calculation at trial, this court will consider, as relevant, offsetting benefits in analyzing class certification issues.

-16-

## C. HHI

Plaintiffs also seek to exclude Mr. Kheyfets' opinion "that the HHI test cannot be used in markets that are already highly concentrated." (Pls.' Br. (Doc. 264) at 28-29.) Specifically, they seek to exclude Mr. Kheyfets' opinion that an increase in HHI of over 200 points is not evidence that market power was enhanced if the market was already highly concentrated. (Id. at 29.) Plaintiffs argue that Mr. Kheyfets "proposes a substantial and novel change to the established HHI test" because "he contends that the HHI test cannot be used in markets that are already highly concentrated." (Pls.' Br. (Doc. 264) at 28-29.) Plaintiffs assert that Mr. Kheyfets "cites no authority for his interpretation" besides relying on his own interpretation. (Id. at 29-30.) Therefore, Plaintiffs contend Mr. Kheyfets' opinion should be excluded. (Id. at 31.)

This court agrees with Mr. Kheyfets that the coupon processing market was already highly concentrated before any purported anticompetitive conduct occurred. (See Mem. Op. & Order (Doc. 271) at 24 ("This court finds that the coupon processing industry, as relevant here, is fairly described as an oligopoly.").) But to the extent Mr. Kheyfets argues the HHI cannot be applied to the coupon processing market because it is already highly concentrated, that argument lacks merit.

-17-

According to the Department of Justice Antitrust Division's website, which was relied on by both parties, even in markets that are already highly concentrated, "[t]ransactions that increase the HHI by more than 200 points . . . are presumed likely to enhance market power." U.S. Dep't of Just., Antitrust Div., <u>supra</u>. However, as Mr. Kheyfets noted, that presumption is rebuttable. <u>See</u> U.S. Dep't of Just. & FTC, <u>Horizontal Merger Guidelines</u> § 5.3 (2010), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#5c.

This court does not find Mr. Kheyfets' opinion argues the HHI cannot be applied to markets that are already highly concentrated; instead, this court understands his opinion to be that any increases in the HHI after the agreements are not <u>per se</u> enhancement of market power. Indeed, Mr. Kheyfets goes on to cite examples of evidence tending to show that the agreements were unlikely to enhance market power. (<u>See</u> Kheyfets Merits Report (Doc. 266-2) ¶ 46.) Mr. Kheyfets will be permitted to appropriately critique Dr. Grace's HHI analysis; the fact that Mr. Kheyfets opines on potential shortcomings of Dr. Grace's opinions does not make his opinions unreliable. However, Mr. Kheyfets will be precluded from arguing that the HHI is irrelevant because the HHI is "a commonly accepted measure of market concentration," U.S. Dep't of Just., Antitrust Div.,

supra, and is relevant to proving a Sherman Act § 1 violation, see Sewell Plastics, Inc. v. Coca-Cola Co., 720 F. Supp. 1196, 1211 (W.D.N.C. 1989) (citing the HHI in analyzing a Sherman Act § 1 claim). Accordingly, this court will deny Plaintiffs' motion to exclude as to Mr. Kheyfets' opinions on the HHI analysis.

### III. CONCLUSION

For the foregoing reasons, this court will grant in part Plaintiffs' motion, (Doc. 263).

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Exclude Certain Opinions of Mr. Kheyfets, (Doc. 263), is **GRANTED IN PART**. The motion is **GRANTED** as to Mr. Kheyfets' opinions on offsetting benefits as related to antitrust damages. The motion is otherwise **DENIED**.

This the 19th day of August, 2022.

_____
United States District Judge

-19-

Case 1:19-cv-00141-WO-LPA   Document 290   Filed 08/19/22   Page 19 of 19