IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MR. DEE'S INC., RETAIL          )
MARKETING SERVICES, INC., on    )
behalf of themselves and all    )
others similarly situated,      )
and CONNECTICUT FOOD            )
ASSOCIATION,                    )
                                )
          Plaintiffs,           )
                                )
     v.                         )          1:19-cv-141
                                )
                                )
INMAR, INC., CAROLINA           )
MANUFACTURER'S SERVICES, INC.,  )
CAROLINA SERVICES, and          )
CAROLINA COUPON CLEARING, INC., )
                                )
          Defendants.           )


## <u>MEMORANDUM OPINION AND ORDER</u>

**OSTEEN, JR., District Judge**

Presently before this court is Plaintiffs' Renewed Motion
for Class Certification filed by Mr. Dee's Inc. ("Mr. Dee's")
and Connecticut Food Association ("CFA"), ("Plaintiffs").
(Doc. 276.) Inmar Inc., Carolina Manufacturer's Services, Inc.,
Carolina Services, and Carolina Coupon Clearing, Inc.,
("Defendants"), oppose this motion. (Doc. 282.) This court will
grant in part and deny in part Plaintiffs' motion. The Limited
Payer Classes fail the ascertainability requirement and cannot
be certified because the scope of the classes is untethered from

Defendants' alleged wrongs. Additionally, the All Payer Manufacturer Class cannot be certified because common issues do not predominate. However, this court will certify the All Payer Retailer Class.

## I.   **FACTUAL BACKGROUND**

The facts of this case were more fully set forth in this court's previous Memorandum Opinion and Order denying Defendants' Motion for Summary Judgment. (Mem. Op. and Order (Doc. 271) ("MSJ Order") (Doc. 271) at 2-3, 4-7.)[1] Some of that background is repeated here to provide context for the pending motion for class certification.

### A.   **The Parties**

Plaintiff Mr. Dee's, Inc. manufactures food products. (Third Am. Compl. Class Action ("TAC") (Doc. 145) ¶ 2.) Mr. Dee's issues coupons to customers and purchases coupon processing services. (Id.) Plaintiff Connecticut Food Association ("CFA") purchases coupon processing services for retailers and members. (Id. ¶¶ 3-4.)

Defendant Inmar, Inc. and its subsidiary, Defendant Carolina Manufacturer's Services ("CMS"), sell coupon processing

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

services to manufacturers. (Id. ¶ 7.) Inmar's other
subsidiaries, Defendants Carolina Coupon Clearing, Inc. ("CCC")
and Carolina Services ("CS"), sell coupon processing services to
retailers. (Id.) Inmar's president during the relevant time
period was Robert Carter. (See Decl. of Robert Carter ("Carter
Decl.") (Doc. 234-1) ¶ 1.)

Non-party International Outsourcing Services, LLC ("IOS"),
acted as a processor in the coupon redemption process. (Id.
¶ 5.) IOS was initially a named party. (See Class Action Compl.
("Compl.") (Doc. 1).) In November 2008, these proceedings were
stayed pending resolution of a criminal case against IOS's
former officers and employees. (Doc. 72.) IOS filed a Suggestion
of Bankruptcy in 2009, (Doc. 73), and was later dismissed from
these proceedings, (Doc. 77).

### B. **The Coupon Processing Industry**

The coupon processing industry began declining in the
mid-1990s. (Excerpts of Dep. of Robert Carter ("Pls.' Carter
Dep. Excerpts") (Doc. 249-4) at 14.) But despite the decline in
coupon volume, Inmar's revenue levels remained consistent. (Id.
("[I]n spite of the value dropping by 200-and-some million
coupons at CCC, we have been able to keep the revenue roughly
flat-ish across that five-year period.").) Inmar and IOS offered
coupon processing services to manufacturers and retailers. (TAC

- 3 -

(Doc. 145) ¶¶ 5, 7.) In the early 2000's, there were three main competitors in the coupon processing market: Inmar, IOS, and NCH Marketing Services, Inc. ("NCH"). (Excerpts of Dep. of Jennifer Mauldin ("Pls.' Mauldin Dep. Excerpts") (Doc. 249-1) at 3–4.)

Shipping fees are one of the fees assessed during coupon processing. (Pls.' Carter Dep. Excerpts (Doc. 249-4) at 7.) "It's a fee intended to be a reimbursement for the [] cost of moving the coupons around." (Id.) Shipping fees are not tied to the physical movement of coupons. (Id.) Rather, they are a "market level fee" where "manufacturers [are] effectively covering part of the cost of the retailer's processing." (Id. at 7–8.) Manufacturers were not contractually bound to pay these fees. (Id. at 8.) If manufacturers paid less than the full amount of the shipping fee, they would "chargeback" the unpaid fee amounts to retail processors, who would in turn deduct the unpaid shipping fee amounts from their retail clients or write off the shipping fee chargebacks. (Excerpts of Dep. of Thomas Chris Balsiger, ("Pls.' Balsiger Dep. Excerpts") (Doc. 249-9) at 12–13; Carter Decl. (Doc. 234-1) ¶¶ 16–18.)

IOS, as a retail coupon processor, charged shipping fees to manufacturers. (Pls.' Carter Dep. Excerpts (Doc. 249-4) at 16.) Inmar, in response to IOS's increased shipping fees, increased its chargebacks to IOS's retail clients. (Ex. N ("July 17, 2000

- 4 -

Letter") (Doc. 249-14).) IOS responded to Inmar's chargebacks by threatening a "price war" against Inmar. (Id.; Pls.' Balsiger Dep. Excerpts (Doc. 249-9) at 31.) On October 10, 2000, IOS CEO Chris Balsiger spoke with CMS President Robert Carter. (Ex. P ("Oct. 10, 2000 Email") (Doc. 249-16) at 2.) Balsiger "made a number of references to 'our need for control.' He said 'you guys at Inmar are going to have to figure out that strategic alliances and mergers will make you rich.'" (Id.)

On April 11, 2001, Inmar and IOS entered into a series of related agreements. After these agreements, Inmar and IOS's fees increased. (Pls.' Carter Dep. Excerpts (Doc. 249-4) at 6–7.) IOS's CEO Balsiger maintained that IOS's fees were increasing prior to the execution of these agreements. (See Pls.' Balsiger Dep. Excerpts (Doc. 249-9) at 17–18.) Inmar's president denies that there were ever any discussions between IOS and Inmar about fixing shipping fees. (Carter Decl. (Doc. 234-1) ¶ 32.) During IOS CEO Chris Balsiger's criminal trial, he testified that he entered into a joint venture with Inmar "to head off a price war on coupons" which "allow[ed] [them] to escalate [their] freight revenue." (Tr. Excerpt of Bench Trial ("Balsiger Trial Tr.") (Doc. 249-5) at 9–10.) However, when deposed for this case, Balsiger denied discussions about fixing shipping fees. (Excerpts of Dep. of Thomas Chris Balsiger (Doc. 234-4) at 18.)

C.    **Expert Reports**

The parties in this case have proffered competing expert testimony and reports. Plaintiffs' expert reports were described in a prior Memorandum Opinion from this court denying Defendants' motion to exclude Plaintiffs' expert. (Mem. Op and Order (Doc. 246) at 12–15.) That prior description is repeated here for context. (Id.)

Plaintiffs' expert, Dr. Kathleen Grace, received a dataset from Defendants that revealed ancillary fees charged to manufacturers by CCC, IOS, and NCH. (Suppl. Expert Report of Kathleen Grace ("Grace Suppl. Report") (Doc. 195-1) ¶ 5.) Dr. Grace aggregated each coupon program and determined, for each year between 2000 and 2007, a "mean shipping fee payment per 1,000 coupons for Inmar, NCH, and IOS." (Id. ¶ 11.) Dr. Grace viewed the allegedly anticompetitive agreements between Defendants and IOS, which remained in place from April 11, 2001 until March 28, 2007, (Expert Report of Kathleen Grace ("Grace Expert Report") (Doc. 151-12) ¶ 19), as defining the duration of the alleged conspiracy, (Grace Suppl. Report (Doc. 195-1) ¶ 18). For brevity, this court refers to that time period as the "conspiracy period."

Using the data from January 2000 through 2007, Dr. Grace "conduct[ed] three separate analyses to estimate shipping fee

overcharges to manufacturers: (i) a before-during analysis [("Before-During Analysis")], (ii) a benchmark analysis [("Benchmark Analysis")], and (iii) a difference-in-differences analysis [("DiD Analysis")]." (Id. ¶ 17.) To determine the effect of the alleged conspiracy on retailers, Dr. Grace "estimate[d] how much retailers paid in shipping fee overcharges," (id.), as a result of manufacturers refusing to pay higher shipping fees and CCC extracting the unpaid shipping fees from retailers, (id. ¶ 43). Based on those analyses, Dr. Grace compiled "a list of manufacturers and retailers that paid observably higher shipping fees [during the conspiracy period]." (Id. ¶ 18.)

First, via the Before-During Analysis, Dr. Grace "model[ed] CCC's paid shipping fee per coupon in the pre-conspiracy period, controlling for volume, and then use[d] that relationship to forecast what a competitive shipping fee would have been absent a conspiracy." (Id. ¶ 20.) Dr. Grace calculated as damages the difference between the amounts that manufacturers paid to CCC in shipping fees and the forecasted competitive shipping fee. (Id.) Dr. Grace concluded that some manufacturers who transacted with CCC overpaid by $28.3 million during the conspiracy period. (Id. ¶ 23.) Employing that same methodology

for manufacturers served by IOS, Dr. Grace calculated overcharge damages as $2.4 million. (Id. ¶¶ 24-27.)

Second, Dr. Grace employed the Benchmark Analysis to "model NCH's paid shipping fees per coupon over time, controlling for volume, and then use[d] that relationship to forecast what a competitive shipping fee would have been absent a conspiracy." (Id. ¶ 29.) According to Dr. Grace, such an approach "controls for extraneous nonconspiratorial factors that may have affected shipping fees during the [conspiracy] period." (Id.) Dr. Grace calculated overcharges by both CCC and IOS by comparing increases in their shipping fees to the model that Dr. Grace used to "establish the relationship between NCH's shipping fees with volume and time." (Id. ¶ 31.) The Benchmark Analysis yields a damages estimate of $41.7 million. (Id. ¶ 32.)

Third, in connection with the DiD Analysis, Dr. Grace "quantif[ied] the relationship between NCH shipping fees (the control) and CCC shipping fees (the treatment group) in the pre-conspiracy period," (id. ¶ 34), by determining "how NCH fees changed over time compared to how CCC fees changed over the same time period, controlling for volume," (id.). As with the Benchmark Analysis, Dr. Grace asserted that "[t]he inclusion of NCH . . . controls for extraneous non-conspiratorial factors that may have affected shipping fees during the [conspiracy]

period, such as changes in postage rates." (Id.) Dr. Grace found that, before the alleged conspiracy, "for 2-count coupons, CCC's prices were 4.22 times NCH's prices for similar-volume customers, and for 1-count coupons, CCC's prices were 2.67 times NCH's prices." (Id. ¶ 39.) Dr. Grace "calculated as overcharges instances in which CCC's shipping fees increased above NCH shipping fees in excess of [the pre-conspiracy relationship]," (id. ¶ 40), resulting in "a damages estimate of $37.1 million" (id.). However, that estimate pertains only to manufacturers served by CCC, as Dr. Grace concluded that "IOS's shipping fee changes do not correlate in any statistically meaningful way to NCH shipping fee changes, making [the DiD Analysis] inapplicable to IOS's fees." (Id. ¶ 41.)

Fourth, because "some [manufacturers] simply refused to pay higher shipping fees," (id. ¶ 43), via chargebacks and because CCC could extract those chargebacks from retailers, "[Dr. Grace] perform[ed] a before-after regression analysis to assess chargeback changes in the pre-conspiracy period compared to the conspiracy period." (Id. (describing the "Chargeback Analysis").) More specifically, Dr. Grace relied on a "regression to estimate the relationship between chargebacks and gross shipping for each invoice in the pre-conspiracy period, where gross shipping is equal to shipping dollars paid by the

manufacturer plus shipping dollars charged back to retailers."
(Id. ¶ 44.) Using that equation "to estimate what chargebacks
should be in the conspiracy period[, Dr. Grace] then
calculate[d] any difference between observed chargebacks versus
forecasted chargebacks in the conspiracy period to estimate
damages due to 'excess chargebacks' to retailers." (Id.)
Dr. Grace concluded that certain retailers paid $8.8 million in
excess chargebacks during the conspiracy period. (Id.)

Defendants' expert, Mr. Kheyfets, offers numerous
criticisms of Dr. Grace's analysis. (See Doc. 261-1; Doc. 266-2;
Doc. 284.) This court previously evaluated some of Mr. Kheyfets'
criticisms in considering Defendants' motion to exclude
Dr. Grace. (See Mem. Op and Order (Doc. 246).) Even so, several
of Mr. Kheyfets' criticisms remain relevant at the class
certification stage.

## II.  PROCEDURAL HISTORY

This action was initially brought on May 22, 2008 in the
Eastern District of Wisconsin. (Compl. (Doc. 1).) In 2019, the
case was transferred to this district. (Doc. 113.) Plaintiffs
have filed three motions for class certification. (Docs. 150,
254, 276.) After the first motion was filed, discovery issues
arose, (see Minute Entry 09/21/2021), and the parties were
permitted to supplement their submissions to the court, (see,

- 10 -

e.g., Doc. 187). To clarify the record, this court denied the motion for class certification without prejudice. (See Minute Entry 09/21/2021.) The second motion for class certification, (Doc. 254), was denied because it impermissibly sought to certify fail-safe classes. (Order ("Fail Safe Class Order") (Doc. 275).)

Plaintiffs subsequently filed the instant Renewed Motion for Class Certification and Appointment of Class Counsel, (Pls.' Renewed Mot. for Class Cert. and Appt. of Class Counsel ("Class Cert. Mot.") (Doc. 276)), and a brief in support, (Pls.' Br. in Supp. of Renewed Mot. for Class Cert. and Appt. of Class Counsel ("Class Cert. Br.") (Doc. 279)). Defendants responded. (Mem. in Opp'n to Pls.' Renewed Mot. for Class Cert. ("Class Cert. Resp.") (Doc. 282).) Plaintiffs replied. (Pls.' Reply in Supp. of Renewed Mot. for Class Cert. and Appt. of Class Counsel ("Class Cert. Reply") (Doc. 287).)

Defendants also requested an evidentiary hearing on Plaintiffs' motion. (Doc. 289.) Plaintiffs responded. (Doc. 291.) Defendants replied. (Doc. 292.) At the motions hearing, this court heard argument from counsel and testimony from Dr. Grace and Mr. Kheyfets. (See Tr. of Mots. Hr'g (Doc. 299).) Following the hearing, the parties submitted additional briefing on whether the class definitions should be

- 11 -

amended, and related issues. (See Minute Entry 03/24/2023;
Defs.' Suppl. Mem. in Opp'n to Pls.' Renewed Mot. for Class
Cert. ("Defs.' Suppl. Mem.") (Doc. 296); Pls.' Br. Regarding
Proposed Revision to Pls.' Class Definition ("Pls.' Suppl.
Mem.") (Doc. 298).) They also responded to the opposing parties'
briefs. (Defs.' Reply Mem. in Opp'n to Pls.' Proposed Revision
to Pls.' Class Definitions ("Defs.' Suppl. Resp.") (Doc. 300);
Pls.' Resp. to Defs.' Suppl. Mem. in Opp'n to Pls.' Renewed Mot.
for Class Cert. ("Pls.' Suppl. Resp.") (Doc. 301).)

This court reached tentative conclusions regarding the
percentage of putative class members that suffered no
demonstrable antitrust impact or damages and ordered the parties
to respond to its preliminary conclusions. (Text Order
06/20/2023.) The parties filed supplemental briefs in response.
(Defs.' Suppl. Br. in Resp. to Or. of June 20, 2023 ("Defs.'
Resp. to Text Order") (Doc. 302); Pls.' Br. in Resp. to
Tentative Conclusions Regarding Uninjured Class Members ("Pls.'
Resp. to Text Order") (Doc. 303).) Plaintiffs' Renewed Motion
for Class Certification is now ripe for ruling.

III. **STANDARD OF REVIEW**

"The class action is an exception to the usual rule that
litigation is conducted by and on behalf of the individual named
parties only." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348

- 12 -

(2011) (internal quotations and citations omitted). Rule 23 sets out the requirements a district court must consider in determining whether to certify a class. See Fed. R. Civ. P. 23. "Plaintiffs bear the burden of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden." Thorn v. Jefferson-Pilot Life Ins., 445 F.3d 311, 317 (4th Cir. 2006) (cleaned up). "[A]t the class certification stage, Plaintiffs need only show by a preponderance of the evidence that these elements are 'capable of proof at trial through evidence that is common to the class rather than individual to its members.'" In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 344 (D. Md. 2012) (emphasis in original) (citation omitted).

"As threshold matters, the putative class representative must show that he is a member of the proposed class, and must establish that the members of the proposed class are 'readily identifiable' or 'ascertainable.'" Krakauer v. Dish Network L.L.C., 311 F.R.D. 384, 388 (M.D.N.C. 2015), aff'd, 925 F.3d 643 (4th Cir. 2019) (cleaned up) (citing EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014)).

After clearing the threshold requirements, a class must satisfy the explicit requirements of Rule 23. Id. "Rule 23(a) ensures that the named plaintiffs are appropriate

- 13 -

representatives of the class whose claims they wish to litigate." Wal-Mart Stores, Inc., 564 U.S. at 348. To show compliance with Rule 23(a), the district court must find:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

In re Zetia (Ezetimibe) Antitrust Litig., 7 F.4th 227, 233–34 (4th Cir. 2021) (citing Fed. R. Civ. P. 23(a)). Rule 23 is not "a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." Wal-Mart, 564 U.S. at 350.

In addition, "the class action must fall within one of the three categories enumerated in Rule 23(b)." Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 424 (4th Cir. 2003). "The same analytical principles [that apply to Rule 23(a)] govern Rule 23(b). Plaintiffs seek certification pursuant to Federal Rule of Civil Procedure 23(b)(3). (Class Cert. Mot. (Doc. 276) at 2.) To certify a class under Rule 23(b)(3), Plaintiffs must demonstrate that: "common questions of law or fact predominate over any questions affecting only individual class members," and "proceeding as a class is superior to other

- 14 -

available methods of litigation." In re Zetia, 7 F.4th at 234 (cleaned up).

"In ruling on a class certification motion, a court must take a close look at the facts relevant to the certification question, even if those facts 'tend to overlap with the merits of the case.'" In re Titanium Dioxide, 284 F.R.D. at 336 (citation omitted). This examination requires a "rigorous analysis" to determine whether Rule 23 has been satisfied. Id. (citing Wal-Mart, 564 U.S. at 351). This analysis frequently overlaps with the merits of the plaintiff's underlying claim because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Wal-Mart, 564 U.S. at 351.

However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," instead, "the merits of a claim may be considered only when 'relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" Brown v. Nucor Corp., 785 F.3d 895, 903 (4th Cir. 2015) (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013)).

IV. **PROPOSED CLASS DEFINITIONS**

Plaintiffs' third motion for class certification sought to certify:

- 15 -

> (1) a class of manufacturers that directly paid CCC
> shipping fees during more than 8 different calendar
> months during the class period (April 11, 2001 through
> March 28, 2007) and/or were clients of CMS and
> directly paid shipping fees to IOS for at least 2.2
> million coupons during the class period; and

> (2) a class of retailers and retail associations that
> were CCC customers and directly paid shipping fee
> chargebacks to CCC of at least $50 during the class
> period.

(Class Cert. Mot. (Doc. 276) at 2.) Defendants object to these classes claiming, inter alia, the criteria for class membership is arbitrary. (Class Cert. Resp. (Doc. 282) at 13–17.) During the motions hearing, this court asked why Plaintiffs' class definitions sought to exclude certain manufacturers and retailers. (See Tr. of Mots. Hr'g (Doc. 299) at 24, 54.) Plaintiffs' counsel responded they "would be delighted to have" classes of "all customers." (Id. at 54–55.) At the end of the motions hearing, this court directed the parties to file briefs addressing whether the court should certify classes without the eight month, 2.2 million coupon, or $50 cutoffs. (Id. at 83–86.)

In response, Plaintiffs proffered two new class definitions:

> (1) manufacturers that directly paid CCC shipping fees
> during the class period and/or were clients of CMS and
> directly paid shipping fees to IOS; and

> (2) retailers and retail associations that were CCC
> customers and directly paid shipping fee chargebacks
> to CCC during the class period.

- 16 -

(Pls.' Suppl. Mem. (Doc. 298) at 2.)

For clarity, this court will refer to the class definitions proposed in Plaintiffs' third motion for class certification as the "Limited Payer Manufacturer Class" and "Limited Payer Retailer Class" (collectively the "Limited Payer Classes"). This court will refer to the class definitions proposed following the motions hearing as the "All Payer Manufacturer Class" and "All Payer Retailer Class" (collectively the "All Payer Classes").

Defendants objected to the newly proposed All Payer Classes because, inter alia, they include an unacceptably high percentage of uninjured class members. (See Defs.' Suppl. Mem. (Doc. 296) at 12–13.)

In response to the parties' briefs, this court issued a Text Order outlining preliminary conclusions about the number of uninjured members in the All Payer Classes. (Text Order 06/20/2023.) Plaintiffs' response to the Text Order stated that if the court does not certify the All Payer Classes, it should address the Limited Payer Classes, "which Plaintiffs have not withdrawn." (Pls.' Resp. to Text Order (Doc. 303) at 7.)

**V.   ANALYSIS**

This Memorandum Opinion primarily addresses the four class definitions Plaintiffs have proffered: the Limited Payer Manufacturer and Retailer Classes and the All Payer Manufacturer

- 17 -

and Retailer Classes. This court finds the Limited Payer Classes fail the ascertainability requirement, the All Payer Manufacturer Class fails the predominance requirement, and the All Payer Retailer Class may be certified.

## A. **Ascertainable Classes**

Defendants raised issues with the Limited Payer Classes proposed in Plaintiffs' Motion for Class Certification. Specifically, they argue Plaintiffs' choice to limit the manufacturer class[2] to manufacturers who paid shipping fees "during more than 8 different calendar months . . . and/or . . . paid shipping fees . . . for at least 2.2 million coupons," (Class Cert. Mot. (Doc. 276) at 2), is arbitrary.[3] (Class Cert. Resp. (Doc. 282) at 13–17.) Plaintiffs' reply failed to directly respond to Defendants' criticism. (See Class Cert. Reply (Doc. 287) at 6–15.) At the motions hearing, Plaintiffs' counsel

_____

[2] While Defendants appear to object only to the Limited Payer Manufacturer Class, (see Class Cert. Resp. (Doc. 282) at 13), their arguments apply equally to the Limited Payer Retailer Class, which limits membership to retailers who paid "at least $50" in shipping fees during the class period.

[3] Though this court analyzes this issue under ascertainability, the issue may also implicate other elements of the class certification analysis. For example, another court in this circuit analyzed a class that arbitrarily excluded individuals outside of a particular county under the superiority requirement. See Fariasantos v. Rosenberg & Assocs., LLC, 303 F.R.D. 272, 277–78 (E.D. Va. 2014). Regardless of where in the certification analysis this issue is addressed, this court's conclusions regarding certification remains the same.

- 18 -

explained the cutoffs were "the natural breaking point where basically using the model that we have . . . there's demonstrable harm. We can say, as a conservative model, that's the breaking point where everyone north of that [experienced demonstrable harm]." (Tr. of Mots. Hr'g (Doc. 299) at 25.)

The Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable,'" also known as the "'ascertainability' requirement." EQT Prod. Co., 764 F.3d at 358. "A class cannot be certified unless a court can readily identify the class members in reference to objective criteria." Id. Courts "have determined that 'the important distinguishing characteristic of a class is that its scope is defined by the activities of the defendants.'" Daigle v. Shell Oil Co., 133 F.R.D. 600, 602 (D. Colo. 1990) (cleaned up) (citing Alliance To End Repression v. Rochford, 565 F.2d 975, 978 (7th Cir. 1977)); see also Franco v. Connecticut Gen. Life Ins. Co., 289 F.R.D. 121, 141 (D.N.J. 2013), aff'd, 647 F. App'x 76 (3d Cir. 2016); Town of Lexington v. Pharmacia Corp., No. 12-CV-11645, 2015 WL 1321448, at *6 (D. Mass. Mar. 24, 2015); Clark v. State Farm Mut. Auto. Ins. Co., No. 00-CV-01841LT, 2007 WL 1078883, at *2 (D. Colo. Apr. 9, 2007); O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 320 (C.D. Cal. 1998). Legal treatises have

recognized the same proposition. See Existence of identifiable
class — Class must be definable by reference to objective
criteria, 1 McLaughlin on Class Actions, § 4:2 (19th ed.)
("While plaintiffs need not prove that putative class members
have been injured for purposes of defining a class, the class
definition must have some relation to the defendants' conduct.")
Persuasive to this court is guidance from the Manual for Complex
Litigation directing district courts to

> consider whether the class definition captures all
> members necessary for efficient and fair resolution of
> common questions of fact and law in a single
> proceeding. If the definition fails to include a
> substantial number of persons with claims similar to
> those of the class members, the definition of the
> class may be questionable. A broader class action
> definition or separate class might be more
> appropriate. If the class definition includes people
> with similar claims but divergent interests or
> positions, subclasses with separate class
> representatives and counsel might suffice.

Manual for Complex Litigation, § 21.222 (4th ed. 2004) (emphasis
added) (hereinafter "Manual").[4]

In Elsea v. Jackson County, the Western District of
Missouri cited this provision of the Manual highlighting

_____

[4] This court agrees with the Third Circuit Court of Appeals
that, "[a]lthough the Manual for Complex Litigation 'offer[s]
helpful suggestions to judges,' it 'does not have the force of
law and can not undermine Supreme Court precedent or the
decisions of [the Fourth Circuit Court of Appeals].'" In re Nat.
Football League Players Concussion Inj. Litig., 775 F.3d 570,
581 n.16 (3d Cir. 2014) (cleaned up).

- 20 -

insufficiencies with proposed class definitions. See No. 10-0620-CV-W-ODS, 2010 WL 4386538, at *3 n.3 (W.D. Mo. Oct. 28, 2010), abrogated on other grounds by Hood v. Gilster-Mary Lee Corp., 785 F.3d 263 (8th Cir. 2015). The court criticized a class definition "that excludes . . . people who are indistinguishable from the class members — except that they are not currently citizens of Missouri and would thus create diversity of citizenship." Id. The court concluded that the "'citizenship requirement' is an artificial construct adopted for purposes unrelated to the claims in the case or the interests of the injured parties. Such devices, when employed solely to preserve the class or for other litigation advantage, are generally unworthy of certification." Id.

Plaintiffs' prior fail-safe manufacturer class included 5,280 injured manufacturers. (See Suppl. Expert Report of Michael Kheyfets ("Kheyfets Suppl. Report") (Doc. 261-1) ¶ 17 (adding "5,020 manufacturer accounts that paid shipping fees to CCC and 260 manufacturer accounts that paid shipping fees to IOS" yields 5,280).) The Limited Payer Manufacturer Class includes 3,219 injured manufacturers and 65 uninjured

manufacturers.[5] Excluded from this definition are more than 2,000 manufacturers who were allegedly victims of the same Sherman Act violation. (See Kheyfets Suppl. Report (Doc. 261-1) ¶ 17) The fail-safe retailer class contained 304 injured retailers. (Compare Doc. 254-1 at 2, with Doc. 257-25 at 121-28 (listing 304 retailers); see also Kheyfets Suppl. Report (Doc. 261-1) ¶ 18.) The Limited Payer Retailer Class contains 146 injured retailers and excludes 157 retailers. (Compare Class Cert. Br. (Doc. 279), with Docs. 279-29, 279-30.)

Plaintiffs' counsel conceded at the motions hearing that they imposed numerical cutoffs for the classes (8 months, 2.2 million coupons, or $50) because, "using [Plaintiffs'] model," the cutoffs provide a "natural breaking point" above which almost all manufacturers and retailers were injured.[6] (Tr. of Mots. Hr'g (Doc. 299) at 25.) Plaintiffs' model, rather than the Defendants' alleged conspiracy, determines which retailers and

_____

[5] Plaintiffs' expert determined that 3,188 manufacturers paid shipping and handling fees to CCC and suffered damages, (Doc. 279-27), 63 manufacturers paid shipping and handling fees to CCC and suffered no damages, (Doc. 278-28), 31 manufacturers paid shipping and handling fees to IOS and suffered damages, (Doc. 279-31), and 2 manufacturers paid shipping and handling fees to IOS and suffered no damages, (Doc. 279-32), for a total of 3,284 class members.

[6] This court questions how "natural" of a "breaking point" Plaintiffs' cutoffs are since they exclude over 2,000 injured manufacturers and more than half of all injured retailers.

manufacturers receive the benefits of class membership. As such, the classes' "scope is [not] defined by the activities of the defendants." Daigle, 133 F.R.D. at 602.

In Daigle, the plaintiffs sought to recover for "the defendants' cleanup activities at Basin F, a toxic waste disposal pond." Id. at 601. They sought certification of a class of individuals who lived or owned property within certain boundaries delineated by four roads. Id. at 602. The court denied the motion for class certification, concluding that:

> [t]he scope of this proposed class is not defined by the defendants' Basin F activities. Instead, the plaintiffs arbitrarily have drawn lines on a map, and declared that certain persons within those geographical boundaries constitute a class. Plaintiffs have failed to identify any logical reason relating to the defendants' activities at Basin F for drawing the boundaries where they did.

Id. at 602-03. Here, as in Daigle, there is no connection between Defendants' allegedly impermissible activities and the classes Plaintiffs seek to certify. In both cases, Plaintiffs' counsel "arbitrarily" drew "lines" to decide who would be included in their class. See id. In Daigle, the lines were roads on a map; here they are 8 months, 2.2 million coupons, or $50. Lines that arbitrarily exclude some injured parties from the class are impermissible in either case.

When a definition excludes injured parties with valid claims, those parties are free to pursue litigation outside of

- 23 -

the class. This frustrates "one of the main purposes of class actions — avoiding multiple lawsuits." Fariasantos, 303 F.R.D. at 278. As the All Payer Class definitions are untethered from the scope of Defendants' alleged wrong, these classes may not be certified.[7]

**B.    CFA is a Member of the Retailer Class**

Defendants also claim a retailer class may not be certified because its representative, CFA, is not a member of the class. (Class Cert. Resp. (Doc. 282) at 10-11.) "As [a] threshold matter[], the putative class representative must show that he is a member of the proposed class." Krakauer, 311 F.R.D. at 388; see also Fed. R. Civ. P. 23(a) ("One or more members of a class may sue . . . as representative parties on behalf of all members . . . .")

Defendants claim that CFA's contract did not allow CCC to assess shipping chargebacks to CFA and that Plaintiffs erroneously assume CFA paid shipping chargebacks because Dr. Grace "misinterpreted a certain type of multi-retailer invoice." (Decl. of Dawn Grubbs ("Grubbs Decl.") (Doc. 283)

---

[7] Plaintiffs' brief asks this court to consider alternative definitions that mirror the Limited Payer Class definitions with the addition that "[e]xcluded from the class are the manufacturers, retailers, and retail associations identified in Exhibits 27, 29, and 31." (Class Cert. Br. (Doc. 279) at 16.) Those class definitions suffer from the same infirmity described in this analysis.

¶ 11.) Plaintiffs respond that CFA's contract permitted chargebacks and that Inmar's internal data reflects that CFA paid chargebacks, regardless of what the contract permitted. (Class Cert. Reply (Doc. 287) at 19-20.) This court agrees with Plaintiffs for two reasons.

First, while Defendants claim CFA's contract "did not permit shipping chargebacks," (Grubbs Decl. (Doc. 283) ¶ 12; see also Class Cert. Resp. (Doc. 282) at 10-11), they do not explain how the terms of CFA's contract proscribe shipping fee chargebacks. (See Class Cert. Resp. (Doc. 282) at 10-11.) Instead, Defendants attach copies of two contracts — one between Duane Reade and CCC, which allegedly permitted shipping chargebacks, (see Kheyfets Decl. (Doc. 284) ¶ 15; Doc. 283-1 at 2-3), and another between CFA and CCC, which allegedly did not, (see Kheyfets Decl. (Doc. 284) ¶ 15; Doc. 283-2 at 2-3).

To Defendant's credit, the Duane Reade contract states, "CCC will deduct chargebacks, inclusive of chargebacks for shipping, from the next payment due to [Duane Reade]." (Doc. 283-1 at 2.) In contrast, the CFA contract states "CCC will deduct chargebacks from the next payment due to [CFA]." (Doc. 283-2 at 2.) While this court agrees that Duane Reade expressly agreed to pay shipping fee chargebacks, CFA's contract

- 25 -

does not expressly state CCC could not charge CFA shipping fee chargebacks. (See id.)

Second, regardless of the contract terms, Dr. Grace stated that her methodology relied on the charges assessed, not contract terms. Dr. Grace asked Inmar: "[h]ow can we tell whether CCC's shipping fees were paid by manufacturers, charged back to retailers, or written off (in whole or in part) by CCC?" (Grace Merits Rebuttal Report (Doc. 250-32) ¶ 32.) Inmar responded that, "[i]f shipping . . . fees . . . [were] written off or charged back, it is indicated in one of the following fields [of the spreadsheet]. Otherwise, the amount was paid." (Id. ¶ 32 (cleaned up).) During the motions hearing, Dr. Grace reiterated that:

> For me, I'm a data person, and really, just as a matter of speaking in life, I don't usually care what people say they do, I care what they actually do. So instead of going through contracts and trying to see who missed that or who said they would do what and this, that, and the other, I just look at the data. So all of the -- you know, <u>any shipping fees that we're using, those are from the data provided by Inmar as paid shipping fees.</u> So it shows up in their database . . . as paid shipping. They say it's paid. . . ."

(Tr. of Mots. Hr'g (Doc. 299) at 70-71 (emphasis added).) This court credits Dr. Grace's unrebutted testimony that she relied on Defendants' data in drawing conclusions about the retailer class. Therefore, this court finds CFA is a member of the retailer class.

**C.   Rule 23(a) Factors**

### 1.   Numerosity

The first Rule 23(a) requirement is that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specified number is needed to maintain a class action. Rather, an application of the rule is to be considered in light of the particular circumstances of the case." Brady v. Thurston Motor Lines, 726 F.2d 136, 145 (4th Cir. 1984) (internal citation and quotations omitted). "As a general guideline, a class that encompasses fewer than 20 members will likely not be certified while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." In re Zetia, 7 F.4th at 234 (citing 1 Newberg on Class Actions § 3:12 (5th ed. 2021)).

Both the Limited Payer Manufacturer Class and the All Payer Manufacturer Class satisfy numerosity. The Limited Payer Manufacturer Class contains 3,284 members. (See Docs. 279-27, 279-28, 279-31, 279-32.) The All Payer Manufacturer Class contains 7,813 members. (See Kheyfets Suppl. Report (Doc. 261-1) ¶ 17 (adding "5,020 manufacturer accounts that paid shipping fees to CCC," "260 manufacturer accounts that paid shipping fees to IOS," "1,789 additional manufacturer accounts that were

charged these fees by CCC" and "744 accounts that were charged these fees by IOS" yields 7,813 manufacturers).)

The proposed retailer classes also satisfy numerosity. Plaintiffs' Limited Payer Retailer class includes 147 "geographically dispersed" retailers, 146 of which are injured. (Compare Class Cert. Br. (Doc. 279) at 20, with Doc. 279-29 (listing injured members of the Limited Payer Retailer Class), and Doc. 279-30 (listing the single uninjured member of the Limited Payer Retailer Class).) Plaintiffs' All Payer Retailer Class contains 323 retailers, 305 of which are injured. (See Grace Decl. (Doc. 303-1) ¶¶ 4–5.) Even the smaller proposed class of 147 retailers would satisfy the numerosity requirement. The size of each of the four proposed classes "raises a presumption of impracticability of joinder based on numbers alone." In re Zetia, 7 F.4th at 234 (citations omitted).

Defendants claim the classes fail the numerosity requirement because Plaintiffs' expert, Dr. Grace "double-count[ed]" certain retailers. (Class Cert. Resp. (Doc. 282) at 8.) Plaintiffs respond that Dr. Grace properly counted parent and subsidiary corporations separately. (Class Cert. Reply (Doc. 287) at 21–22.)

Other courts have held that parent and subsidiary corporations may be counted individually for purposes of

- 28 -

satisfying the numerosity requirement where the parent and subsidiary each experience a "distinct and separate injury." In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 207 (S.D.N.Y. 2018). A "separate injury" is felt when "the companies are separately incorporated, separately listed in the manufacturers' transactional data, and, most importantly, separately purchased (and were overcharged for) the product." Id.; accord Am. Sales Co. v. Pfizer, Inc., No. 2:14CV361, 2017 WL 3669604, at *8 (E.D. Va. July 28, 2017), report and recommendation adopted, No. 2:14CV361, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017) ("[A]lthough five proposed members are subsidiaries of other proposed class members, their inclusion is based on [Defendant's] own transactional sales data showing their independent purchases . . . . Unless there is evidence that Plaintiffs are trying to artificially inflate the number of class members, subsidiaries should be considered as potential class members to vindicate their own antitrust injury. Here, there is evidence to suggest that the subsidiaries made direct purchases . . . distinct from the purchases of their parent companies, and thus, would have suffered independent injury . . .")

Dr. Grace explained during the motions hearing that "most of the time, subsidiaries are doing their own coupon processing

- 29 -

because you're seeing that hit their own income statement . . .
so they're interacting with the company on their own. They've
got a unique customer ID." (Tr. of Mots. Hr'g (Doc. 299) at 70.)
Where Defendants' data listed subsidiaries with unique IDs,
Dr. Grace counted them separately. (Id.) After Dr. Grace's
testimony, Defendants' counsel claimed their witness,
Ms. Grubbs, could explain how she reduced the number of
retailers to 21. (Id. at 78.) However, Defendants did not have
Ms. Grubbs testify even though she attended the motions hearing.
(Id. at 78–82.) This court also permitted the parties to submit
supplemental briefing following the motions hearing, (see Minute
Entry 03/24/2023), but Defendants again failed to provide
additional evidence that Dr. Grace had miscounted retailers.
Instead, Defendants implied, for the first time and without
evidence, that the purportedly double-counted retailers are
divisions of a single company, not subsidiaries. (See Defs.'
Suppl. Mem. (Doc. 296) at 18.) This unsupported argument is
insufficient to rebut Dr. Grace's testimony.

From Dr. Grace's testimony, it appears parent and
subsidiary corporations experienced "distinct and separate
injur[ies]." In re Namenda, 331 F. Supp. 3d at 207. While this
court lacks information on the retailers' incorporation status,
according to Dr. Grace, "they're interacting with the company on

their own" and have "a unique customer ID," (Tr. of Mots. Hr'g (Doc. 299) at 70), so they are "separately listed in the manufacturers' transactional data, and, . . . separately purchas[ing] . . . the product." In re Namenda, 331 F. Supp. 3d at 207. As stated above, Defendants had the chance to rebut these conclusions and failed to do so. Plaintiffs have carried their burden to show the retailer class is sufficiently numerous.

### 2. Commonality

The second Rule 23(a) inquiry asks whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A common question is one that can be resolved for each class member in a single hearing," and does not "turn[] on a consideration of the individual circumstances of each class member." Thorn, 445 F.3d at 319 (internal citations and quotations omitted). "In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is subsumed under, or superseded by, the more stringent Rule 23(b)(3) [predominance] requirement . . . ." Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 147 n.14 (4th Cir. 2001) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 609 (1997)). In the antitrust context, "'the existence of an alleged conspiracy or monopoly is a common issue that will satisfy' the commonality

requirement." In re Titanium Dioxide, 284 F.R.D. at 337 (citation omitted).

Plaintiffs allege Defendants and IOS conspired to increase the cost of coupon processing services. (See TAC (Doc. 145) ¶ 108.) Plaintiffs have identified a bevy of common questions including whether an anticompetitive conspiracy existed and whether it caused higher prices. (See id. ¶ 99.) "These questions and answers are common because every putative [c]lass member was subjected to the alleged" conspiracy. Wilson v. Eagle Nat'l Bank, No. 8:20-CV-01344-JRR, 2023 WL 2478933, at *11 (D. Md. Mar. 13, 2023). Central to each class member's claim is whether there was a Sherman Act violation. Thus, the commonality element is met.

### 3. **Typicality and Adequacy**

The typicality requirement of Rule 23(a) asks whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006) (citation omitted). "Although a representative's claims and the claims of other members of the class need not be perfectly identical or perfectly aligned, the

- 32 -

representative's pursuit of his own interests must simultaneously tend to advance the interests of the absent class members." Ealy v. Pinkerton Gov't Servs., Inc., 514 F. App'x 299, 305 (4th Cir. 2013) (internal citations and quotations omitted). "Factual differences do not necessarily render a claim atypical, but the claims must be based on the same course of conduct and legal theory." In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig., 341 F.R.D. 128, 148 (D. Md. 2022).

Finally, the adequacy requirement asks whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" In re Titanium Dioxide, 284 F.R.D. at 338. "[A] conflict 'must be more than merely speculative or hypothetical'" to defeat class certification. Gunnells, 348 F.3d at 430 (citation omitted).

Defendants argue Mr. Dee's is not an adequate class representative and that the putative retailer and manufacturer classes are antagonistic. (Class Cert. Resp. (Doc. 282) at 26-27.) This court disagrees.

As this court will not certify a manufacturer class, the issue regarding Mr. Dee's is moot. However, if this issue was

not moot, this court would find Mr. Dee's to be a typical member of the manufacturer class.[8]

Defendants also argue that the manufacturer and retailer classes have antagonistic interests and this conflict bars certification. (Class Cert. Resp. (Doc. 282) at 26–27.) Defendants argue:

> The manufacturers seek to show that they voluntarily paid most of the fees (which would increase their alleged injuries but reduce the pool of potential damages that the retailers can claim), while the retailers seek to show that they were the ones who involuntarily paid the fees because the processors passed the unpaid shipping fees on to them.

(Id. at 27 (emphasis in original).) Defendants further argue that "[m]anufacturers and retailers are essentially 'choosing' whether to be part of the class" based on whether [they] chose

---

[8] Mr. Dee's was overcharged more than $5,000 for shipping fees on two-count coupons. (Doc. 279-27 at 32, Row 2736.) Plaintiffs seek treble damages pursuant to 15 U.S.C. § 15, (TAC (Doc. 145) at 41–42), so, should Mr. Dee's succeed in this action, it may recover more than $15,000. Defendants contend that Mr. Dee's later switched to one-count coupons, (Class Cert. Reply (Doc. 287) at 17), and because of the switch Mr. Dee's was undercharged more than $12,000, (Kheyfets Suppl. Report (Doc. 261-1) ¶ 49). As "evidence of offsets, deductions, or rebates is [not] relevant to calculating damages," (Mem. Op. and Order (Doc. 290) at 14, 16 (citing In re Delta/AirTran Baggage Fee Antitrust Litig., 317 F.R.D. 675, 683 (N.D. Ga. 2016)), the undercharges do not affect Mr. Dee's ability to recover from Defendants. Ultimately, this court finds that the $7,000 net gain Mr. Dee's experienced does not make it an atypical or inadequate representative.

to pay certain fees. (Defs.' Suppl. Mem. (Doc. 296) at 15.) Defendants' arguments are unpersuasive for several reasons.

First, Defendants ignore that Dr. Grace relied on data Defendants produced to determine how much individual manufacturers and retailers paid. (See Doc. 279-25 ¶¶ 8-9, 17, 43.) Dr. Grace used this data to calculate impact and damages for individual manufacturers and retailers. (See id.) Defendants have not explained how Plaintiffs could manipulate Defendants' data to maximize one class's recovery at the expense of the other.

Second, to the extent manufacturers chose to charge back fees to retailers and retailers chose to deduct fees from manufacturers, those choices do not render the classes antagonistic. The class period covered by this litigation spans April 11, 2001 through March 28, 2007. (Class Cert. Mot. (Doc. 276) at 2.) This action commenced May 22, 2008. (Compl. (Doc. 1).) A class member deciding whether to pay or pass on a fee from April 2001 through March 2007 did not know litigation concerning those fees would eventually be brought or that the amount they paid could impact their future recovery. Put simply, the choice to pay or pass on a fee was not informed by a desire to maximize a future recovery and those past choices do not make the classes presently antagonistic.

- 35 -

Thus, at this point in the litigation, any conflict of interest between the classes remains "merely speculative and hypothetical." Gunnells, 348 F.3d at 43. As such, this court will not deny certification on that basis.

### D.    Rule 23(b) Factors

If a putative class overcomes Rule 23(a)'s requirements, the court performs the Rule 23(b)(3) inquiry, which asks whether "questions of law or fact common to class members predominate over any questions affecting only individual members, and [whether] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

#### 1.    Predominance

The predominance requirement of "Rule 23(b)(3) requires a showing that questions common to the class predominate, [but] not that those questions will be answered, on the merits, in favor of the class" or that "each element of [the] claim is susceptible to class[-]wide proof." Amgen Inc., 568 U.S. at 459, 469 (emphasis in original) (cleaned up). The "predominance requirement is far more demanding than Rule 23(a)(2)'s commonality requirement and . . . tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation." <u>Gray v. Hearst Commc'ns, Inc.</u>, 444 F. App'x 698, 701 (4th Cir. 2011) (cleaned up).

To establish an antitrust violation, Plaintiffs must prove: "(1) a violation of the antitrust law, (2) direct injury to the plaintiff from such violations, and (3) damages sustained by the plaintiff." <u>Deiter</u>, 436 F.3d at 467 (cleaned up).

An antitrust plaintiff proves "antitrust injury, i.e. injury to competition" by showing "that the plaintiff was overcharged in its purchases because of the injury to or absence of competition." <u>Id.</u> "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-<u>reducing</u> aspect or effect of the defendant's behavior." <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 344 (1990) (emphasis in original). "Thus, proof of a per se violation and of antitrust injury are distinct matters that must be shown independently." <u>Id.</u> (citations omitted). "[E]ven in cases involving per se violations, . . . plaintiffs [are] still required to 'show that the conspiracy caused <u>them</u> an injury for which the antitrust laws provide relief.'" <u>Id.</u>

"The plaintiffs must also show that they can prove, through common evidence, that <u>all</u> class members were in fact injured by the alleged conspiracy." <u>In re Rail Freight Fuel Surcharge Antitrust Litig.</u>, 725 F.3d 244, 252 (D.C. Cir. 2013)

- 37 -

[hereinafter In Re Rail Freight I] (emphasis added). "[T]o prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008).

This court finds that the All Payer Manufacturer Class cannot satisfy the predominance requirement because Plaintiffs' expert's regressions did not find impact to almost one-third of the class and Plaintiffs fail to proffer additional evidence that all manufacturers in the class suffered antitrust impact and damages. However, the All Payer Retailer Class may be certified because it contains a de minimis number of uninjured members.

### a. All Payer Manufacturer Class

After reviewing the parties' submissions and expert reports, this court tentatively concluded that the All Payer Manufacturer Class included 7,813 members, 5,280 of which suffered empirically demonstrable antitrust impact and damages based on Dr. Grace's regressions. (See Text Order 06/20/2023; Compare Grace Suppl. Report (Doc. 195-1) ¶¶ 23, 27, 32 (noting that manufacturers who were assessed overcharges based on the regressions were listed in Appendix A), with Kheyfets Suppl. Report (Doc. 261-1) ¶ 18 (noting Appendix A lists 5,280

- 38 -

manufacturers who were impacted by the conspiracy and the data

Dr. Grace used to compile her list contained an additional 2,533

manufacturers who were charged fees but were not overcharged

based on Dr. Grace's regressions).) Dr. Grace's regressions

failed to show that the remaining 2,533 members of the All Payer

Manufacturer Class, or 32% of the class, suffered antitrust

injury. (See Text Order 06/20/2023) As Dr. Grace is Plaintiffs'

only expert, Plaintiffs have not shown "that they can prove,

through common evidence, that all class members were in fact

injured by the alleged conspiracy." In re Rail Freight I, 725

F.3d at 252. This court is unable to certify a class where

Plaintiffs lack evidence that almost a third of the putative

class suffered any antitrust injury.

Other circuits have devoted "considerable attention" to

"[t]he question of how to handle classes that may include

uninjured class members." Krakauer v. Dish Network, L.L.C., 925

F.3d 643, 652 (4th Cir. 2019). Some circuits have refused to

certify classes where any putative class members were uninjured.

In re Asacol Antitrust Litig., 907 F.3d 42, 56 (1st Cir. 2018)

(noting the Eighth Circuit has framed the issue as an Article

III standing problem); see also Halvorson v. Auto-Owners Ins.

Co., 718 F.3d 773, 779 (8th Cir. 2013) ("A class 'must . . . be

defined in such a way that anyone within it would have standing.'").

The D.C. Circuit and other courts have recognized a de minimis exception and held that a class may satisfy the predominance requirement when the plaintiff proffers "common proof covering 'virtually all' members of the proposed class" such that "only a 'de minimis' number of cases require individualized proof of injury and causation." In re Rail Freight Fuel Surcharge Antitrust Litig., 934 F.3d 619, 624 (D.C. Cir. 2019) [hereinafter In Re Rail Freight II] (discussing the lower court's decision and assuming arguendo that there is a de minimis exception to the predominance requirement); see also B & R Supermarket, Inc. v. Mastercard Int'l Inc., No. 17CV02738MKBJO, 2021 WL 234550, at *28 (E.D.N.Y. Jan. 19, 2021) ("District courts in this and other circuits have held that a class may be certified so long as a 'de minimis' number of class members were uninjured or, conversely, 'virtually all' class members were injured."). This is an exception to the general rule that "to establish predominance, [plaintiffs] must 'show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy.'" In re Rail Freight II, 934 F.3d at 624.

The de minimis exception does not allow courts to certify classes with large numbers of uninjured members. "[T]he 'few reported decisions' involving uninjured class members 'suggest that 5% to 6% constitutes the outer limits of a de minimis number.'" Id. at 625. "[T]he words 'common' and 'predominate' in Rule 23(b)(3) suggest that the class should include only (or mostly only) people who have suffered an injury. If one-third—or half or two-thirds—of the class members suffered no injury, it follows that 'common' issues would not 'predominate,' as required under the text of Rule 23, because those uninjured class members have little in common with those who have been harmed." Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 669 (9th Cir. 2022) (J. Lee, dissenting). Additionally, "allowing more than a de minimis number of uninjured class members tilts the playing field in favor of plaintiffs . . . [and] invite[s] plaintiffs to concoct oversized classes stuffed with uninjured class members — with little fear of having their class certification bids being denied . . ." Id.

In contrast, the Ninth Circuit has "reject[ed] the . . . argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." Olean Wholesale Grocery Coop., Inc., 31 F.4th at 669. In refusing to adopt a bright-line rule, the

court recognized that the "district court is in the best position to determine whether individualized questions, including those regarding class members' injury, 'will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).'" Id. (citations omitted).

Where there is a manageable "winnowing mechanism" to filter out uninjured class members, courts are more inclined to certify a class that contains uninjured members. See id.; see also In re Nexium Antitrust Litig., 777 F.3d 9, 19–21 (1st Cir. 2015) (certifying a class that included uninjured members because they could be filtered out through consumer testimony).)

The Fourth Circuit has not endorsed an approach to the issue of uninjured class members. See Krakauer, 925 F.3d at 652, 658 (noting its "sister circuits" have considered the issue but declining to address it because "there is simply not a large number of uninjured persons included within the plaintiffs' class.") However, another court in the Middle District of North Carolina found "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." Krakauer, 311 F.R.D. at 396. This language resembles the de minimis rule announced by the D.C. Circuit.

A class where 32% of its members are uninjured far exceeds the "outer limits" of a de minimis number as recognized in In re Rail Freight II. 934 F.3d at 654. Instead, a "great many [entities in this class] have suffered no injury at the hands of the defendant." Krakauer, 311 F.R.D. at 396. Thus, if the All Payer Manufacturer Class contains 2,533 uninjured manufacturers, this court may not certify that class without running afoul of the predominance requirement. The 2,533 uninjured manufacturers "have little in common with" the remaining two thirds of the class "who have been harmed." Olean Wholesale Grocery Coop., Inc., 31 F.4th at 692 (J. Lee, dissenting), so common issues do not predominate. Plaintiffs do not claim 2,533 is a de minimis number of manufacturers or that they can establish a winnowing mechanism,[9] instead they claim that they can show all members of the All Payer Manufacturer Class were injured. (See Pls.' Suppl. Mem. (Doc. 298) at 2-20.)

Additionally, even if this court were to adopt the Ninth Circuit's approach, which rejected a bright-line rule and

_____

[9] The only winnowing mechanism this court could foresee would be to define the manufacturer class as all manufacturers who paid shipping fees during the class period, but excluding those manufacturers who Dr. Grace found paid no overcharges. This class would run afoul of the rule against certifying fail-safe classes as "class membership [would be] conditioned on having suffered antitrust injury or impact in the form of increased shipping fees." (Fail Safe Class Order (Doc. 275) at 7; see also infra n.10.)

- 43 -

allowed a district court to certify classes with more than a de minimis number of uninjured members, this court would reach the same conclusion. The putative All Payer Manufacturer class contains 2,533 uninjured members. If this class was certified, "individualized questions, including those regarding class members' injury, '[would] overwhelm common ones and render class certification inappropriate.'" Olean Wholesale Grocery Coop., Inc., 31 F.4th at 669. Whether, and to what degree, those 2,533 manufacturers were injured would smother all other inquiries.

Plaintiffs contended this court's conclusions about the number of uninjured class members were "based on inaccurate assumptions," namely, "the assumption that all payers of shipping fees are class members, and that the relevant inquiry is the percentage of class members who are uninjured based on a merits determination." (Pls.' Resp. to Text Order (Doc. 303) at 4–8.)

As to Plaintiffs' first point, the All Payer Classes include all "manufacturers that directly paid CCC shipping fees during the class period and/or were clients of CMS and directly paid shipping fees to IOS; and all "retailers and retail associations that were CCC customers and directly paid shipping fee chargebacks to CCC during the class period." (Pls.' Suppl. Mem. (Doc. 298) at 2 (emphasis added).) By their terms, these

- 44 -

definitions include "all payers of shipping fees." (See Pls.'
Resp. to Text Order (Doc. 303) at 4-8.)

Rather than identifying a mistake in this court's
conclusions, Plaintiffs appear to be reminding this court they
have not abandoned the Limited Payer Class definitions. (See
Pls.' Resp. to Text Order (Doc. 303) at 7 ("If classes of all
payers of shipping fees are not certified, then the Court should
address Plaintiffs' motion and the classes proposed therein

(Doc. 277), which Plaintiffs have not withdrawn.").)[10] This court has evaluated those definitions. (See supra section V.A.)

Next, Plaintiffs contend this court's tentative conclusions were based on a merits inquiry into the percentage of class members who were uninjured. This is incorrect. This court's inquiry at class certification is limited to "whether class-wide impact may be proven by evidence common to all class members," In re Polyester Staple Antitrust Litig., No. 3:03CV1516, 2007 WL

---

[10] Plaintiffs also argue that the court could "define the class as 'the retailers and manufacturers listed in [Doc. 257-25] App'x A, B.'" (hereinafter "Revised Definitions") (Doc. 287.) These Revised Definitions mirror the fail-safe classes this court refused to certify, (see Fail Safe Class Order (Doc. 275)), and fail for the same reason. Plaintiffs' fail safe classes were:

> (1) a class of manufacturers that directly paid observably higher CCC or IOS shipping fees during the class period (April 11, 2001 through March 28, 2007), identified [at Doc. 257-25 at 21–120]; and
> (2) a class of retailers that directly paid observably higher CCC or IOS shipping fees during the class period, identified [at Doc. 257-25 at 122–130].

(Doc. 254 at 1–2.) The only difference between the fail-safe definitions and the Revised Definitions is that the latter remove the phrase, "that directly paid observably higher CCC or IOS shipping fees during the class period." (Id.) However, Plaintiffs generated the lists of manufacturers and retailers referenced in both definitions from Dr. Grace's regressions which sought to determine which manufacturers and retailers "paid observably higher shipping fees." (See Grace Suppl. Report (Doc. 195-1).) Thus, the Revised Definitions "are impermissible fail-safe classes because class membership is conditioned on having suffered antitrust injury or impact in the form of increased shipping fees." (Fail Safe Class Order (Doc. 275) at 7.)

- 46 -

2111380, at *19 (W.D.N.C. July 19, 2007), and whether "Plaintiffs . . . can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy." In re Rail Freight I, 725 F.3d at 252 (emphasis added).

Ultimately, this court concludes Plaintiffs' lack common evidence that all members of the manufacturer class were injured. Dr. Grace's analysis did not find a demonstrable antitrust injury for 2,533 manufacturers in the class.[11] Dr. Grace explained that the alleged conspiracy may have caused "indirect" harms to manufacturers "like the cost of finding a new supplier . . . [or] industry knowledge that it would take to get your firm up and running to process your own coupons" but explained that she was "not going to be able to measure that stuff." (Tr. of Mots. Hr'g (Doc. 299) at 31.)

Dr. Grace's regressions measured shipping fee overcharges; she did not purport to measure "indirect" effects, which she candidly explained she could not measure. (See Grace Suppl. Report (Doc. 195-1) ¶¶ 17–18 (explaining that her analyses "estimate shipping fee overcharges to manufacturers"); Tr. of Mots. Hr'g (Doc. 299) at 31.) To the extent Plaintiffs ask this

---

[11] As Plaintiffs have failed to show injury or damages for these 2,533 manufacturers, the class action device is inappropriate for their claims.

court to speculate how indirect effects impacted manufacturers, this court declines to do so.

Plaintiffs have not explained what these alleged indirect effects were, nor have they provided a theory for how a factfinder could assess which manufacturers were impacted by them and by how much. Additionally, Plaintiffs have failed to establish that these undisclosed indirect effects even qualify as antitrust injuries. See Steves & Sons, Inc. v. JELD-WEN, Inc., 988 F.3d 690, 711 (4th Cir. 2021) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)) (noting antitrust injuries are those that harm the plaintiff "in a way that 'the antitrust laws were intended to prevent.'").

Moreover, Dr. Grace never stated that all manufacturers were impacted by these indirect harms. Dr. Grace simply told the court that she "cannot observe the [indirect] harm." (Tr. of Mots. Hr'g (Doc. 299) at 31.) As Dr. Grace is Plaintiffs' only expert, Plaintiffs lack evidence that all manufacturers in the All Payer Class were harmed by the conspiracy.

Despite Plaintiffs' lack of expert testimony or empirical evidence showing that all manufacturers were impacted, Plaintiffs claim they can "prov[e] impact to the class" through five kinds of evidence:

- 48 -

> (1) that a horizontal antitrust conspiracy can be
> presumed to cause harm to the market and all class
> members;
> (2) a price war would have occurred absent a
> conspiracy;
> (3) IOS admitted to systematically raising shipping
> fees because of the conspiracy, and Inmar followed
> IOS's lead on fees;
> (4) Dr. Grace's shipping fee analysis is capable of
> demonstrating impact to all class members; and
> (5) a market structure analysis demonstrates common
> impact.

(Pls.' Suppl. Mem. (Doc. 298) at 5–6.) As this court will
explain, this evidence is insufficient to show "that all class
members were in fact injured by the alleged conspiracy." In re
Rail Freight I, 725 F.3d at 252.

### i. Dr. Grace's Empirical Analysis

As explained previously, Dr. Grace's regressions found
impact for 68% of the All Payer Manufacturer Class. Without
discussing Dr. Grace's regressions, Plaintiffs argue that
"Dr. Grace testified that one way of demonstrating impact and
damages to class members would be to take the average overcharge
multiplied by volume, which would demonstrate impact to all
purchasers." (Pls.' Suppl. Mem. (Doc. 298) at 12 (citing Tr. of
Mots. Hr'g (Doc. 299) at 31:17–32:2).) This misrepresents
Dr. Grace's testimony.

First, in the sections of the motions hearing Plaintiffs
cite, Dr. Grace and the court were discussing market harm, not
harm to individual class members. (See Tr. of Mots. Hr'g

- 49 -

(Doc. 299) at 29.) Dr. Grace also candidly admitted her analysis could not observe all harms.

> **THE WITNESS:** Can I just interrupt you on that? <u>So it's not necessarily that they were not all harmed, it's that we cannot observe the harm</u>, because if they're able to substitute away, they're avoiding the direct harm that we can observe, but that doesn't mean that they're not suffering indirect harm like the cost of finding a new supplier, the information and, you know, industry knowledge that it would take to get your firm up and running to process your own coupons, things like that. <u>We're not going to be able to measure that stuff</u>.

(<u>Id.</u> at 31 (emphasis added).) Dr. Grace did not say that she could demonstrate impact and damages to all individual class members by taking the average overcharge multiplied by volume.[12]

Indeed, Dr. Grace's Supplemental Expert Report explained that averages should not be used to calculate impact to manufacturers. (<u>See</u> Grace Suppl. Report (Doc. 195-1) ¶ 13 ("Accordingly, using an overall market average . . . to assess how much shipping fee payments increased after the Non-Compete Agreements understates the effect of the increases on smaller manufacturers, as smaller manufacturers were disproportionately

---

[12] This market harm that Dr. Grace spoke of is insufficient to show antitrust injury. "[P]roof of a per se violation and of antitrust injury are distinct matters that must be shown independently." <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 344 (1990). Merely showing that there was a per se violation of the antitrust laws or that a conspiracy harmed the market generally is insufficient to show that each participant in the market experienced antitrust impact.

affected by the increases. Comparing median shipping fee
payments is a better measure of comparision[sic] (<u>relative to an
average</u>), as it better captures the degree of shipping fee
increases on smaller manufacturers . . . .") (emphasis added).)
Dr. Grace's reports do not say that averages are an acceptable
means of calculating whether individual class members were
impacted by the conspiracy or their damages.[13]

Additionally, Dr. Grace made clear in her report that,
based on her regressions, "not all manufacturers paid observably
higher shipping fees after Defendants' entered the Non-Compete
Agreements with IOS." (<u>Id.</u> ¶ 18.) Plaintiffs' argument, that
Dr. Grace can now perform some other calculation to demonstrate
that all class members were in fact harmed, is contradicted by
her testimony. (<u>See</u> <u>id.</u>)

The Ninth Circuit's recent decision in <u>Olean Wholesale
Grocery Coop., Inc.</u>, bolsters this court's conclusion. <u>See</u> 31
F.4th 651. There, the plaintiffs' expert for the direct
purchaser class (DPPs), Dr. Magnum, theorized that the "Tuna
Suppliers' collusive behavior would affect the DPPs on a class-
wide basis" and "used . . . econometric tools to evaluate

_____

[13] The fact that Dr. Grace used a regression to determine
impact further suggests that a simpler calculation, such as
calculating average overcharge by volume, may be insufficient to
accurately determine impact and damages.

- 51 -

whether quantitative evidence supported this theory." Id. at
670-71. Dr. Magnum's regression found "the DPPs paid 10.28
percent more for tuna during the conspiracy period," which he
labeled an overcharge. Id. at 671. Dr. Magnum ran "robustness
checks" to "confirm the reliability of the model." Id. at 672.
One check "showed that 94.5 percent of the purchasers had at
least one purchase above the predicted but-for price." Id. The
court was careful to point out that "Dr. Mangum did not
'suggest' that 5.5 percent of the class were uninjured. Rather,
Dr. Mangum concluded that each class member was injured by
supra-competitive prices, and used a different methodology for
calculating damages for each member of the class." Id. at 672
n.18. The defendants' expert attacked Dr. Magnum's analysis and
proffered evidence that 28% of the class did not pay a
statistically significant overcharge. Id. at 673.

In evaluating these experts, the district court
acknowledged the defendants' criticisms of Dr. Magnum's model
could be persuasive to a jury but "recognized . . . its task was
to determine whether Dr. Mangum's evidence was capable of
showing class-wide impact, not to reach a conclusion on the
merits of the DPPs' claims. Id. at 676.

Here, this court reaches the opposite outcome in large part
because of differences in the evidence offered in each case. In

<u>Olean Wholesale Grocery Cooperative</u>, the plainitffs' expert theorized there would be class-wide harm and then used numerous empirical models to demonstrate it. See <u>id.</u> at 670. The fact that one model did not affirmatively show damages for 5.5% of the class was deemed unimportant by the majority opinion in part because the plaintiffs' expert provided other empirical evidence demonstrating antitrust impact and damages for each direct purchaser. Here, Plaintiffs' lack expert testimony showing impact and damages to almost a third of the class and ask this court to instead infer that each manufacturer was injured based on arguments about the market. This court refuses to fill in the gaps of Plaintiffs' expert reports to find common evidence after Plaintiffs failed to meet their burden.[14]

### ii.    <u>**Plaintiffs' Evidence About the Market**</u>

Plaintiffs also contend they can present evidence about the alleged conspiracy and the coupon market that will show impact to the class. Specifically, Plaintiffs argue that: (1) a price war would have lowered prices in the market, (2) the conspiracy led to broad price increases; and (3) market structure analysis demonstrates common impact. (Pls.' Suppl. Mem. (Doc. 298)

---

[14] Even if this court found Plaintiffs proffered common evidence of antitrust impact, Plaintiffs fail to explain how a factfinder would assess damages for the one-third of the class for which Dr. Grace found suffered no damages.

- 53 -

at 9-17.) While these facts suggest Defendants' alleged conspiracy harmed the market, they are insufficient to "show that [Plaintiffs] can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy." In re Rail Freight I, 725 F.3d at 252 (emphasis added). Plaintiffs fail to explain how these general arguments about the market show that each manufacturer was impacted by the conspiracy.

Related to Plaintiffs' first statement — that a price war would have lowered prices in the market — Plaintiffs claim "[a] jury could reasonably infer that the price war would have affected the entire market rather than being limited to specific customers or markets." (Pls.' Suppl. Mem. (Doc. 298) at 9.) Plaintiffs fail to identify cases suggesting factfinders may make such an inference, nor do they identify expert testimony explaining that such an inference would be appropriate here.

Undaunted, Plaintiffs add:

> [t]his evidence that the conspiracy headed off a price war is sufficient to demonstrate impact to all direct payers of shipping fees. See In re Mushroom Direct Purchaser Antitrust Litig., 319 F.R.D. 158, 192-93 (E.D. Pa. 2016) (finding that nature of conspiracy — an "express conspiracy . . . that was intended to impact all class members" — supported a finding that impact to the class could be proven with common evidence).

(Id. at 10 (cleaned up).)

- 54 -

However, in In re Mushroom, the plaintiff's arguments about the nature of the conspiracy went further than evidence that prices might have fallen absent a conspiracy. 319 F.R.D. at 192–93. The court considered "the [defendant's] 'comprehensive price lists' which identified 'particular circumstances in which the [defendant's] members were allowed to depart from the prices on the price list' and its 'elaborate system of monitoring and enforcement' which allowed" the defendant to ensure compliance with the price list. Id. at 192. The court also considered the plaintiff's expert testimony of before and after price comparisons. Id. at 193.

Here, Plaintiffs' evidence about the "nature of the conspiracy" is limited to an argument that there was to be a price war absent the conspiracy. Accepting this as true, it fails to establish that all manufacturers would pay overcharges because no price war happened. Instead, Dr. Grace's methodologies undermine such a conclusion since she found 32% of the class was not impacted by the conspiracy. Had Plaintiffs offered expert testimony that a price war would have impacted all manufacturers and that all manufacturers would have paid lower prices absent a conspiracy, this court's analysis may have been different. However, Plaintiffs have not offered such evidence.

- 55 -

Plaintiffs' next category of evidence is that the conspiracy led to broad price increases. Plaintiffs identify statements by IOS and Inmar that they increased prices. (Pls.' Suppl. Mem. (Doc. 298) at 10–11.) However, Plaintiffs again point to no evidence in the record or statements from their expert that all manufacturers were impacted.

Instead, Plaintiffs claim that:

> [t]his evidence of widespread price increases supports a finding of class-wide impact. See In re Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 222 n.30 (M.D. Pa. 2012) (finding class-wide antitrust impact where list prices were inflated even if individual purchasers could negotiate away the price increase) (citing In re Linerboard, 203 F.R.D. at 221).

(Id. at 11–12.) However, the In re Chocolate Confectionary court relied upon a myriad of factors absent from this case to demonstrate antitrust impact to all purchasers, including an expert's detailed findings about how the industry's structure "facilitates collusive pricing" and a multiple regression analysis that found 98% of class members were impacted by price increases. Id. at 220–21. Here, Plaintiffs' expert's regression found only 68% of the class was injured. As the In re Chocolate Confectionary court decided there was common evidence of impact after considering important evidence absent from the present case, this case does not support Plaintiffs' argument that it

- 56 -

may infer impact to all class members from Defendants'
statements about price increases without more evidence.

Finally, Plaintiffs claim Dr. Grace's findings about market
conditions are consistent with findings that have supported an
inference of class-wide impact in other cases. (See Pls.' Suppl.
Mem. (Doc. 298) at 13.) While Plaintiffs are correct that market
structure analysis is one factor courts may consider in
determining antitrust impact, the cases Plaintiffs cite did not
rely on market structure alone. See, e.g., In re Static Random
Access Memory (SRAM) Antitrust Litig., No. 07-MD-01819 CW, 2010
WL 5141861, at *2 (N.D. Cal. Dec. 13, 2010) (noting "empirical
analysis . . . found overcharges"). While Plaintiffs point to
Dr. Grace's statements about conditions in the market that
increased prices, (see Pls.' Suppl. Mem. (Doc. 298) at 14–15),
Dr. Grace did not say all manufacturers paid overcharges because
of the conspiracy. (See Tr. of Mots. Hr'g (Doc. 299) at 31.)

Plaintiffs have not "show[n] that they can prove, through
common evidence, that all class members were in fact injured by
the alleged conspiracy." In re Rail Freight I, 725 F.3d at 252.
Plaintiffs' evidence that prices would have fallen absent a
conspiracy, that prices rose because of the conspiracy, and that
the market was impacted by an antitrust conspiracy do not show
that all class members were impacted by the alleged conspiracy.

### iii.     **Presumption of Class-Wide Impact**

Plaintiffs also argue that courts presume class-wide impact in price-fixing cases and horizontal consumer or market allocation cases. (See Pls.' Suppl. Mem. (Doc. 298) at 6.) Plaintiffs overstate the law.

The presumption Plaintiffs discuss is called the "Bogosian Shortcut." See In re Linerboard Antitrust Litig., 305 F.3d 145, 151 (3d Cir. 2002). The presumption is not mechanically applied to show impact in all cases alleging certain kinds of antitrust violations. Instead, the Third Circuit's decision In re Hydrogen Peroxide clarified that "[w]hether or not fact of damage can be proven on a common basis . . . depends upon the circumstances of each case." 552 F.3d at 325 (emphasis added). Thus, courts should conduct a rigorous inquiry at class certification, see Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013), and determine from all the evidence whether antitrust impact will be provable at trial through evidence common to the class, see In re Hydrogen Peroxide, 552 F.3d at 321.

In most cases following In re Hydrogen Peroxide, including most of the cases Plaintiffs rely upon in their brief, courts consider expert testimony, empirical analysis, or both, when deciding whether Plaintiffs have evidence of common impact. See In re Urethane Antitrust Litig., 768 F.3d 1245, 1256, 1259

- 58 -

(10th Cir. 2014) (relying in part on one expert's "regression models (used to show impact)" and expert testimony "'that nearly all class members had been impacted or overcharged' during the pertinent period."); In re Microcrystalline Cellulose Antitrust Litig., 218 F.R.D. 79, 87–92 (E.D. Pa. 2003) (citing (1) extensive analysis of the economic arguments about the market, (2) analysis "that roughly resembles multiple regression analysis . . . and analysis of the pricing structure of the industry;" and (3) "plaintiffs' expert['s] . . . evidence that all MCC buyers in the pharmaceutical class were injured by Asahi's competition"); In re Bulk (Extruded) Graphite Prod. Antitrust Litig., No. CIV. 02-6030 (WHW), 2006 WL 891362, at *12 (D.N.J. Apr. 4, 2006) (noting that the court considered an expert's conclusion "that the alleged conspiracy would have resulted in all class members paying higher prices for bulk extruded graphite than they would have absent the alleged conspiracy. . . . Dr. Beyer claims his empirical analysis of defendants' pricing practices confirms that the alleged conspiracy would have impacted all parties. Dr. Beyer says he can show class-wide impact and damages through the use of multiple regression and benchmark (also known as yardstick) methodologies"). Plaintiffs lack similar expert testimony and empirical analysis demonstrating impact to all class members.

- 59 -

Even assuming a plaintiff need not come forward with expert testimony or empirical evidence to make use of the <u>Bogosian</u> Presumption, certification of the All Payer Manufacturer Class would still be improper. This court is not aware of any case in which a court certified a class after the plaintiffs' expert stated that she only determined two-thirds of the class suffered any antitrust impact and damages.

Plaintiffs have proffered facts that suggest Defendants' alleged conspiracy impacted the market generally. However, to infer from general market harm that all manufacturers were injured requires a speculative leap this court is not permitted to make. The leap Plaintiffs ask this court to make is even more impermissible given that Plaintiffs' only expert found 32% of the class was uninjured and Plaintiffs have proffered no other expert or empirical testimony showing these manufacturers suffered any antitrust injury.

### b. **All Payer Retailer Class**

#### i. **Number of Uninjured Members**

This court also reached tentative conclusions regarding the All Payer Retailer Class. (<u>See</u> Text Order 06/20/23.) It noted that, based on Defendants' expert's report, there are 385 retailers and Dr. Grace excluded 81 of them from the Limited Payer Retailer Class. (<u>Id.</u> (citing Kheyfets Suppl. Report

(Doc. 261-1) ¶ 18).) Of the excluded retailers, some were excluded because Dr. Grace did not find antitrust impact and damages, and others were excluded because they were never charged shipping fees in the first place. (Id. (citing Kheyfets Suppl. Report (Doc. 261-1) ¶ 18).)

Plaintiffs responded to this court's tentative conclusions and attached an affidavit from Dr. Grace explaining that she originally examined shipping fee chargebacks for 390 retailers. (Grace Decl. (Doc. 303-1) ¶ 4.) She found "67 did not pay any shipping fee chargebacks, and 18 paid shipping fee chargebacks but paid no observable overcharges based on [her] regression analysis." (Id.)[15] Thus, 18 out of 323 retailers, "or 5.57%, did not suffer observable injury or damages." (Id. ¶ 5.)

Unlike the All Payer Manufacturer Class, which includes more than 2,500 uninjured members, the All Payer Retailer Class only includes 18 uninjured class members. Though the uninjured percentage of the class approaches the "outer limits of a de minimis number," In re Rail Freight II, 934 F.3d at 625, the 18 class members have been identified, (see Doc. 303-2), and could be winnowed from the class without individual issues subsuming class-wide ones.

---

[15] As these 67 retailers did not pay chargebacks, they would not be part of the All Payer Retailer Class.

### ii. **Alleged Flaws in Dr. Grace's Regression**

Defendants also argue that Dr. Grace's analysis of the retailer class is "fundamentally flawed" because it finds antitrust impact when applied to shipping fees charged by retailers. (Class Cert. Resp. (Doc. 282) at 11.) However, "Plaintiffs have identified means by which anticompetitive conduct could have tainted the transactions that [Mr.] Kheyfets deemed unaffected by the alleged conspiracy." (Mem. Op and Order (Doc. 246) at 59.) Retailers "presumably would have demanded lower fees in a competitive market where fees throughout the industry were reduced." (See Doc. 221 at 21.)

Having determined that Defendants' objections to the All Payer Retailer Class do not bar certification, this court finds that Plaintiffs have carried their burden to show the class satisfies predominance. Plaintiffs' evidence of the conspiracy is common to all retailers and would predominate in establishing the existence of an antitrust conspiracy. Additionally, Dr. Grace's analysis of the retailer class provides a common method for determining which retailers were impacted by the alleged conspiracy and how much they paid in shipping fee overcharges. (See Grace Suppl. Report (Doc. 195-1) ¶¶ 43-45.)

## 2. **Superiority**

The final Rule 23(b) requirement is for Plaintiffs "to demonstrate that proceeding as a class 'is superior to other available methods for fairly and efficiently adjudicating the controversy.'" EQT Prod. Co., 764 F.3d at 371 (citing Fed. R. Civ. P. 23(b)(3)).

> "[M]atters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

This court is not aware of "any litigation concerning the controversy already begun by or against class members." Id. This court is familiar with this case and no party has alleged that this is an undesirable forum to adjudicate this dispute. Finally, there are no obvious difficulties in managing the class action. The putative All Payer Retailer Class includes 323 "geographically dispersed" retailers. (Class Cert. Br. (Doc. 279) at 20.) Many of the retailers have small claims and would lack incentive to litigate an expensive antitrust action on their own. (See Doc. 279-29.) Therefore, a class action is

- 63 -

superior to other methods of litigating the class members'
claims.

### E. **Appointment of Class Counsel**

Plaintiffs' instant motion also asks this court to appoint
Plaintiffs' counsel as class counsel. (Class Cert. Mot.
(Doc. 276) at 3-4.) Pursuant to Rule 23(g), in appointing class
counsel, the district court must consider:

> (i) the work counsel has done in identifying or
> investigating potential claims in the action;
> (ii) counsel's experience in handling class actions,
> other complex litigation, and the types of claims
> asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to
> representing the class;

Fed. R. Civ. P. 23(g)(1)(A). The court may also "consider any
other matter pertinent to counsel's ability to fairly and
adequately represent the interests of the class." Fed. R. Civ.
P. 23(g)(1)(B).

Over the last fifteen years, Plaintiffs' counsel has
dutifully pursued this litigation. "Plaintiffs [counsel] began
investigating the case in 2008, reviewing documents filed in a
related criminal case, and speaking to witnesses, including
class members and others in the industry." (Kotchen Decl.
(Doc. 279-1) ¶ 3.) Since the stay in this case ended in 2018,
Plaintiffs' counsel has filed three amended complaints, three
motions for class certification, proposed numerous class

- 64 -

definitions, and responded to various issues that have arisen. Plaintiffs' filings demonstrate their counsel's familiarity with antitrust law and class action practice and that they are willing to devote sufficient resources to this litigation.

Defendants raise two objections to appointing Plaintiffs' counsel. First, they claim that because Plaintiffs proposed the Limited Payer Class Definitions, which exclude a considerable number of class members, Plaintiffs' counsel should not be certified. (Class Cert. Resp. (Doc. 282) at 19–20.) Second, they argue Plaintiffs' counsel created "an 'irreconcilable conflict' by seeking to represent one subset of a larger class previously claimed to be injured but now eliminated from the class." (Id. at 22.) This court disagrees.

As to Defendants' first argument, Plaintiffs' have struggled to offer a workable class definition for their putative manufacturer class. While this court finds their proposal to use cutoffs to limit the number of uninjured class members is impermissible, (see supra Section V.A.), that does not make class counsel inadequate. As to Defendants' second point, this court has denied Plaintiffs' motion to certify the Limited Payer Manufacturer Class, thus removing any irreconcilable conflict created by that putative class.

Case 1:19-cv-00141-WO-LPA   Document 304   Filed 08/23/23   Page 65 of 67

Therefore, this court will appoint Plaintiffs' counsel as class counsel.

## VI.   CONCLUSION

This court finds that Plaintiffs have failed to proffer a manufacturer class that complies with the requirements of Rule 23. The Limited Payer Classes are not ascertainable because their scope is not defined by the Defendants' allegedly conspiratorial activities. The All Payer Manufacturer Class fails the predominance requirement because one-third of the class is uninjured. However, the All Payer Retailer Class may be certified because it only contains a de minimis number of uninjured members and satisfies the other requirements of Rule 23.

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Plaintiffs' motion for class certification, (Doc. 276), is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's motion is **GRANTED** as to the All Payer Retail Class and as to Plaintiffs' request to appoint class counsel. Plaintiffs' motion is otherwise **DENIED**.

This court **CERTIFIES** a class of "retailers and retail associations that were CCC customers and directly paid shipping fee chargebacks to CCC during the class period (April 11, 2001 through March 28, 2007)."

- 66 -

This court **APPOINTS** Kotchen & Low LLP and Brooks, Pierce, McLendon, Humphrey & Leonard as class counsel.

This the 23rd day of August, 2023.

_____
United States District Judge